JUDGE JONES

08 CV 3685

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

————————————————————— x

PEDRO E. RIVAS, On Behalf of Himself and
All Others Similarly Situated,

                         Plaintiff,

    vs.

LEHMAN BROTHERS BANK, FSB; BNC
MORTGAGE, INC.,

                  Defendants.

————————————————————— x

Civil Action No. _____

CLASS ACTION

CLASS ACTION COMPLAINT FOR:

1. VIOLATIONS OF THE EQUAL CREDIT
   OPPORTUNITY ACT; and
2. VIOLATIONS OF THE FAIR
   HOUSING ACT.

DEMAND FOR JURY TRIAL

Plaintiff Pedro E. Rivas ("Plaintiff"), by and through his attorneys, brings this action on behalf of all others similarly situated, against Defendants Lehman Brothers Bank, FSB and BNC Mortgage, Inc. ("Defendants") seeking redress for racially discriminatory lending practices under the Equal Credit Opportunity Act, 15 U.S.C. §1691, *et seq.* ("ECOA") and the Fair Housing Act, 42 U.S.C. §3601 *et seq.* ("FHA").

## INTRODUCTION

1.     This class action challenges Defendants' racially discriminatory mortgage lending practices. As described below, Defendants schemed to establish a specific, identifiable and uniform credit pricing system, a component of which, referred to herein as the "Discretionary Pricing Policy," authorized an unchecked, subjective surcharge of additional points and fees to an otherwise objective risk-based financing rate. Further, Defendants schemed to engage in the discriminatory practices described herein with respect to loans issued under their own names, as well as those loans issued under the names or brands of their divisions or subsidiaries, including Aurora Loan Services, Inc.

2.     The subjective, additional finance charges authorized by Defendants' uniform Discretionary Pricing Policy directly lead to minorities receiving home loans with higher interest rates and higher fees and costs than similarly situated non-minority borrowers.

3.     As used in this Complaint, "minority" or "minorities" shall refer to all non-Caucasians and other minority racial groups protected under 42 U.S.C. §3604 and 15 U.S.C. §1691.

4.     Plaintiff brings this action on behalf of a Class of all minorities who have entered into residential mortgage loan contracts that were originated, financed or purchased by Defendants and their divisions or subsidiaries, and who were harmed by Defendants' discriminatory conduct as described herein (the "Class").

5.     Plaintiff seeks injunctive, declaratory, disgorgement, restitution and equitable relief, punitive damages, and other monetary and non-monetary remedies for Defendants' racially discriminatory conduct.

## JURISDICTION AND VENUE

6.     This Court has jurisdiction pursuant to 28 U.S.C. §1331, which gives this Court original jurisdiction over civil actions arising under federal law.

7.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(b) because Defendant Lehman Brothers Bank maintains its principal executive offices in this District, and practices complained of herein were formulated and structured in this District.

## PARTIES

8.     Plaintiff Pedro E. Rivas ("Plaintiff" or "Rivas") is a Latino homeowner residing in Pacoima, California.

9.     Defendant Lehman Brothers Bank, F.S.B., is a thrift mortgage banker insured by the FDIC and regulated by the United States Department of the Treasury's Office of Thrift Supervision. Defendant Lehman Brothers Bank has its principal executive offices located at 745 7th Avenue, 24th Floor, New York, NY 10019. Defendant Lehman Brothers Bank was reported to have held approximately $17.7 billion in assets as of September 30, 2007. Defendant Lehman Brothers Bank is a wholly-owned subsidiary of Lehman Brothers Holdings Inc., a Delaware corporation traded publicly on the New York Stock Exchange under the symbol LEH. Defendant Lehman Brothers Bank's immediate parent company is Lehman Brothers Bancorp, Inc.

10.    Defendant BNC Mortgage, Inc., is a mortgage lender with principal executive offices located at 1063 McGaw Avenue, Irvine, California 92614. Defendant BNC Mortgage's immediate parent company is Defendant Lehman Brothers Bank, F.S.B. Defendant Lehman Brothers Bank is also the immediate parent to Aurora Loan Services, Inc.

- 2 -

## FACTS

### HISTORICAL DISCRIMINATION IN AMERICAN MORTGAGE LENDING: A LONG LEGACY

11.    Racial discrimination in America's mortgage lending industry has a long legacy. As this Complaint attests, that unfortunate history continues to this day due to discriminatory treatment of minority borrowers by mortgage banks such as Defendants.

12.    According to the Joint Center for Housing Studies at Harvard University's 2005 study called "The Dual Mortgage Market: The Persistence of Discrimination in Mortgage Lending," "[i]n the immediate post-World War II period, racial discrimination in mortgage lending was easy to spot. From government-sponsored racial covenants in the Federal Housing Administration (FHA) guidelines to the redlining practices of private mortgage lenders and financial institutions, minorities were denied access to home mortgages in ways that severely limited their ability to purchase a home. Today, mortgage lending discrimination is more subtle. . . . [M]ore than three decades after the enactment of national fair lending legislation, minority consumers continue to have less-than-equal access to loans at the best prices and on the best terms that their credit history, income, and other individual financial considerations merit."

13.    The passage of civil rights legislation and fair lending laws in the 1960s and 1970s brought an end to the most virulent forms of overt racial discrimination in the housing markets, but throughout the 1980s and 1990s, mortgage lenders found more subtle ways to discriminate, including maintaining offices only in Caucasian neighborhoods and engaging in practices such as redlining (refusing to lend on properties in predominantly minority neighborhoods).

14.    After redlining practices were challenged in the 1990s, mortgage lenders changed tactics once again. Lenders began making loans to minorities, but charged them higher interest rates and loan-related fees than they charged to similarly-situated Caucasian borrowers. Loan data that

- 3 -

mortgage lenders must now compile under the federal Home Mortgage Disclosure Act ("HMDA") reveals profound loan pricing disparities between minority borrowers and similarly-situated Caucasian borrowers.

15.    The HMDA requires mortgage lenders to report information about the home loans they process each year. In 2005, lenders reported information on more than 30 million home loan applications pursuant to HMDA. In 1989, Congress required lenders to begin disclosing information about mortgage borrowers' race and ethnicity.   In 2004, concerned with potential racial discrimination in loan pricing, and recognizing that racial or other types of discrimination can occur when loan officers and mortgage brokers have latitude in setting interest rates, the Federal Reserve Board began requiring lenders to also report information concerning rates, points, and fees charged to borrowers on high-cost loans.

16.    According to the Federal Reserve, both 2004 and 2005 HMDA data revealed that "Blacks and Hispanics were more likely . . . to have received higher-priced loans than non-Hispanic whites. . . . [which has] increased concern about the fairness of the lending process." Robert B. Avery, Kenneth P. Brevoort and Glenn B. Canner, "Higher-Priced Home Lending and the 2005 HMDA Data," Federal Reserve Bulletin, A124, A159 (revised Sept. 18, 2006) (http://www.federalreserve.gov/pubs/bulletin/2006/hmda/bull06hmda.pdf (last viewed March 7, 2008)).

17.    HMDA data for 2004 reveals profound loan pricing disparities between Hispanic borrowers and non-Hispanic whites even after controlling for borrowers' gender, income, property location, and loan amount. After accounting for those differences in the 2004 HMDA data, Hispanic borrowers were still almost twice as likely to receive a higher-rate home loan as non-Hispanic whites (http://www.responsiblelending.org/pdfs/Testimony-Ernst061306.pdf (last viewed March 7, 2008)).

- 4 -

In a speech last year, the Vice-Chairman of the Federal Deposit Insurance Corporation, Martin Gruenberg, discussed the 2004 HMDA data and observed that that data "clearly indicated" that Hispanics are more likely to receive high-cost home loans than are non-Hispanic whites (http://www.fdic.gov/news/news/speeches/archives/2006/chairman/spoct1806.html (last viewed March 7, 2008)).

18.    Likewise, HMDA data for 2005 shows that "for conventional home-purchase loans, the gross mean incidence of higher-priced lending was 54.7 percent for blacks and 17.2 percent for non-Hispanic whites, a difference of 37.5 percentage points." Avery, Brevoort, and Canner, Federal Reserve Bulletin, at A159. The situation is similar for refinancings, where there is a difference of 28.3 percentage points between blacks and non-Hispanic whites. *Id.* at A124, A159.

19.    A growing number of research studies and investigations show that significant racial disparities still exist. Association of Community Organizations for Reform Now (ACORN), "The High Cost of Credit: Disparities in High-priced Refinanced Loans to Minority Homeowners in 125 American Cities" (September 27, 2005) ("[i]n every metropolitan area where at least 50 refinances were made to African-American homeowners, African-Americans were more likely to receive a high-cost loan than White homeowners") (http://acorn.org/uploads/media/High_Cost_of_ Credit_Report_02.doc (last viewed on March 7, 2008)); Ross, "The Continuing Practice and Impact of Discrimination" (Revised July 2006) (Univ. of Connecticut, Working Paper 2005-19R) (http://www.econ.uconn.edu/working/2005-19r.pdf) (last viewed March 7, 2008); California Reinvestment Coalition, *et al.*, "Paying More for the American Dream: A Multi-State Analysis of Higher Cost Home Purchase Lending" (March 2007) (http://www.nedap.org/pressroom/documents/ 2007_Report-2005_HMDA.pdf (last viewed March 7, 2008)).

20.    The aggregate HMDA data discussed above is representative of Defendants.

21.    Based on HMDA data, minorities who borrowed from Defendants between 2004 and 2006 were nearly 50% more likely than Caucasian borrowers to have received a high-APR loan to purchase or refinance their home.

22.    Importantly, consistent with the consensus that the HMDA data reveals profound loan pricing disparities between minorities and Caucasians even after controlling for income and other objective factors, research studies have also generally suggested that borrowers' credit profiles cannot fully explain why some borrowers, and not others, are saddled with higher cost loans.

23.    As an example, research by Howell Jackson of Harvard Law School, detailed in the article *Kickbacks or Compensation*: *The Case of Yield Spread Premiums* (Harvard Univ.), H. Jackson and J. Berry, available at (http://www.law.harvard.edu/faculty/hjackson/pdfs/january_draft.pdf) (last viewed March 7, 2008), concluded that the substantially higher mortgage broker compensation received as the result of yield spread premiums could not fully be explained when controlling for variables associated with creditworthiness.

24.    In short, a number of researchers have raised "doubts that risk can adequately explain racial differences" in high-cost loans. Bradford, Center for Community Change, "Risk or Race? Racial Disparities and the Subprime Refinance Market" (May 2002) (http://www.knowledgeplex.org/kp/report/report/relfiles/ccc_0729_risk.pdf) (last viewed March 7, 2008). In other words, evidence "suggests that weak borrower credit profiles do not fully explain why some borrowers get stuck with higher-cost home loans." California Reinvestment Coalition, *et al.*, "Paying More for the American Dream: A Multi-State Analysis of Higher Cost Home Purchase Lending" (March 2007).

**PAST AS PROLOGUE:**
**DEFENDANTS' DISCRIMINATORY LENDING POLICY**

**DEFENDANTS' RELATIONSHIPS WITH THEIR**
**MORTGAGE BROKERS AND CORRESPONDENT LENDERS**

25.    Defendants, by and through their own lending activities and that of their divisions and subsidiaries, including Aurora Loan Services, Inc., rank among America's leading mortgage lenders. Defendants originate, fund and purchase mortgage loans through loan officers, authorized mortgage brokers, and a network of correspondent lenders.

26.    On information and belief, Defendants' loan officers, mortgage brokers and correspondent lenders broker and fund loans in collaboration with Defendants, and in conformance with Defendants' uniform Discretionary Pricing Policy.

27.    Defendants have established, implemented and continue to implement their uniform Discretionary Pricing Policy, causing minority borrowers to pay subjective fees such as yield spread premiums and other mortgage-related finance charges at higher rates than similarly situated non-minority borrowers. By their Discretionary Pricing Policy, Defendants schemed to intentionally discriminate against Plaintiff and Class Members, systematically channeling Plaintiff and other Class members into mortgage loans with less favorable conditions than those given to similarly situated non-minority borrowers. This pattern of discrimination is not the result of random or non-discriminatory factors. Rather, it is the direct and intended result of Defendants' business model and loan-funding practices.

28.    Defendants' loan officers, authorized mortgage brokers and correspondent lenders receive part or all of their compensation from Defendants based on the interest rate charged to the borrower. Defendants' loan officers, authorized brokers and correspondent lenders receive more compensation from Defendants when they steer their clients into Defendants' loans with higher interest rates, and less compensation when they place their clients into Defendants' loans with lower

interest rates. These same incentives apply when Defendants' loan officers, authorized mortgage brokers and correspondent lenders place borrowers into loans which include prepayment penalties and other onerous conditions.

29.     Defendants intentionally and actively implement their Discretionary Pricing Policy in a variety of ways, including actively educating loan officers and brokers about Defendants' credit policies and procedures and directing their loan officers and brokers regarding the marketing of Defendants' loan products.

30.     Defendants evaluate their loan officers, authorized brokers and correspondents to ensure that they comply with Defendants' Discretionary Pricing Policy. Because the uniform Discretionary Pricing Policy is designed to discriminate, Defendants have not taken precautions to ensure that application of the Policy will avoid discrimination against minorities.

31.     Defendants' Discretionary Pricing Policy permits their loan officers, authorized mortgage brokers and correspondent lenders subjectively to charge minority loan applicants yield spread premiums and other discretionary charges, and indeed provides financial incentives for them to do so.

32.     This pattern and design of discrimination cannot be justified by business necessity, and could be avoided through the use of alternative policies and procedures that have less discriminatory impact and no less business efficacy.

### DEFENDANTS' DISCRETIONARY CREDIT PRICING SYSTEM: DESIGNED TO DISCRIMINATE

33.     Defendants discriminate through their authorized mortgage brokers. Authorized mortgage brokers act as Defendants' agents in originating mortgage loans. Authorized mortgage brokers enter into agreements with Defendants to accept loan applications on behalf of Defendants; communicate to loan applicants financing terms and rates set by Defendants; tell loan applicants

about Defendants' various financing options; and ultimately originate mortgage loans funded by Defendants using Defendants' forms and in accordance with Defendants' policies and procedures.

34.    Likewise, Defendants' authorized correspondent lenders and loan officers, acting as Defendants' agents, work with Defendants to make loans in accordance with Defendants' credit policies and procedures. Defendants fund or purchase correspondent-generated loans before or shortly after they go to closing.

35.    Defendants then fund loans originated by their loan officers, authorized mortgage brokers and correspondent lenders, set the terms and conditions of credit on those loans, and shoulder part or all of the risk on such loans. Defendants actively and intentionally enforce their credit policies through their loan officers, authorized mortgage brokers and correspondent lenders in a variety of ways. Among other things, Defendants supply their loan officers, mortgage brokers and correspondent lenders with an array of loan-related forms and agreements, including loan contracts, loan applications, and instructions on completing loan applications and contracts. And, as noted above, Defendants actively train their authorized brokers to follow their policies and procedures, and reinforces that training with marketing support.

36.    Once a loan applicant has provided credit information through a loan officer, mortgage broker or correspondent lender, Defendants perform an initial objective credit analysis. Defendants, at this point, evaluate numerous risk-related credit variables, including debt-to-income ratios, loan-to-value ratios, credit bureau histories, debt ratios, bankruptcies, automobile repossessions, prior foreclosures, payment histories, credit scores and the like.

37.    Defendants derive a risk-based financing rate from these objective factors, which Defendants and others in the mortgage industry simply call the "par rate." (Defendants' brokers and

correspondent lenders can also estimate the par rates by referring to an applicant's credit bureau-determined credit score.)

38.     Although Defendants' initial analysis applies objective criteria to calculate this risk-related interest rate, Defendants' Discretionary Pricing Policy authorizes and provides incentives to their loan officers, mortgage brokers and correspondent lenders to mark up that rate later and also impose additional non-risk-based charges, including yield spread premiums and other discretionary fees. Defendants regularly communicate applicable par rates, authorized yield spread premiums, and other discretionary fees to their loan officers, mortgage brokers and correspondent lenders via "rate sheets" and other communications.

39.     Defendants give their loan officers, authorized mortgage brokers and correspondent lenders discretion to impose yield spread premiums and other subjective fees on borrowers. When borrowers pay yield spread premiums, Defendants share in additional income generated by the premium because the yield spread premium-affected borrower is locked into a higher interest rate going forward on their loan than they would be if they had been placed in a par rate loan without a yield spread premium.

40.     Defendants' borrowers pay yield spread premiums and other discretionary fees that inflate their finance charges not knowing that a portion of their finance charges are non-risk-related. Moreover, Defendants' policies make it more difficult for a borrower to get out of such an unfavorable loan, by including substantial prepayment penalties.

41.     Defendants' Discretionary Pricing Policy causes persons with identical or similar credit scores to pay differing amounts for obtaining credit. Such subjective loan pricing – which by design imposes differing finance charges on persons with the same or similar credit profiles – disparately impacts Defendants' minority borrowers.

- 10 -

42.    While Defendants' use of their Discretionary Pricing Policy for all loan applicants might appear to be racially neutral, Defendants' use of yield spread premiums and other discretionary fees disproportionately and adversely affect minorities (relative to similarly situated non-minorities). Defendants' Discretionary Pricing Policy causes minorities to pay disparately more finance charges than similarly situated non-minorities, and Defendants takes no precautions to avoid this result. As the HMDA data cited herein indicates, minorities, after controlling for credit risk, are substantially more likely than similarly situated non-minorities to pay such charges.

43.    Defendants' Discretionary Pricing Policy is in fact intentionally discriminatory. In an attempt to insulate itself from the discriminatory decision-making, Defendants intentionally designed their subjective Discretionary Pricing Policy to allow and encourage their lending agents to obtain greater profits from minority borrowers. As described above, Defendants' Discretionary Pricing Policy by design discriminates against minority borrowers and directly causes this disparate impact.

### DEFENDANTS IMPOSED DISCRIMINATORY FEES ON PLAINTIFF

44.    Defendants' discriminatory Discretionary Pricing Policy directly damaged Plaintiff and the Class.

45.    On or about June 21, 2007, Plaintiff Pedro E. Rivas entered into a mortgage transaction with Defendant Lehman Brothers Bank to finance the purchase of his primary residence in Pacoima, California. By this transaction, Plaintiff Rivas received loans with a principal balance of $348,000.00 and $87,000.00. The financing was arranged through Bernard E. Cohen Investments Inc. ("Cohen"), located in Tarzana, California, which on information and belief is one of Defendant Lehman Brothers Bank's authorized mortgage brokers and/or correspondent lenders.

46.    In connection with the loan, Defendant Lehman Brothers Bank paid a yield spread premium to Cohen in the amount of $435.00, paid outside of closing ("POC") which was based in whole or in part on a mark-up of Plaintiff's loan rate. Plaintiff Rivas also paid to Cohen loan

origination fees in amounts of $5,220.00 and $1305.00, a "broker processing fee" in the amount of $750.00, and a "loan fee" of $500.00. On information and belief, all of these fees were assessed pursuant to Defendants' Discretionary Pricing Policy. These fees were higher than fees charged by Lehman Brothers Bank to non-minority borrowers with objective credit risk factors similar to Plaintiff Rivas.

47.    Moreover, Plaintiff Rivas' loan with Defendant Lehman Brothers Bank included rates and terms, including significant prepayment penalties, which were significantly less favorable than rates and terms imposed on non-minority borrowers with objective credit risk factors similar to Plaintiff Rivas.

48.    Cohen and Defendant Lehman Brothers Bank knew that Plaintiff Rivas was a minority borrower.

49.    As a result of Defendant Lehman Brothers Bank's discriminatory conduct, Plaintiff Rivas received a loan on worse terms, with higher costs, than similarly situated non-minority borrowers.

## CLASS ACTION ALLEGATIONS

50.    Plaintiff repeats and re-alleges each allegation above as if set forth herein in full.

51.    This class action is brought pursuant to the ECOA and the FHA by Plaintiff on behalf of himself and all minority borrowers who entered into residential mortgage loan contracts that were originated, financed or purchased by Defendants and their divisions or subsidiaries, and who were harmed by Defendants' discriminatory conduct.

52.    Plaintiff sues on his own behalf, and on behalf of a class of persons under Rule 23(a) and (b)(2) and/or (b)(3) of the Federal Rules of Civil Procedure.

53.    Plaintiff does not know the exact size of the Class or the identities of the members of the Class, since that information is in the exclusive control of Defendants. Plaintiff believes that the

Class includes many thousands, or tens of thousands of individuals, who are geographically dispersed throughout the United States. Therefore, the Class is so numerous that joinder of all members is impracticable.

54.     All members of the Class have been subject to and affected by Defendants' practices of assessing yield spread premiums and other discretionary fees on mortgage loans. There are questions of law and fact that are common to the Class, and that predominate over any questions affecting only individual members of the Class. These questions include, but are not limited to the following:

(a)     the nature and scope of Defendants' policies and procedures concerning the assessment of yield spread premiums and other discretionary fees on mortgage loans it funds;

(b)     whether Defendants are creditors under the ECOA because, in the ordinary course of business, they participate in the decision of whether or not to extend credit to consumers;

(c)     whether Defendants' policies and procedures regarding yield spread premiums and other discretionary fees are a facially neutral credit pricing system that has effected racial discrimination in violation of the ECOA;

(d)     whether there are statistically significant disparities between the amount of the discretionary charges imposed on minorities and the amount of the discretionary charges imposed on Caucasians that are unrelated to creditworthiness;

(e)     whether Defendants have had any legitimate business justification for their policies and procedures;

(f)     whether there is a less discriminatory alternative to these policies and procedures;

(g)     whether the Court can enter declaratory and injunctive relief; and

- 13 -

(h)    the proper measure of disgorgement or monetary relief.

55.    Plaintiff's claims are typical of the claims of the Class, and do not conflict with the interests of any other members of the Class, in that Plaintiff and the other members of the Class were subjected to the same yield spread premiums and other discretionary fees that have disproportionately affected minority borrowers.

56.    Plaintiff will fairly and adequately represent the interests of the Class. Plaintiff is committed to vigorous prosecution of the Class' claims, and has retained attorneys who have extensive experience in consumer protection and credit discrimination actions and in class actions.

57.    A class action is superior to other methods for the speedy and efficient adjudication of this controversy. A class action regarding the issues in this case does not create any problems of manageability.

58.    In the alternative, Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

**COUNT I**

**VIOLATION OF THE EQUAL CREDIT OPPORTUNITY ACT
(15 U.S.C. §§1691 – 1691f)**

59.    Plaintiff repeats, realleges and incorporates the allegations contained in paragraphs 1 through 58 above as if fully set forth herein.

60.    Defendants engage in credit transactions through their offering, granting, and purchasing of residential mortgage loans.

61.    By imposing higher interest rates and other discretionary fees and terms on residential mortgage loans to Plaintiff and the Class than they imposes on non-minority mortgage borrowers, Defendants have discriminated and continue to discriminate against Plaintiff and members of the

Class with respect to a credit transaction on the basis of race in violation of the ECOA. 15 U.S.C. §1691(a).

62.    In addition, Defendants' pricing policies and procedures (including yield spread premiums), which provide financial incentives to their loan officers, mortgage brokers and correspondent lenders to make subjective decisions to increase interest rates and charge additional fees and costs, have a disparate impact on Plaintiff and the Class.

63.    As a proximate result of Defendants' violations of 15 U.S.C. §1691, Plaintiff and members of the Class have been injured and are entitled to injunctive and declaratory relief and damages, or make whole equitable relief.

64.    In addition, Defendants' conduct as alleged herein was intentional, willful, wanton, reckless, malicious, outrageous, or otherwise aggravated beyond mere negligence. Defendants acted with malice and reckless indifference to the federally protected rights of Plaintiff and the Class. As a result, Plaintiff and the Class are entitled to punitive damages.

65.    Moreover, Defendants continue to discriminate in violation of the ECOA against Class Members every time Defendants provide a home mortgage loan as described herein. If not enjoined from such violation by the Court, Defendants will continue to engage in conduct that disregards the rights of Plaintiff and members of the Class, and cause Plaintiff and the Class irreparable injury for which there is no adequate remedy at law. 15 U.S.C. §1691(e).

66.    Plaintiff and the Class ask this Court to declare the rights of the parties herein regarding Defendants' obligations to enter into credit transactions without discriminating against applicants for credit on the basis of the applicants' race.

## COUNT II

### VIOLATION OF THE FAIR HOUSING ACT
### (42 U.S.C. §§3601 – 3619)

67.    Plaintiff repeats, re-alleges and incorporates the allegations in paragraphs 1 through 66 above as if fully set forth herein.

68.    Mortgage lending and the providing of residential mortgage loans is a "residential real estate-related transaction" within the meaning of the FHA. 42 U.S.C. §3605(b).

69.    By imposing higher interest rates and other discretionary fees and terms on residential mortgage loans to Plaintiff and the Class than it imposed on non-minority mortgage borrowers, Defendants have discriminated against Plaintiff and the Class concerning their ability to participate in real estate-related transactions, and in the terms and conditions of such transactions, in violation of the FHA. 42 U.S.C. §3605(a).

70.    In addition, Defendants' pricing policies and procedures (including yield spread premiums), which provide financial incentives to their loan officers, mortgage brokers and correspondent lenders to make subjective decisions to increase interest rates and charge additional fees and costs, had a disparate impact upon Plaintiff and the Class.

71.    As a proximate result of Defendants' violations of 42 U.S.C. §3605, Plaintiff and the Class have been injured and are entitled to injunctive and declaratory relief and damages, or make whole equitable relief.

72.    In addition, Defendants' conduct as alleged herein was intentional, willful, wanton, reckless, malicious, outrageous, or otherwise aggravated beyond mere negligence. Defendants acted with malice and reckless indifference to the federally protected rights of Plaintiff and the Class. As a result, Plaintiff and the Class are entitled to punitive damages.

73.     Moreover, Defendants continue to discriminate in violation of the FHA against members of the Class every time Defendants provide a home mortgage loan as described herein. If not enjoined from such violation by the Court, Defendants will continue to engage in conduct that disregards the rights of Plaintiff and the Class, and cause Plaintiff and the Class irreparable injury for which there is no adequate remedy at law. 42 U.S.C. §3613(c).

74.     Plaintiff and the Class ask this Court to declare the rights of the parties herein regarding Defendants' obligation to participate in credit transactions without discriminating against applicants for credit on the basis of the applicants' race.

## REQUESTS FOR RELIEF

WHEREFORE, Plaintiff requests the following relief:

A.     An order determining that the action is a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.     A Judgment awarding Plaintiff and the Class costs and disbursements incurred in connection with this action, including reasonable attorneys' fees, expert witness fees and other costs;

C.     A Judgment granting extraordinary equitable and/or injunctive relief as permitted by law or equity, including rescission, restitution, reformation, attaching, impounding, or imposing a constructive trust upon, or otherwise restricting, the proceeds of Defendants' ill-gotten funds to ensure that Plaintiff and the Class have an effective remedy;

D.     A Judgment awarding Plaintiff and the Class compensatory damages according to proof;

E.     A Judgment awarding punitive damages to Plaintiff and the Class;

F.     A Judgment granting declaratory and injunctive relief and all relief that flows from such injunctive and declaratory relief; and

- 17 -

G.     A Judgment or other Order granting such other and further relief as the Court deems

just and proper.

DATED: April 17, 2008

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
SAMUEL H. RUDMAN
ROBERT M. ROTHMAN

ROBERT M. ROTHMAN

58 South Service Road, Suite 200
Melville, NY  11747
Telephone: 631/367-7100
631/367-1173 (fax)

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
JOHN J. STOIA, JR.
THEODORE J. PINTAR
LESLIE E. HURST
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone: 619/231-1058
619/231-7423 (fax)

BONNETT, FAIRBOURN, FRIEDMAN, &
BALINT, P.C.
ANDREW S. FRIEDMAN
WENDY J. HARRISON
T. BRENT JORDAN
2901 North Central Avenue, Suite 1000
Phoenix, AZ  85012
Telephone: 602/274-1100
602/274-1199 (fax)

CHAVEZ & GERTLER, L.L.P
MARK A. CHAVEZ
JONATHAN GERTLER
NANCE F. BECKER
42 Miller Avenue
Mill Valley, CA  94941
Telephone:  415/381-5599
415/381-5572 (fax)

*Attorneys for Plaintiff*

- 18 -