Jami Wintz McKeon (JM-6144)
Michael S. Kraut (MK-4469)
**MORGAN, LEWIS & BOCKIUS LLP**
101 Park Avenue
New York, New York 10178-0060
Telephone: (212) 309-6000
jmckeon@morganlewis.com
mkraut@morganlewis.com

*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

|  |  |
|---|---|
| **PEDRO E. RIVAS, on Behalf of Himself and All Others Similarly Situated,** : | **No. 08 CV 3685 (BSJ) (MDF)** |
| : | |
| **Plaintiff,** : | **MEMORANDUM OF LAW** |
| : | **IN SUPPORT OF DEFENDANTS'** |
| v. : | **MOTION TO DISMISS** |
| : | **PLAINTIFF'S COMPLAINT** |
| **LEHMAN BROTHERS BANK, FSB;** : | |
| **BNC MORTGAGE, INC.,** : | **ELECTRONICALLY FILED** |
| : | |
| **Defendants.** : | |

---

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................................................1

BACKGROUND ..................................................................................................................4

LEGAL STANDARD ..........................................................................................................6

ARGUMENT.......................................................................................................................8

I.    PLAINTIFF'S CLAIMS AGAINST BNC SHOULD BE DISMISSED
      BECAUSE PLAINTIFF FAILS TO ALLEGE ANY INJURY THAT IS
      "FAIRLY TRACEABLE" TO CONDUCT BY BNC .......................................................8

II.   PLAINTIFF FAILS TO STATE A CLAIM AGAINST LEHMAN UNDER THE
      ECOA OR FHA FOR DISPARATE TREATMENT OR DISPARATE IMPACT .........10

      A.    Plaintiff's Conclusory Allegations of Discriminatory Intent Fail to State a
            "Plausible" Claim for Disparate Treatment under the FHA and ECOA ..............10

      B.    Plaintiff Fails To Assert A Cognizable Disparate Impact Claim ........................12

            1.    Neither the ECOA nor the FHA Permits Disparate Impact Claims .........12

            2.    Plaintiff Fails to Allege Any Facts that Support His Speculation
                  that Lehman's Mortgage Lending Policies Had an Adverse
                  Disparate Impact Against Minorities....................................................15

            3.    Plaintiff Fails to Identify A Specific "Facially-Neutral" Policy Or
                  Practice That Was Applied In a Facially-Neutral Manner .......................20

CONCLUSION .................................................................................................................22

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Acree v. Republic of Iraq,*
370 F.3d 41 (D.C. Cir. 2004)..................................................................................15

*Alliance for Envtl. Renewal, Inc. v. Pyramid Crossgates Co.,*
436 F.3d 82 (2d Cir. 2006) ....................................................................................8

*Amron v. Morgan Stanley Inv. Advisors, Inc.,*
464 F.3d 338 (2d Cir. 2006) ............................................................7, 16, 17, 19

*Avnet, Inc. v. Am. Motorists Ins. Co.,*
115 F.R.D. 588 (S.D.N.Y. 1987)............................................................................20

*Bell Atl. Corp. v. Twombly,*
127 S. Ct. 1955 (2007)..................................................................................*passim*

*Bjustrom v. Trust One Mortgage Corp.,*
322 F.3d 1201 (9th Cir. 2003) ............................................................................6

*Boykin v. Keycorp,*
521 F.3d 202 (2d Cir. 2008) ..............................................................................11

*Brown v. Coach Stores, Inc.,*
163 F.3d 706 (2d Cir. 1998) ..............................................................................18

*Diagnostic Cardioline Monitoring v. Leavitt,*
171 Fed. Appx. 374 (2d Cir. 2006)..........................................................................7

*Duncan v. AT&T Communications, Inc.,*
668 F. Supp. 232 (S.D.N.Y. 1987) ........................................................................7

*Dura Pharmaceuticals, Inc. v. Broudo,*
544 U.S. 336 (2005) ..............................................................................................19

*Electronics Comm. Corp. v. Toshiba Am. Consumer Prod., Inc.,*
129 F.3d 240 (2d Cir. 1997) ..................................................................................7

*Garcia v. Country Wide Fin. Corp.,*
No. 07-1161 (C.D. Cal. Jan. 17, 2008)..................................................................11

*Gebhardt v. Allspect, Inc.,*
96 F. Supp. 2d 331 (S.D.N.Y. 2000) ......................................................................7

*Griggs v. Duke Power,*
401 U.S. 424 (1971) ..............................................................................................20

*Hack v. Yale Coll.*,
 237 F.3d 81 (2d Cir. 2000) ...................................................................................................10

*Hirsch v. BankAmerica Corp.*,
 328 F.3d 1306 (11th Cir. 2003) .............................................................................................6

*Jones v. Capital Cities/ABC Inc.*,
 168 F.R.D. 477 (S.D.N.Y. 1996)..........................................................................................19

*Lerner v. Fleet Bank, N.A.*,
 318 F.3d 113 (2d Cir. 2003) ...................................................................................................7

*Lewis v. Casey*,
 518 U.S. 343 (1996) ................................................................................................................9

*Lujan v. Defenders of Wildlife*,
 504 U.S. 555 (1992) ................................................................................................................8

*Payares v. JP Morgan Chase & Co.*,
 No. 07-5540 (C.D. Cal. May 15, 2008) ................................................................................12

*Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown*,
 294 F.3d 35 (2d Cir. 2002) .............................................................................................15, 21

*Simon v. Eastern Ky. Welfare Rights Org.*,
 426 U.S. 26 (1976) ..................................................................................................................9

*Smith v. City of Jackson*,
 544 U.S. 228 (2005) ........................................................................................4, 12, 13, 20

*Thompson v. County of Franklin*,
 15 F.3d 245 (2d Cir. 1994) .....................................................................................................8

*Tribett v. BNC Mortgage Inc.*,
 No. 07-cv-2809 (N.D. Ill. Jan. 17, 2008)......................................................................12, 15

*Tsombanidis v. West Haven Fire Dept.*,
 352 F.3d 565 (2d Cir. 2003) ............................................................................................20, 21

*Wards Cove Packing Co., Inc. v. Atonio*,
 490 U.S. 642 (1989) ........................................................................................................18, 19

*Watson v. Fort Worth Bank & Trust*,
 487 U.S. 997 (1988) ..............................................................................................................13

*Wolff v. Rare Medium, Inc.*,
 171 F. Supp. 2d 354 (S.D.N.Y. 2001) ....................................................................................7

*World Religious Relief, Inc. v. Sirius Satellite Radio, Inc.*,
   No. 05-civ-8257, 2007 U.S. Dist. LEXIS 57609 (S.D.N.Y. Aug. 3, 2007) ............................ 10

*Yusuf v. Vassar Coll.*,
   35 F.3d 709 (2d Cir. 1994) ................................................................................................... 10

*Zappier v. Sun Life Assurance Co. of Can.*,
   No. 05-civ-5300, 2006 WL 2621110 (S.D.N.Y. Aug. 10, 2006) ........................................... 16

*Zeising v. Kelly*,
   152 F. Supp. 2d 335 (S.D.N.Y. 2001) ..................................................................................... 7

## FEDERAL STATUTES

Equal Credit Opportunity Act, 15 U.S.C. § 1691 *et seq* ...........................................................*passim*

Fair Housing Act, 42 U.S.C. § 3601 *et seq* .............................................................................*passim*

Fed. R. Civ. P. 12(b)(6) .............................................................................................. 6, 7, 8, 10

Fed. R. Civ. P. 12(b)(1) .................................................................................................. 1, 7, 8

Home Mortgage Disclosure Act of 1975, 12 U.S.C. § 2801 ............................................................ 2

## MISCELLANEOUS

Peter N. Cubita & Michelle Hartmann, The ECOA Discrimination Proscription and
   Disparate Impact—Interpreting the Meaning of the Words That Actually Are There,
   61 BUS. LAWYER 829, 834 (2006) 61 BUS. LAWYER 829 (2006) .................................... 15

*Moore's Federal Practice* § 12.34[1][b] at 12-61 (3d ed. 1999) .................................................... 7

"New Information Reported under HMDA and Its Application in Fair Lending
   Enforcement," Federal Reserve Bulletin, Summer 2005, 344 ......................................... 16, 17

"Higher-Priced Home Lending and the 2005 HMDA Data," Federal Reserve Bulletin,
   A123 .................................................................................................................................... 11

Real Estate Settlement Procedures Act Statement of Policy 1999-1 Regarding Lender
   Payments to Mortgage Brokers, 64 Fed. Reg. 10080, 10085 (March 1, 1999)........................ 6

Real Estate Settlement Procedures Act Statement of Policy 2000-1: Clarification of
   Statement of Policy 1999-1 Regarding Lender Payments to Mortgage Brokers, 66
   Fed. Reg. 53052-53059 (Oct. 18, 2001) .............................................................................. 5, 6

Defendants Lehman Brothers Bank, FSB ("Lehman") and BNC Mortgage LLC ("BNC") (collectively, "Defendants") respectfully submit this memorandum of law in support of their motion to dismiss the complaint filed by Plaintiff Pedro E. Rivas ("Plaintiff") in the above-captioned matter (the "Complaint") with prejudice pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

## INTRODUCTION

Plaintiff alleges violations of the Equal Credit Opportunity Act, 15 U.S.C. § 1691 *et seq.* ("ECOA") and the Fair Housing Act, 42 U.S.C. § 3601 *et seq.* ("FHA") in connection with a loan he obtained from Lehman through a third-party mortgage broker. Plaintiff complains that the terms of his mortgage were discriminatory, and seeks to hold Lehman liable, despite his concession that the unaffiliated mortgage brokers—not Lehman—have complete discretion to determine whether to build the allegedly discriminatory fees and pricing terms into a mortgage. Plaintiff's sole basis for claiming that Lehman discriminated against him is that in certain years (but not the year in which Plaintiff obtained his loan), discrimination occurred in the mortgage industry generally.

For the reasons explained below, the factual allegations in the Complaint do not "raise a right to relief above the speculative level," which the U.S. Supreme Court has held is fatal to an action. *Bell Atl. Corp. v. Twombly*, __U.S.__, 127 S. Ct. 1955, 1965 (2007). The Complaint rests on conclusory allegations that Lehman "schemed to intentionally discriminate" through a so-called discretionary pricing policy that "caused minority borrowers to pay subjective fees . . . at higher rates than similarly situated non-minority borrowers." Notably, Plaintiff does *not* allege that:

- Lehman participated in any way in the negotiation of his loans with his mortgage broker;

- Lehman is affiliated with the mortgage broker that set the pricing terms for Plaintiff's loans;

- Lehman's conduct would have differed at all had the mortgage broker instead submitted applications of a non-minority for Plaintiff's loans;

- Lehman offered loan options to non-minority customers that it did not make available to him or other minority customers; or

- Lehman made any misrepresentations in connection with Plaintiff's loans or somehow induced him to accept any particular mortgage option or payment terms.

The Complaint lacks *any* statements of fact to support its bald conclusory allegations and provide a basis to believe that Plaintiff's alleged theory surpasses the "speculative level." The absence of factual support and dependence on speculation are demonstrated in part by Plaintiff's inclusion of BNC in this action. Presumably, Plaintiff speculated that BNC issued Plaintiff's loan. Plaintiff was wrong and therefore has no viable claims against BNC.

Perhaps in recognition of the fact that Plaintiff's broker, and not Lehman, was responsible for the pricing about which Plaintiff complains, Plaintiff: (1) goes through a tortured exegesis containing irrelevant anecdotes about industry-wide mortgage lending practices in the post-World War II era, and (2) cites data that are publicly available pursuant to the Home Mortgage Disclosure Act of 1975, 12 U.S.C. § 2801 ("HMDA") concerning trends in the mortgage lending industry as a whole. From this generalized material, none of which is specific to Lehman (and which, curiously, does not include Lehman's publicly available HMDA data), Plaintiff asserts the existence of a disparate impact in Lehman's mortgage lending.

Plaintiff's conclusory assertion that "[t]he aggregate HMDA data discussed above is representative of Defendants" without any underlying factual allegations concerning Lehman whatsoever is exactly the style of pleading that the Supreme Court in *Twombly* sought to eliminate and for good reason. If a motion to dismiss can be defeated, even when the plaintiff fails to offer even a single specific factual allegation concerning the defendant and relies solely

2

on industry-wide data, then class counsel simply could change the name of the plaintiff and defendant and file the same complaint against each of the nearly 8,900 lenders whose loans have been aggregated into the industry-wide HMDA data. Such a fishing expedition would create extraordinary and undue burdens, costs, and distractions on innocent parties who must defend or settle frivolous lawsuits. This concern is not hypothetical. Plaintiff's counsel has filed more than *a dozen* complaints with virtually identical allegations against mortgage lenders in the past year.[1] The lack of specific allegations against Lehman, coupled with Plaintiff's counsel's *modus operandi*, establish that this Complaint is precisely the kind of speculative fishing expedition prohibited under *Twombly*.

The absence of specific allegations as to the Defendants is fatal to Plaintiff's Complaint. In any event, however, the admitted fact that Plaintiff's dealings were with a broker that is unaffiliated with Lehman and that made the pricing decisions makes it impossible for Plaintiff to establish the required causal nexus between the allegedly offensive policy and the asserted impact. Disparate impact cases require proof of a facially-neutral policy that is neutrally applied. Plaintiff alleges that Lehman instituted a facially-neutral policy that brokers applied in a wide and varying manner, which cannot form the basis of a disparate impact claim against Lehman.

---

[1]    *See Kimbrew v. Fremont Inv. & Loan*, No. CV08-3277 (C.D. Cal. May 16, 2008); *Burns v. Wash. Mut. Bank*, No. 08-cv-00919 (N.D. Cal. Feb. 13, 2008); *Lopez v. GE Money Bank*, No. 08-cv-00479 (C.D. Cal. Jan. 25, 2008); *Salazar v. Greenpoint Mortgage Funding, Inc.*, No. 08-cv-0155 (S.D. Cal. Jan. 25, 2008); *Ramirez v. Greenpoint Mortgage Funding, Inc*., No. 08-cv-00369 (N.D. Cal. Jan 18, 2008); *Toruno v. HSBC Fin. Corp*., No. 07-cv-05998 (C.D. Cal. Sept. 14, 2007); *Chavez v. GE Money Bank*, No. 2:07-cv-05967-PSG-PLA (C.D. Cal. Sept. 13, 2007); *Garcia v. Countrywide Fin*., No. EDCV07-1161VAP(JCRx) (C.D. Cal. Sept. 12, 2007); *Zamora v. Wachovia Corp*., No. 3:07-cv-04603 TEH (N.D. Cal. Sept. 5, 2007); *Payares v. JP Morgan Chase & Co.*, Case No. 07-05540 ABC (SHx) (C.D. Cal. Aug. 23, 2007); *Sanchez v. Wash. Mut., Inc.*, No. CV-07-55420-CAS(Ex) (C.D. Cal. Aug. 23, 2007); *Ventura v. Wells Fargo Bank, N.A*, No. 3:07-cv-04309-EMC (N.D. Cal. Aug. 21, 2007); *Jeffries v. Wells Fargo Home Mortgage*, No. 3:07-cv-03880-MJJ (N.D. Cal. July 30, 2007).

Plaintiff's efforts to dress up a disparate treatment claim against his mortgage broker (who is *not* a defendant in this action) as a disparate impact claim against Lehman must fail.

Finally, the Second Circuit has never held that disparate impact is a viable theory for claims brought under the ECOA, and recent U.S. Supreme Court precedent strongly suggests that disparate impact claims may not be brought under the ECOA or the FHA. *See Smith v. City of Jackson*, 544 U.S. 228 (2005).

For all of these reasons, Plaintiff's claims should be dismissed.

## **BACKGROUND**

Plaintiff Pedro E. Rivas is a Latino man who alleges that on or about June 21, 2007, he financed the purchase of his primary residence in Pacoima, California through a mortgage broker, Bernard E. Cohen Investments, Inc. ("Cohen"). (Compl. ¶ 45.) Plaintiff financed the purchase with one mortgage for $348,000 and a second mortgage for $87,000. (Compl. ¶ 46.) The loans were funded by Lehman. Plaintiff alleges that in connection with the loan (although he does not specify which loan), Lehman paid a $435 yield spread premium to Cohen. (Compl. ¶ 46.) He also alleges that the fees and rates, as well as certain financing charges that he paid to Cohen, were higher than those paid by "non-minority borrowers with objective credit risk factors similar to Plaintiff Rivas" whose mortgages were financed by Lehman. (Compl. ¶¶ 46-47.)

Plaintiff alleges that Lehman "schemed to intentionally discriminate against" him by causing him to pay higher rates and fees in connection with his mortgage, despite the fact that he does not allege that Lehman played any role in deciding the terms of his loan or whether such fees would be assessed with respect to his loan. To the contrary, Plaintiff alleges that pursuant to Lehman's so-called discretionary pricing policy, *mortgage brokers* have the "discretion to

impose yield spread premiums and other subjective fees on borrowers."[2]  (Compl. ¶ 39.)

Plaintiff alleges that Lehman "provides financial incentives for" loan officers, brokers, and

correspondent lenders" to mark up the loan rate and charge additional financing fees.  (Compl.

¶ 38.)  The Complaint does not allege that those same financial incentives are applicable only

with respect to loans to minorities.

   While conceding that Lehman's so-called discretionary pricing policy "appear[s] to be

facially neutral," Plaintiff alleges that the use of yield spread premiums and other discretionary

fees assessed by mortgage brokers, not Lehman, "disproportionately and adversely affects

minorities (relative to similarly situated non-minorities)."  (Compl. ¶ 42.)  Plaintiff fails to

allege any statistics, anecdotes, or other facts supporting the contention that Lehman—

knowingly or unknowingly—provided non-minorities with mortgage pricing terms that were

superior to a statistically significant degree than the mortgage pricing terms that it provided to

minorities.

   Plaintiff's assertions concerning yield spread premiums are neither factually nor legally

accurate.  A yield spread premium is simply a means by which the borrower indirectly

compensates a mortgage broker for loan origination services through a payment made by a

lender to the broker at closing.  The use of yield spread premiums to finance origination costs in

a mortgage loan transaction raises no inference of illegality or impropriety.[3]  HUD has

acknowledged that a yield spread premium payment can be a legitimate mechanism by which a

---

[2]     The Complaint alleges that discrimination occurred not only with respect to loans originated
through mortgage brokers but also loans originated through loan officers and correspondent lenders.
While such allegations might be relevant on a motion for class certification, they are irrelevant for the
purposes of determining whether Plaintiff, who obtained his mortgage through a mortgage broker that is
unaffiliated with Defendants, has stated a claim against Defendants.

[3]     *See* Real Estate Settlement Procedures Act Statement of Policy 2001-1: Clarification of Statement
of Policy 1999-1 Regarding Lender Payments to Mortgage Brokers, 66 Fed. Reg. 53052-53059 (Oct. 18,
2001) ("RESPA Statement of Policy 2001-1").

broker is fully or partially compensated by the lender for the goods, services, and facilities provided by the broker in connection with the origination of a mortgage loan, costs that a borrower would otherwise be obliged to pay up front out-of-pocket.[4] HUD has expressed that the availability of yield spread premiums, which may serve to reduce or eliminate altogether the up-front out-of-pocket loan payment, "foster[] homeownership."[5]

Courts have acknowledged that yield spread premium fees "can be 'a useful means to pay some or all of a borrower's settlement costs' as well as 'a legitimate tool to assist the borrower.'"[6] This is true even though the payment of a yield spread premium may result in an incremental increase in the interest rate to the borrower; again, the incremental increase in the interest rate avoids out-of-pocket loan closing expense to the borrower.

## LEGAL STANDARD

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the claims stated in the complaint. Dismissal is appropriate under Rule 12(b)(6) if the complaint fails to plead a cognizable legal theory or sufficient facts supporting a cognizable legal theory. *Twombly*, 127 S. Ct. at 1968-69, 1974 ("Because the plaintiffs here have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed.").

Although pleading requirements under the Federal Rules of Civil Procedure are construed liberally, "[l]iberal construction has its limits, for the pleading must at least set forth sufficient

---

[4]    *See* Real Estate Settlement Procedures Act (RESPA) Statement of Policy 1999-1 Regarding Lender Payments to Mortgage Brokers, 64 Fed. Reg. 10080, 10085 (Mar. 1, 1999) (yield spread premium fees may be used to reduce up-front costs paid by borrower); *see also* RESPA Statement of Policy 2001-1, at 53052-53059.

[5]    RESPA Statement of Policy 2001-1 at 53053.

[6]    *See, e.g., Hirsch v. BankAmerica Corp.*, 328 F.3d 1306, 1309 (11th Cir. 2003) (affirming grant of summary judgment in defendant lender's favor) (citing 66 Fed. Reg. 53052-54); *Bjustrom v. Trust One Mortgage Corp.*, 322 F.3d 1201, 1206 (9th Cir. 2003).

information for the court to determine whether some recognized legal theory exists upon which relief could be accorded the pleader. If it fails to do so, a motion under Rule 12(b)(6) will be granted." *Wolff v. Rare Medium, Inc.*, 171 F. Supp. 2d 354, 358 (S.D.N.Y. 2001) (quoting 2 James Wm. Moore et al., *Moore's Federal Practice* § 12.34[1][b] at 12-61 (3d ed. 1999)). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitle[ment] to relief require more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 127 S. Ct. at 1964-65 (internal citations omitted and alteration in original). Courts need not strain to find inferences that are favorable to the plaintiff that are not apparent from the complaint. *See Zeising v. Kelly*, 152 F. Supp. 2d 335, 350 (S.D.N.Y. 2001) (granting motion to dismiss complaint). Vague and conclusory allegations cannot "substitute for minimally sufficient factual allegations." *Electronics Comm. Corp. v. Toshiba Am. Consumer Prod., Inc.*, 129 F.3d 240, 243 (2d Cir. 1997) (internal citation omitted); *see also Amron v. Morgan Stanley Inv. Advisors, Inc.*, 464 F.3d 338, 343-44 (2d Cir. 2006).[7]

The standards for reviewing a 12(b)(1) motion are "substantively identical" to the standards for reviewing a 12(b)(6) motion, *Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 128 (2d Cir. 2003), except that on a 12(b)(1) motion, the plaintiff bears the burden of proof with respect to jurisdiction. *See Diagnostic Cardioline Monitoring v. Leavitt*, 171 Fed. Appx. 374, 375 (2d Cir. 2006). In considering a Rule 12(b)(1) motion challenging plaintiff's standing, courts may look beyond the allegations of the complaint and consider matters presented in affidavits or an evidentiary hearing without converting the motion into a motion for summary judgment under

---

[7]    *See also Wolff*, 171 F. Supp. 2d at 357 ("In order to avoid dismissal, plaintiffs must do more than plead mere "[c]onclusory allegations or legal conclusions masquerading as factual conclusions."); *Gebhardt v. Allspect, Inc.*, 96 F. Supp. 2d 331, 333 (S.D.N.Y. 2000).

Rule 56. *Alliance for Envtl. Renewal, Inc. v. Pyramid Crossgates Co.*, 436 F.3d 82, 87-88 (2d Cir. 2006).

**ARGUMENT**

I.    **PLAINTIFF'S CLAIMS AGAINST BNC SHOULD BE DISMISSED BECAUSE PLAINTIFF FAILS TO ALLEGE ANY INJURY THAT IS "FAIRLY TRACEABLE" TO CONDUCT BY BNC**

Plaintiff has not alleged that BNC played any role in connection with his mortgage, nor can he do so. Accordingly, Plaintiff lacks standing to bring an action against BNC, and his claims against BNC should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(1). For the same reason, the Complaint fails to state a claim and therefore could be dismissed on alternative grounds pursuant to Federal Rule of Civil Procedure 12(b)(6).

For a federal court to have subject matter jurisdiction over any case, a plaintiff must have standing to assert its claims under Article III of the United States Constitution. Standing, like other jurisdictional limitations, is a threshold inquiry and "cannot be inferred argumentatively from averments in the pleadings." *Thompson v. County of Franklin,* 15 F.3d 245, 249 (2d Cir. 1994) (internal quotation admitted). Rather, a plaintiff bears the burden to allege facts sufficient to establish constitutional standing. *Id.*

To establish constitutional standing, a plaintiff must show three elements: (1) he suffered "an injury in fact" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical;" (2) the injury is "fairly traceable to the challenged conduct of the defendant and not the result [of] independent action of some third party not before the court;" and (3) the injury is likely redressable by a favorable decision of the court. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (internal citations and quotations omitted). A plaintiff must meet the causation or "traceability" element with respect to each defendant. *Id.*

Here, Plaintiff lacks Article III standing to assert a claim against BNC because he fails to allege that BNC caused or had any connection whatsoever to his purported injury. While the Complaint is filled with broad and conclusory allegations concerning the mortgage lending industry in general, Plaintiff alleges few specific facts against Defendants, and even fewer facts against BNC as a separate legal entity from Lehman. Indeed, Plaintiff's only specific allegation against BNC is contained in paragraph 10 where the Complaint introduces the parties:

> Defendant BNC Mortgage, Inc., is a mortgage lender with principal executive offices located at 1063 McGraw Avenue, Irvine, California, 92614. Defendant BNC Mortgage's immediate parent company is Defendant Lehman Brothers Bank, F.S.B. Defendant Lehman Brothers Bank is also the immediate parent to Aurora Loan Services, Inc.

Importantly, Plaintiff does not allege *any* contact or involvement with BNC relating to his loan. The section of the Complaint entitled "Defendants Imposed Discriminatory Fees on Plaintiffs" does not allege a single fact against BNC. (Compl. ¶¶ 44-49). Absent any factual allegations that BNC originated, solicited, funded, serviced, set rates on, or had any other connection whatsoever with Plaintiff's loan, Plaintiff cannot meet his burden of showing that his purported injury is fairly traceable to conduct by BNC.

Moreover, the mere fact that Plaintiff brings his claims as a class action does not obviate the need to establish standing under Article III. The law is well settled that a class action "adds nothing to the question of standing, for even named plaintiffs who represent a class 'must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent.'" *Lewis v. Casey*, 518 U.S. 343, 357 (1996) (quoting *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 40, n.20 (1976)). Because Plaintiff makes no allegations against BNC and provides no facts to establish that BNC had any involvement or connection with Plaintiff that could have caused his purported injuries, Plaintiff's claims against BNC should be dismissed with prejudice.

For the same principal reason, namely that Plaintiff failed to plead any actionable conduct by BNC, the Complaint fails to state a claim and therefore also should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6).

## II.    PLAINTIFF FAILS TO STATE A CLAIM AGAINST LEHMAN UNDER THE ECOA OR FHA FOR DISPARATE TREATMENT OR DISPARATE IMPACT

For the reasons explained below, Plaintiff lacks a factual basis for his disparate treatment claims and lacks factual and legal bases for his disparate impact claims against Lehman. Accordingly, the Court should dismiss Plaintiff's claims against Lehman in their entirety.

### A.    Plaintiff's Conclusory Allegations of Discriminatory Intent Fail to State a "Plausible" Claim for Disparate Treatment under the FHA and ECOA

To establish disparate treatment under the FHA and the ECOA, Plaintiff must show that Lehman adopted or maintained the allegedly discretionary pricing policy "on discriminatory terms and conditions for reasons that were, in significant part, discriminatory…." *Hack v. Yale Coll.*, 237 F.3d 81, 88 (2d Cir. 2000). While Plaintiff need not *prove* discriminatory intent in his complaint, Plaintiff must at least allege sufficient facts to raise the assertion of discriminatory intent beyond the "speculative level." *See Twombly*, 127 S. Ct. at 1965 (allegations that are conclusory and merely recite the elements of a cause of action fail to meet the requirements of Rule 8 notice pleading); *see also Yusuf v. Vassar Coll.*, 35 F.3d 709, 713 (2d Cir. 1994) ("naked assertions" in a complaint that do not set forth support facts are insufficient and cannot withstand dismissal); *World Religious Relief, Inc. v. Sirius Satellite Radio, Inc.*, No. 05-cv-8257, 2007 U.S. Dist. LEXIS 57609, at *10 (S.D.N.Y. Aug. 3, 2007) (Jones, J.) (dismissing complaint where plaintiff failed to allege specific facts showing intentional disparate treatment on account of race).

Here, Plaintiff's Complaint focuses almost exclusively on the purported disparate impact of the discretionary pricing policy with only conclusory allegations that Defendants "schemed to

intentionally discriminate against Plaintiff and Class Members" through implementation of its

facially neutral policies. (*E.g.*, Compl. ¶ 27.) Plaintiff does not allege *any* facts suggesting that

Lehman adopted or used the discretionary pricing policy as a pretext for discrimination. Nor

does Plaintiff allege any direct interactions with Lehman from which this Court could plausibly

infer that Lehman intended to discriminate against him.[8] Absent any supporting factual

allegations, Plaintiff's bald assertions cannot raise an inference of deliberate discrimination

"above the speculative level." *Twombly*, 127 S. Ct. at 1965.

District courts that have recently analyzed virtually identical allegations of intentional

discrimination related to the use of yield spread premiums in the mortgage industry have

similarly dismissed the claims as insufficient. *See, e.g., Garcia v. Country Wide Financial

Corp.*, No. 07-1161 (C.D. Cal. Jan. 15, 2008) (dismissing plaintiff's disparate treatment claim

because he provided "no factual allegations regarding intent to discriminate beyond his bare

---

[8]    The Second Circuit's recent decision in *Boykin v. Keycorp*, 521 F.3d 202, 215 (2d Cir. 2008), is
easily distinguishable. In *Boykin*, the court held that a *pro se* plaintiff plead sufficient facts to maintain a
disparate treatment claim under the FHA by alleging that she was a minority who had been qualified and
conditionally approved for a loan, and that the loan was later denied on grounds that were a pretext for
race and sex discrimination as evidenced by defendant's failure to provide guidance or counseling that
defendant offered to other non-minority loan applications upon denial of a loan. In *Boykin*, the Second
Circuit explicitly recognized that *Twombly* requires a "flexible 'plausibility standard,' requiring a pleader
to amplify a claim with some factual allegations in those contexts where such amplification is needed to
render the claim plausible." *Id.* at 213 (internal citations omitted). The Second Circuit declined to
"locate the outer bounds of *Twombly*'s new standard," concluding only that amplification was not
necessary in *Boykin* because "dismissal of a pro se claim as insufficiently pleaded is appropriate in only
the most unsustainable of cases." Accordingly, the Court reversed the district court's dismissal of
Boykin's complaint, holding that as a *pro se* plaintiff, her allegations regarding defendant's conduct
toward her were sufficient to support a plausible inference of discrimination. *Id.* at 216. Here, in
contrast, Plaintiff is assisted by competent counsel, and accordingly the holding in *Boykin* does not apply.

Moreover, the Complaint arguably does not satisfy even the standard applied in *Boykin*. Unlike
the plaintiff in *Boykin*, Plaintiff fails to allege any contact with Defendants, or any other conduct by
Defendants, that could support a plausible inference of intentional discrimination. In fact, Plaintiff
concedes that Lehman's so-called discretionary pricing policy "appear[s] to be facially neutral." (Compl.
¶ 42.) Also, Boykin alleged that she had been conditionally approved for a loan, only to have it denied
subsequently based on a bank policy that prohibited out-of-state loans. Accordingly, Boykin plead facts
supporting her creditworthiness for the loan she sought. Here, Plaintiff has provided no facts supporting
his conclusory allegation that he was qualified for loans that Lehman purportedly made to "non-minority
borrowers with objective credit risk factors similar to" his. (Compl. ¶ 47.)

assertion that Defendants intentionally discriminated and that Defendants' policy by design discriminates against minority borrowers"); *see also Payares v. JP Morgan Chase & Co.*, No. 07-5540 (C.D. Cal. May 15, 2008) (holding that the failure to allege any facts suggesting that "Defendants ever deliberately acted to impose less favorable loan terms on minority applicants" doomed the disparate treatment claim under the requirements of *Twombly*); *Tribett v. BNC Mortgage Inc.*, No. 07-cv-2809 (N.D. Ill. Jan. 17, 2008) (dismissing plaintiff's claims under the FHA and ECOA because ["t]he Complaint states mainly vague and conclusory allegations that do not establish a plausible entitlement to relief"). Because Plaintiff fails to allege any facts plausibly supporting a claim that Defendants intentionally discriminated against him, Plaintiff cannot maintain his claim for disparate treatment under the FHA or the ECOA.

**B.**     **Plaintiff Fails To Assert A Cognizable Disparate Impact Claim**

Plaintiff's disparate impact claims against Lehman should be dismissed for multiple reasons. First, the ECOA and FHA do not permit disparate impact claims. Second, Plaintiff failed to allege *any* facts that support his conclusory allegations that: (1) differences in pricing terms of Lehman's mortgage lending to minorities versus non-minorities are statistically significant, and (2) to the extent such statistical significance could be shown, that the discrepancy can be tied to Lehman's so-called discretionary pricing policy.

    1.     <u>Neither the ECOA nor the FHA Permits Disparate Impact Claims</u>

This Court should dismiss Plaintiff's disparate impact claims because they are not cognizable under the FHA and ECOA in light of the Supreme Court's ruling in *Smith v. City of Jackson*, 544 U.S. 228 (2005). In *Smith*, the Supreme Court held that a plaintiff could bring a disparate impact claim under the Age Discrimination in Employment Act ("ADEA") because, like Title VII, the *second* subsection of the ADEA prohibited "actions that deprive any individual of employment opportunities or *otherwise adversely affect his status as an employee* because of

such individual's age." *Id.* at 235 (emphasis added). The Court held that the disparate impact

claim was authorized because "the text focuses on the *effects* of the action on the employee

rather than the motivation for the action of the employer." *Id.* at 236; *see also Watson v. Fort*

*Worth Bank & Trust*, 487 U.S. 977, 991 (1998) (explaining that in disparate impact cases, "the

employer's practices may be said to 'adversely affect' [an individual's status] as an employee").

 The Court in *Smith* also held, however, that the *first* subsection of the ADEA—

prohibiting employers from discriminating against "*any individual…*because of *such*

*individual's*" plainly did not authorize disparate impact claims. *Id.* at 236 n.6 (emphasis in

original). The Court reasoned that the focus of the first subsections of the ADEA and Title VII is

"on the employer's actions with respect to the targeted individual." *Id.* Such discriminatory

action based on discriminatory intent is the gravamen of a disparate treatment claim. *Id.* at 238

("There is no disparate treatment under the ADEA when the factor motivating the employer is

some feature other than the employee's age") (citations omitted). In contrast, in a disparate

impact claim, the "otherwise prohibited action is not *based on age*." *Smith*, 544 U.S. at 239

(emphasis added). Rather, the claim challenges a facially-neutral policy that "in fact falls more

harshly on one group than another." *Id.* Based on the plain text of the statute, the Court

concluded that the first subsections of the ADEA and Title VII authorize only disparate treatment

and not disparate impact claims. *Id.* at 236-38; 236 n.6.

 The language of the ECOA and the FHA mirror the first subsections of the ADEA and

Title VII, focusing solely on the *actions* of creditors or individuals, rather than the subsequent

and unintended effects of such actions. Specifically, the ECOA makes it "unlawful *to*

*discriminate against any applicant … on the basis of* race, color, religion, national original, sex

or marital status, or age. ECOA § 701(a)(1), 15 U.S.C. § 1691(a)(1) (emphasis added).

Similarly, the FHA makes it unlawful to "*discriminate against any person … because of* race, color, religion, sex, handicap familial status, or national origin." FHA § 805(a), 42 U.S.C. 3605(a) (emphasis added). Neither the ECOA nor the FHA has any language focusing on the effects of actions comparable to the second subsection of Title VII or ADEA supporting disparate impact claims. This is demonstrated in the following table:

| Title VII | ADEA | ECOA | FHA |
|---|---|---|---|
| (a) It shall be an unlawful employment practice for an employer - <br>(1) to fail or refuse to hire or to discharge any individual, or otherwise to **discriminate against any individual** with respect to his compensation, terms, conditions, or privileges of employment, **because of such individual's** race, color, religion, sex. or national origin; | (a) It shall be unlawful for an employer: (1) to fail or refuse to hire or to discharge any individual or otherwise **discriminate against any individual** with respect to his compensation, terms, conditions, or privileges of employment, **because of such individual's** age; | (a) It shall be unlawful for any creditor to **discriminate against any applicant,** with respect to any aspect of a credit transaction----(1) **on the basis of** race, color, religion, national origin, sex or marital status, or age (provided the applicant has the capacity to contract); | (a) In general. It shall be unlawful for any person or other entity whose business includes engaging in residential real estate-related transactions to **discriminate against any person** in making available such a transaction, or in the terms or conditions of such a transaction, **because of race,** color, religion, sex, handicap, familial status, or national origin. |
| (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities **or otherwise adversely affect** his status as an employee, because of such individual's race, color, religion, sex, or national origin. | (2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities **or otherwise adversely affect his** status as an employee, because of such individual's age. . . . | **No Effects Language** | **No Effects Language** |

This statutory focus on the creditor's or individual's actions, as well as the absence of any language related to the "effects" of actions, establish that the ECOA and the FHA, unlike Title VII and the ADEA, do not permit disparate impact claims.[9] *See, e.g., Acree v. Republic of Iraq,* 370 F.3d 41, 61 (D.C. Cir. 2004) (Roberts, J., concurring) ("This use of different language in two statutes so analogous in their form and content, enacted so closely in time, suggests that the statutes differ in their meaning . . ."). This Court should dismiss Plaintiff's disparate impact claims.

> 2. Plaintiff Fails to Allege Any Facts that Support His Speculation that Lehman's Mortgage Lending Policies Had an Adverse Disparate Impact Against Minorities

Plaintiff fails to allege any facts suggesting that statistical analysis of Lehman's mortgage pricing would reveal a significant disparate impact on minorities. A plaintiff seeking to establish a disparate impact claim must demonstrate that the defendant's "facially neutral" policies resulted in a "significantly adverse or disproportionate impact" on a protected group. *Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown,* 294 F.3d 35, 52-53 (2d Cir. 2002).

Here, Plaintiff's disparate impact claim should be dismissed because the Complaint fails to allege *any* facts that would show that Lehman's facially neutral policies had a discriminatory impact against minorities, let alone a significant impact. *See Tribett,* No. 07 C 2809 (N.D. Ill. Jan. 15, 2008) (dismissing plaintiff's claims under the FHA and ECOA because ["t]he Complaint states mainly vague and conclusory allegations that do not establish a plausible entitlement to relief"). Plaintiff's sole support for the assertion that Lehman's mortgage lending practices would reveal "a significant discriminatory impact" is that publicly available data concerning

---

[9]    *See* Peter N. Cubita & Michelle Hartmann, The ECOA Discrimination Proscription and Disparate Impact—Interpreting the Meaning of the Words That Actually Are There, 61 BUS. LAWYER 829, 834 (2006) (arguing that the Supreme Court's holding in *Smith* requires the conclusion that the disparate impact claims are not viable under the ECOA).

mortgage lending in the industry *as a whole* during the years 2004 and 2005 purportedly show disparities between the pricing of loans to minorities versus non-minorities. (Compl. ¶¶ 16-18.) This "support" is insufficient to state a claim against Lehman for three reasons.

First, the HMDA data cited by Plaintiffs reflects lending in the industry as a whole based on aggregated information obtained from nearly 8,900 lenders. Accordingly, Lehman's loans represent only a fraction of data relied upon in the studies, and not necessarily a representative one. Indeed, an article prepared by employees of the Federal Reserve Board (the same authors who Plaintiff cite as authority in paragraphs in ¶¶ 16 and 18 of the Complaint), which implements regulations to enforce the HMDA, explicitly warned that "the data are not sufficient by themselves for drawing conclusions about the fairness of the lending process or the *activities of any individual lender*."[10] Accordingly, they caution that their "analysis strongly indicates that the raw data alone can lead to inaccurate conclusions, which in turn may be unfair to particular institutions . . . ." *See id.* Plaintiff's inferences are thus inherently speculative—particularly given that Lehman's HMDA data are publicly available—and therefore should be rejected as insufficient to state a claim.

The Second Circuit recently rejected an attempt by plaintiffs, like Plaintiff here, to rely solely on allegations regarding industry-wide practices to state a claim against a particular defendant. *See Amron*, 464 F.3d at 346. The plaintiffs in *Amron* filed multiple "virtually identical" actions and relied on "speculation, inference and generalized observations about the securities industry" to allege that Morgan Stanley charged unreasonably high fees to manage

---

[10]    "New Information Reported under HMDA and Its Application in Fair Lending Enforcement," Federal Reserve Bulletin, Summer 2005, 344, at 345 (emphasis added). The article can be accessed from the Federal Reserve Board's website via the following URL: http://www.federalreserve.gov/pubs/bulletin/2005/summer05_hmda.pdf. The Court may take judicial notice of this document because it is a United States Government publication. *See, e.g., Zappier v. Sun Life Assurance Co. of Can.*, No. 05-cv-5300, 2006 WL 2621110, at *8 n.12 (S.D.N.Y. Aug. 10, 2006)

several mutual funds. *Id.* at 343, 346 n.2. The Second Circuit emphatically rejected the plaintiffs' argument, holding that the liberal pleading requirements do not mean that "[p]laintiffs bear no burden at the pleading stage." Rather, a plaintiff must allege "facts *necessary* to a finding of liability." *Id.* at 343-44 (emphasis in original). To meet this burden, a plaintiff may not rely on "bald assertions and conclusions of law." *Id.* Applying these principles, the Second Circuit in *Amron* dismissed plaintiffs' claims, holding that their speculative inferences about Morgan Stanley's fees and the interestedness of its directors were insufficient to state a claim because "they were neither specific to the [Fund] directors nor to the purchase of the stock at issue." *Id.* at 346 (internal citations omitted).

Second, a number of the industry sources quoted by Plaintiff fail to control for explanations for perceived discrepancies other than race or ethnicity, such as cash available at closing (which could affect whether a loan included a yield spread premium), loan-to-value ratio, or creditworthiness. *See* "New Information Reported under HMDA and Its Application in Fair Lending Enforcement," Federal Reserve Bulletin, Summer 2005, 344, at 385 ("many factors relevant to underwriting and pricing are not included in the HMDA data and thus cannot be accounted for in analyses that rely exclusively on the data"). Indeed, the article cited by Plaintiff in paragraphs 16 and 18 of the Complaint states that the "unexplained differences [in higher-priced lending to minority borrowers] may stem from *credit-related factors* not available in the HMDA data, such as measures of credit history, LTV [loan-to-value] and DTI [debt-to-income] ratios, and differences in loan products."[11] The HMDA data cited by Plaintiffs, at best, reflects little more than "a bottom-line racial imbalance" in the mortgage lending industry as a whole,

---

[11]     "Higher-Priced Home Lending and the 2005 HMDA Data," Federal Reserve Bulletin, A123, at A164 (emphasis added). The article can be accessed from the Federal Reserve Board's website via the following URL: http://www.federalreserve.gov/pubs/bulletin/2006/hmda/bull06hmda.pdf.

which is insufficient as a matter of law to show disparate impact discrimination at all, let alone specifically against Lehman.  *Brown v. Coach Stores, Inc*. 163 F.3d 706, 712 (2d Cir. 1998) (because the underrepresentation of minorities "might result from any number of factors" plaintiffs must "show that the specific factor challenged under the disparate impact model results in discriminatory impact"); *see also Wards Cove Packing Co., Inc. v. Atonio*, 490 U.S. 642, 650-52 (1989), abrogated on other grounds by 42 U.S.C. § 2000e-2(k).

Finally, Plaintiff alleges that he obtained his loan in June 2007, yet his Complaint simply regurgitates the same allegations contained in complaints brought by Plaintiff's counsel against numerous other mortgage lenders—allegations that cite 2004 and 2005 HMDA data only, plainly irrelevant here, and insufficient to support these claims.[12]  Plaintiff's theory that Lehman must have discriminated against him in 2007 because industrywide data not specific to Lehman reflects a disparate impact against minorities generally in 2004 and 2005 is far too attenuated to state a claim.[13]

Plaintiff's complaint is also devoid of any facts demonstrating any credible basis for his conclusion that a disparate impact exists in Lehman's mortgage lending.  Indeed, the Complaint fails to provide any basis whatsoever for Plaintiff's conclusory allegation that he, or minorities in general, paid "disparately more finance charges than similarly situated non-minorities" in connection with loans by Lehman.  (Compl. ¶ 42.)  The Complaint does not contain a single

---

[12]    Similarly, each of the articles cited or quoted in the Complaint pre-dates Plaintiff's loan by at least several months and as much as six years.  For example, paragraph 23 of the Complaint cites to an article that purportedly was "last viewed March 7, 2008"; however, the face of the cited document makes clear that it is a January 8, 2002 draft version.

[13]    Moreover, the ECOA and FHA have two year statutes of limitations.  Plaintiff filed the Complaint in April 2008, and therefore only mortgages obtained in or after April 2006 possibly could be actionable (although for unexplained reasons, Plaintiff failed to identify the class period for this putative class action).  As a result, the industrywide HMDA data from January 2004 through March 2006—or 75% of the period referenced in the data cited by Plaintiff—is irrelevant to Plaintiff's attempt to establish an actionable disparate impact.

factual allegation about any loan that Lehman made to any minority other than Plaintiff or any loan to a single non-minority. Plaintiff has failed to "nudge [his claims] across the line from conceivable to plausible," and they should be dismissed. *Twombly*, 127 S. Ct. at 1974.

Plaintiff's counsel has filed extremely similar complaints against more than a dozen of the largest companies in the mortgage lending industry. This fact, coupled with the absence of any detailed allegations against Lehman, strongly suggest that Plaintiff is fishing for a claim without any basis for believing that Lehman discriminated against him or any other potential class members. The Court should not subject Defendants to costly and time-consuming discovery techniques while Plaintiff fishes for a claim. As Judge Sprizzo reasoned in denying a motion to vacate his dismissal of a complaint:

> the purpose of discovery is to find out additional facts about a well-pleaded claim, not to find out whether such a claim exists, and a defendant has a right . . . to challenge the legal sufficiency of a complaint's allegations against him, without first subjecting him to discovery procedures.

*Jones v. Capital Cities/ABC Inc.*, 168 F.R.D. 477, 480 (S.D.N.Y. 1996) (internal citations omitted); *see also Twombly*, 127 S. Ct. at 1967 (recognizing that discovery is "expensive" and "the threat of discovery expense will push cost conscious defendants to settle even anemic cases before reaching those proceedings"); *Wards Cove Packing Co.*, 490 U.S. at 652 (recognizing that defending race discrimination litigation is an "expensive and time-consuming task"); *Amron*, 464 F.3d at 346 (declining to "permit [this] plaintiff with a largely groundless claim to simply take up the time of a number of other people, with the right to do so representing an *in terrorem* increment of the settlement value, rather than a reasonably founded hope that the [discovery] process will reveal relevant evidence.") (quoting *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 347 (2005)); *Avnet, Inc. v. Am. Motorists Ins. Co.*, 115 F.R.D. 588, 592 (S.D.N.Y. 1987) ("The discovery rules are not a hunting license to conjure up a claim that does not exist.").

3.    Plaintiff Fails to Identify A Specific "Facially-Neutral"
Policy Or Practice That Was Applied In a Facially-Neutral Manner

The U.S. Supreme Court first recognized the disparate impact theory in connection with

employment discrimination cases, holding that Title VII "proscribes not only overt

discrimination but also practices that are fair in form, but discriminatory in operation." *Griggs v.*

*Duke Power*, 401 U.S. 424, 431 (1971).  The Second Circuit requires a plaintiff seeking to

establish a prima facie disparate impact claim to demonstrate: "(1) the occurrence of certain

outwardly neutral practices, and (2) a significantly adverse or disproportionate impact on persons

of a particular type produced by the defendant's facially neutral acts or practices." *Tsombanidis*

*v. West Haven Fire Dept.*, 352 F.3d 565, 574-75 (2d Cir. 2003) (affirming dismissal of disparate

impact claim because plaintiffs failed to present evidence of a disparate impact).  Even a*ssuming*

*arguendo* that any disparate impact could be shown, Plaintiff fails to establish the neutral

application of a facially-neutral policy.

First, Plaintiff creatively attempts, but fails, to articulate a specific facially-neutral

Lehman policy or practice that allegedly is responsible for some "observed statistical

disparities." *See, e.g., Smith*, 544 U.S. at 241.  What Plaintiff labels a policy—*i.e.*, brokers'

freedom to set certain pricing terms on loans that they originate—describes nothing more than

the absence of a policy, which cannot form the basis of a disparate impact claim.

Second, even if mortgage brokers' freedom to set prices without Lehman's involvement

constitutes a Lehman "policy" under the relevant statutes, the Complaint makes clear that

brokers did not apply the policy in a facially-neutral manner.  To the contrary, Plaintiff concedes

that mortgage brokers (who are not affiliated with Lehman) subjectively set loan pricing terms

that "caus[ed] persons with identical or similar credit scores to pay differing amounts for

obtaining credit." (Compl. ¶ 41.)  Any possible disparate impact necessarily would have resulted

from the actions of many mortgage brokers who individually decided on a loan-by-loan basis whether to charge yield spread premiums or other financing charges with respect to "thousands, or tens of thousands" of loans. (Compl. ¶ 53.) Because Plaintiff cannot demonstrate that the alleged policy was neutrally applied, Plaintiff cannot state a claim under a disparate impact theory.

Finally, Lehman is not a proper defendant under a disparate impact theory because Plaintiff does not allege that Lehman was responsible for carrying out the policy or that Lehman treated its customers differently based on their race or ethnicity. Plaintiff does not allege that the so-called discretionary pricing policy only applied to loans to minorities, or that Lehman encouraged brokers to charge elevated fees for such loans. We are unaware of any legal precedent holding a company that treats all of its customers fairly without regard to race liable for discrimination based on the actions of independent and unrelated third parties. Plaintiff's theory cannot be reconciled with the standard established by the Second Circuit that an actionable disparate impact must be "produced by the *defendant's* facially neutral acts or practices." *See Tsombanidis*, 352 F.3d at 574-75 (emphasis added); *Reg'l Econ. Cmty. Action Program*, 294 F.3d at 52-53.

Under the circumstances, it strains credulity for Plaintiff to allege that any Lehman policy caused an alleged discriminatory impact. Plaintiff blatantly seeks to repackage what is at most a discriminatory treatment claim against his mortgage broker into a disparate impact claim against an innocent deeper pocket, which should not be countenanced by this Court.

## CONCLUSION

For all of the above reasons, defendants BNC and Lehman request that this Court issue an order dismissing Plaintiff's claims with prejudice and granting such other and further relief as

this Court deems proper.


Dated: New York, New York
      June 20, 2008

                                 MORGAN, LEWIS & BOCKIUS LLP

                                 By: _____
                                    Jami Wintz McKeon (JM-6144)
                                    Michael S. Kraut (MK-4469)
                                    101 Park Avenue
                                    New York, New York 10178
                                  (212) 309-6000

                                 *Attorneys for Defendants*