UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

—————————————————— x

PEDRO E. RIVAS, On Behalf of Himself and   :   Civil Action No. 08-cv-03685
All Others Similarly Situated,             :
                                           :   <u>CLASS ACTION</u>
                    Plaintiff,             :
                                           :
          vs.                              :   MEMORANDUM OF LAW IN
                                           :   OPPOSITION TO DEFENDANTS' MOTION
                                           :   TO DISMISS
LEHMAN BROTHERS BANK, FSB, et al.,         :
                                           :
                    Defendants.            :
                                           :
—————————————————— x

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ...................................................................................................1

II.   FACTUAL ALLEGATIONS ....................................................................................3

    A.    Allegations Concerning Defendants "Discretionary Pricing Policy"; the
           Challenged Policy ...................................................................................................3

    B.    Allegations of Disparate Impact ............................................................................4

III.  ARGUMENT ...........................................................................................................5

    A.    Legal Standard ........................................................................................................5

    B.    Plaintiff Has Adequate Standing to Bring His FHA and ECOA Claims
           Against Both Lehman and BNC ..............................................................................7

    C.    Plaintiff Adequately Alleges Disparate Impact Claims .........................................9

          1.    Disparate Impact Claims Are Permitted Under Both the ECOA and
                FHA.........................................................................................................9

          2.    Plaintiff Sufficiently Alleges the Manner in Which Defendants'
                Discretionary Pricing Policy had a Negative Disparate Impact on
                Minorities ...............................................................................................14

IV.   Conclusion .............................................................................................................23

# TABLE OF AUTHORITIES

**Page**

## CASES

*2922 Sherman Ave. Tenants' Ass'n v. District of Columbia,*
    444 F.3d 673 (D.C. Cir. 2006) ........................................................................11

*Affordable Housing Dev. Corp.,*
    433 F.3d 1182, 1194 (9th Cir. 2006) ..............................................................13

*Amron v. Morgan Stanley Inv. Advisors, Inc.,*
    464 F.3d 338 (2d Cir. 2006)......................................................................21, 22

*ATSI Commcn's, Inc. v. Shaar Fund, Ltd.,*
    493 F.3d 87 (2d Cir. 2007).................................................................................5

*Beaulialice v. Federal Home Loan Mortgage Corp.,*
    No. 8:04-CV02316-T-24-EAJ, 2007 U.S. Dist. LEXIS 15846
    (M.D. Fla. Mar. 6, 2007)..................................................................................13

*Bell Atlantic Corp. v. Twombly,*
    127 S. Ct. 1955 (2007)....................................................................................5, 6

*Brown v. Coach Stores,*
    163 F.3d 706 (2d Cir. 1998)........................................................................22, 23

*Carter Ware v. Indymac Bank,*
    534 F. Supp. 2d 835 (N.D. Ill. 2008) ......................................................2, 6, 13

*Coleman v. Gen. Motors Acceptance Corp.,*
    196 F.R.D. 315 (M.D. Tenn. 2000) ...................................................................9

*Comer v. Cisneros,*
    37 F.3d 775 (2d Cir. 1994)................................................................................7

*Conley v. Gibson,*
    355 U.S. 41 (1957)...........................................................................................17

*Erickson v. Pardus,*
    127 S. Ct. 2197 (2007)......................................................................................6

*Fair Hous. in Huntington Comm. v. Town of Huntington,*
    316 F.3d 357 (2d Cir. 2003)....................................................................8, 11, 14

*Gamble v. City of Escondido,*
    104 F.3d 300 (9th Cir. 1997) ...........................................................................12

**Page**

*Garcia v. Countrywide*,
No. EDCV 07-1161-VAP(JCRx) (C.D. Cal. Jan. 15, 2008) ................................... *passim*

*Gladstone, Realtors v. Village of Bellwood*,
441 U.S. 91 (1979)..........................................................................................................9

*Golden v. City of Columbus*,
404 F.3d 950 (6th Cir. 2005) ........................................................................................13

*Griggs v. Duke Power Co.*,
401 U.S. 424 (1971)......................................................................................................10

*Hack v. President & Fellows of Yale College*,
237 F.3d 81 (2d Cir. 2000)..................................................................................7, 11, 14

*Havens Realty Corp. v. Coleman*,
455 U.S. 363 (1982)........................................................................................................7

*Haynes v. Bank of Wedowee*,
634 F.2d 266 (11th Cir. 1981) ........................................................................................9

*In re Elevator Antitrust Litig.*,
502 F.3d 47 (2d Cir. 2007).............................................................................................6

*In re Salomon Smith Barney Mut. Fund Fees Litig.*,
528 F. Supp. 2d 332 (S.D.N.Y. 2007)..........................................................................22

*Iqbal v. Hasty*,
490 F.3d 143 (2d Cir. 2007)............................................................................................6

*Jackson v. Novastar Mortg., Inc.*,
No. 06-2249, 2007 U.S. Dist. LEXIS 93584
(W.D. Tenn. Dec. 20, 2007)........................................................................................2, 8

*Johnson v. Wash. Mut. Bank, F.A.*,
(DLI)(LB), 2006 U.S. Dist. LEXIS 26729
(E.D.N.Y. May 4, 2006) ......................................................................................1, 9, 13

*Jones v. Ford Motor Credit Co.*,
No. 00 Civ. 8330, 2002 U.S. Dist. LEXIS 1098
(S.D.N.Y. Jan. 22, 2002)...........................................................................9, 15, 17, 22

*Khalil v. Farash Corp.*,
452 F. Supp. 2d 203 (W.D.N.Y. 2006).........................................................1, 11, 13, 14

**Page**

*Leblanc-Sternberg v. Fletcher,*
67 F.3d 412 (2d Cir. 1995)...................................................................................7

*Lujan v. Defenders of Wildlife,*
504 U.S. 555 (1992).........................................................................................7, 8

*Martinez v. Freedom Mortg. Team, Inc.,*
527 F. Supp. 2d 827 (N.D. Ill. 2007) ..........................................................2, 9, 13

*Newman v. Apex Financial Group, Inc.,*
No. 07 C 4475, 2008 U.S. Dist. LEXIS 2249
(N.D. Ill. Jan. 11, 2008) ............................................................................ *passim*

*Ojo v. Farmers Group, Inc.,*
No. 05-5818-JFW, 2006 WL 4552707
(C.D. Cal. Mar. 7, 2006) ..................................................................................13

*Orr v. Miller Place Union Free Sch. Dist.,*
07-CV-787 (DRH)(AKT), 2008 U.S. Dist. LEXIS 52803
(E.D.N.Y. July 9, 2008) .................................................................................6, 12

*Payares v. JP Morgan Chase & Co.,*
CV 07-5540 ABC (SHx) (May 15, 2008)...........................................................2

*Pfaff v. U.S. Dep't of Housing & Urban Dev.,*
88 F.3d 739 (9th Cir. 1996) ..............................................................................12

*Powell v. Am. Gen. Fin., Inc.,*
310 F. Supp. 2d 481 (N.D.N.Y 2004)......................................................9, 14, 15

*Ramirez v. GreenPoint Mortgage Funding, Inc.,*
No. C08-0369, 2008 WL 2051018
(N.D. Cal. May 13, 2008) .......................................................................2, 13, 17, 18

*Reg'l Econ. Cmty. Action Program v. City of Middletown,*
294 F.3d 35 (2d Cir. 2002)................................................................................11

*Reinhart v. Lincoln County,*
482 F.3d 1225 (10th Cir. 2007) .........................................................................13

*Smith v. Chrysler Fin. Co.,*
Civil Action No. 00-6003 (DMC), 2003 U.S. Dist. LEXIS 1798
(D.N.J. Jan. 14, 2003) ..........................................................................15, 16, 17

**Page**

*Smith v. City of Jackson,*
544 U.S. 228 (2005)...................................................................................11, 12, 13, 14

*Swierkeiwics v. Soreman,*
534 U.S. 506 (2002)...................................................................................................18

*Tribett v. BNC Mortg.,*
Case No. 07 C 2809 (VMK), 2008 U.S. Dist. LEXIS 3573
(N.D. Ill. Jan. 17, 2008) ...................................................................................18, 20, 21

*Tsombanidis v. West Haven Fire Dep't,*
352 F.3d 565 (2d Cir. 2003).......................................................................................11

*Wards Cove Packing Co. v. Atonio,*
490 U.S. 642 (1989)...................................................................................................16

*Watson v. Fort Worth Bank & Trust,*
487 U.S. 977 (1988)...................................................................................................16

*Wise v. Union Acceptance Corp.,*
IP 02-0104-C-M/ S, 2002 U.S. Dist. LEXIS 23335
(S.D. Ind. Nov. 19, 2002)............................................................................................9

*Zamudio v. HSBC North America Holdings, Inc.,*
No. 07-C-4315, 2008 U.S. Dist. LEXIS 13952
(N.D. Ill. Feb. 20, 2008)...................................................................................2, 13, 19, 21

## STATUTES, RULES AND REGULATIONS

15 U.S.C.
§1691(a)(1) .........................................................................................................9
§1691a(e) ............................................................................................................9

42 U.S.C. 2000e *et seq.*...........................................................................................10

Federal Rules of Civil Procedure
Rule 8(a)(2)..........................................................................................................6
Rule12(b)(6).........................................................................................................1

## LEGISLATIVE HISTORY

Senate Report:
S. Rep. No. 94-589 (1976), reprinted in 1976 U.S.C.C.A.N. 403 ......................................10

**Page**

Conference Report:

    H.R. 6516, No. 94-210, p.5 ...........................................................................................10

    H.R. 6516, No. 94-589, pp. 4-5 ..................................................................................10

Plaintiff Pedro E. Rivas ("Plaintiff" or "Rivas") submits this memorandum in opposition to the Fed. R. Civ. P. 12(b)(6) motion to dismiss filed by Defendants Lehman Brothers Bank, F.S.B. ("Lehman") and BNC Mortgage, Inc. ("BNC") (Lehman and BNC are collectively referred to as "Defendants").

## I.    INTRODUCTION

Plaintiff is a minority homeowner who brought this action under the Fair Housing Act ("FHA") and Equal Credit Opportunity Act ("ECOA") to challenge Defendants' discriminatory mortgage lending practices. The crux of Plaintiff's complaint is that Defendants – both Lehman and BNC – together with their subsidiary mortgage lenders, agents or brokers, developed and implemented a practice of discretionary pricing that effectively charged minority borrowers more than similarly-situated white or non-minority borrowers. This practice causes minority borrowers to pay substantially more for their home loans than non-minorities. As a whole, the practices now challenged by this lawsuit have led to millions of dollars in unjustified and hidden costs to minority homeowners.

The disparate impact claims alleged in Plaintiff's class action complaint (the "Complaint") are permissible under the FHA and the ECOA. *See Johnson v. Wash. Mut. Bank, F.A.*, 03-CV-4704 (DLI)(LB), 2006 U.S. Dist. LEXIS 26729 (E.D.N.Y. May 4, 2006) (ECOA); *Khalil v. Farash Corp.*, 452 F. Supp. 2d 203, 208 (W.D.N.Y. 2006) (FHA). The Complaint sets forth a cognizable disparate impact claim against Defendants through the identification and description of Defendants "Discretionary Pricing Policy." Specifically, Plaintiff alleges that the Defendants authorize the use of subjective criteria to markup standard interest rates and financing charges on loans regardless of

the credit-worthiness of the borrower.  ¶¶ 1, 27, 31, 38, 39, 41.[1]  Plaintiff further alleges that Defendants' policy results in minority borrowers receiving mortgage loans with significantly higher interest rates and finance charges than similarly creditworthy white borrowers. ¶¶ 2, 14, 27, 41, 42, 43, 46.

Although Defendants repeatedly note that similar complaints based on the data used here have been filed against other mortgage lenders, Defendants fail to recognize that in each of those cases where a motion to dismiss was decided, that motion was denied with respect to the claims alleged here.  Indeed, eight District Courts recently denied motions to dismiss filed by defendants who made the same arguments that Lehman and BNC make here:

    i.     *See Payares v. JP Morgan Chase & Co.,* CV 07-5540 ABC (SHx) (May 15, 2008) (attached as Exhibit A);

    ii.    *Ramirez v. GreenPoint Mortgage Funding, Inc.*, No. C08-0369, 2008 WL 205101*8,* at *3-4 (N.D. Cal. May 13, 2008) (attached as Exhibit B);

    iii.    *Carter Ware v. Indymac Bank*, 534 F. Supp. 2d 835 (N.D. Ill. 2008);

    iv.    *Zamudio v. HSBC North America Holdings, Inc.*, No. 07-C-4315, 2008 U.S. Dist. LEXIS 13952 (N.D. Ill. Feb. 20, 2008);

    v.    *Garcia v. Countrywide*, No. EDCV 07-1161-VAP(JCRx) (C.D. Cal. Jan. 15, 2008) (attached as Exhibit C);

    vi.    *Newman v. Apex Financial Group, Inc.*, No. 07 C 4475, 2008 U.S. Dist. LEXIS 2249 (N.D. Ill. Jan. 11, 2008);

    vii.    *Martinez v. Freedom Mortg. Team, Inc.*, 527 F. Supp. 2d 827 (N.D. Ill. 2007); and

    viii.    *Jackson v. Novastar Mortg., Inc.*, No. 06-2249, 2007 U.S. Dist. LEXIS 93584 (W.D. Tenn. Dec. 20, 2007).

---

[1]    ¶__ refers to paragraphs of the Complaint.

For these reasons, discussed in further detail below, Plaintiff respectfully requests that the Court deny Defendants' motion to dismiss in its entirety and allow this case to proceed to discovery.

## II.    FACTUAL ALLEGATIONS

Defendants, through their own lending activities and through the lending activities of their subsidiaries, rank among one of leading mortgage lenders in the United States. ¶25.

### A.    Allegations Concerning Defendants "Discretionary Pricing Policy"; the Challenged Policy

Plaintiff alleges that Defendants' "Discretionary Pricing Policy" refers to a policy that authorizes Defendants and its loan officers and brokers to impose subjective, discretionary charges and interest rate mark-ups to be included in the loans they originate. ¶¶1, 27, 31, 38, 39, 44. According to the Complaint, these charges and markups, which are entirely unrelated to a borrower's objective credit characteristics, result in charges that are determined on a purely *subjective* basis and that adversely affects the rate otherwise available to borrowers. *Id.*

Defendants, their loan officers, mortgage brokers and correspondent lenders all brokered and funded loans in collaboration with one another and in conformance with the described Discretionary Pricing Policy. ¶¶2, 30, 31, 38, 41, 42, 43. Defendants actively executed the Discretionary Pricing Policy by educating and directing their loan officers and brokers about the subjective pricing, premiums and other discretionary charges. *Id.; see also,* ¶29. Defendants supplied their loan officers, mortgage brokers and correspondent lenders with a variety of loan-related forms, including loan contracts, applications, and instructions on filling out the documents necessary to complete home mortgage transactions. ¶35. In fact, financial incentives offered by Defendants motivated their loan officers, mortgage brokers and correspondent lenders to add the subjective charges. ¶¶28-31.

When a borrower's application is submitted, Defendants conduct an initial objective credit analysis. ¶¶36-38. A credit analysis typically considers an array of risk-related variables of

- 3 -

creditworthiness. ¶36. Through this initial analysis, Defendants derive a risk-based financing rate – referred to in the mortgage industry as the "Par Rate." ¶37.

The Complaint alleges that once the objectively applied criteria to calculate the Par Rate are accomplished, the subjective component of Defendants' credit-pricing system – the Discretionary Pricing Policy – is applied for the purposes of imposing non risk-related charges. ¶¶37-39. Defendants' Discretionary Pricing Policy is unrelated to the objective credit characteristics of prospective borrowers. ¶¶37-41. The Discretionary Pricing Policy results in charges that are fashioned on a purely subjective basis. ¶¶1, 2, 38, 41, 42. Plaintiff likewise alleges that once the interest rate is set through the objective criteria, Defendants' loan officers, mortgage brokers and correspondent lenders are given the discretion to subjectively mark up the interest rate and impose additional non risk-based charges, including yield spread premiums. ¶¶27, 31, 38, 39.

### B.    Allegations of Disparate Impact

Plaintiff alleges that Defendants' Discretionary Pricing Policy, to the extent that Defendants use the same policy for all mortgage applicants, is facially neutral. ¶54. Irrespective of the facially neutral posture of the Discretionary Pricing Policy, however, the policy has a disproportionately adverse effect on minority borrowers as compared to similarly-situated whites. ¶42. According to the Complaint, minority borrowers pay disparately more discretionary charges than similarly situated non minorities. *See, e.g.*, ¶¶42, 43. Based on the Home Mortgage Disclosure Act ("HMDA") data from the Department of Housing and Urban Development, minority borrowers were more likely than white borrowers to have received a high-APR loan from Defendants to purchase or refinance their home. ¶¶11-24.

The design or intent of Defendants' Discretionary Pricing Policy allows or causes borrowers with identical or similar credit scores to pay divergent interest rates or fees associated with procuring a mortgage. ¶¶30-31; 41-43. As a consequence of using a subjective pricing component – designed

- 4 -

to charge dissimilar finance charges to borrowers with similar credit profiles – the objective qualities of the initial credit analysis used to calculate the Par Rate are undermined and the potential for discrimination (*e.g.* race bias) becomes inherent in the transaction. ¶¶27, 31, 38-42.  Defendants' design, dissemination, control, implementation and profit from their Discretionary Pricing Policy created the disparate impact.  The disparate impact suffered by minority borrowers is a direct result of Defendants' Discretionary Pricing Policy.  Plaintiff was subject to Defendants' Discretionary Pricing Policy and, as a result, Plaintiff was charged a disproportionately greater amount in non risk-related credit charges than similarly-situated white or nonminority persons. ¶¶44-49.

The disparities between the terms Defendants offer minority borrowers versus the terms they offer white homeowners cannot be a product of chance and cannot be explained by factors unrelated to race.  Rather, the Complaint alleges, the disparities are the direct causal result of Defendants' use of the discriminatory Discretionary Pricing Policy.

## III.    ARGUMENT

### A.    Legal Standard

In deciding a motion to dismiss, the Court must "accept[] all factual allegations in the complaint and draw[] all reasonable inferences in the plaintiff's favor." *ATSI Commcn's, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).  The Supreme Court recently reaffirmed the simple premise that a complaint will survive a motion to dismiss so long as it alleges "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1974 (2007).  The *Twombly* decision further stated that "[a]sking for plausible grounds does not impose a probability requirement at the pleading stage; it simply calls for enough facts to raise a

reasonable expectation that discovery will reveal evidence" to support plaintiff's claims. *Id.,* at 1965.[2]

The Second Circuit has held that *Twombly* does not require a universally heightened standard of pleading, but "instead requir[es] a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible." *Orr v. Miller Place Union Free Sch. Dist.*, 07-CV-787 (DRH)(AKT), 2008 U.S. Dist. LEXIS 52803 (E.D.N.Y. July 9, 2008) (quoting *Iqbal v. Hasty*, 490 F.3d 143, 157-58 (2d Cir. 2007)).

The *Twombly* Court recognized that its holding was in accordance with Fed. R. Civ. P. 8(a)(2), which requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." *Twombly,* 127 S. Ct. at 1964. The Supreme Court then confirmed, in *Erickson v. Pardus*, the following pleading standard under Fed. R. Civ. P. 8(a)(2): "Specific facts are not necessary; the statement need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Erickson v. Pardus*, 127 S. Ct. 2197, 2200 (2007) (internal citations omitted). Simply stated, *Twombly* "'require[s] enough facts to 'nudge [plaintiffs'] claims across the line from conceivable to plausible.'" *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) (quoting *Twombly*, 127 S. Ct. at 1974).

As explained below, Plaintiff's Complaint satisfies this standard.

---

[2]    *See also Carter Ware v. Indymac Bank*, 534 F. Supp. 2d 835, 840 (N.D. Ill. 2008) ("Here, taking the facts alleged in the amended complaint as true, plaintiffs have a right to relief that is more than speculative because they have alleged sufficient facts to suggest the possibility that [defendant lenders] discriminated against minority borrowers."); *Newman v. Apex Fin. Group, Inc.*, No. 07 C 4475, 2008 U.S. Dist. LEXIS 2249, at *4 (N.D. Ill. Jan. 11, 2008) ("requiring the plaintiff to plead those unknown details before discovery would improperly deny the plaintiff the opportunity to prove its claim").

**B.    Plaintiff Has Adequate Standing to Bring His FHA and ECOA Claims Against Both Lehman and BNC**

Plaintiff alleges that both defendant Lehman and defendant BNC participated in the creation of the discriminatory practices at issue in this case.  According to the Complaint, both Lehman and BNC schemed to implement and promote the discriminatory policy that is the center of this litigation.  And, as plead, the Complaint alleges that both Lehman and BNC caused injury to Plaintiff and members of the Class as a result of their use of the Discretionary Pricing Policy.  As such, Plaintiff alleges plausible claims against both Lehman and BNC and has sufficiently plead standing to sue both defendants.

In order to establish standing, Plaintiff must show:

First, the plaintiff must have suffered an "injury in fact" – an invasion of a legally protected interest which is (a) concrete and particularized, and (b) "actual or imminent, not 'conjectural' or 'hypothetical.'"  Second, there must be a causal connection between the injury and the conduct complained of – the injury has to be "fairly . . . trace[able] to the challenged action of the defendant, and not . . . the result [of] the independent action of some third party not before the court." Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)[3] (internal citations omitted); *see also* Def. Mem. at 8.[4]  Defendants do not dispute that Plaintiff has standing against Lehman.  As applied to BNC, Defendants do not dispute that Plaintiff has standing under the first and third

---

[3]    Specifically as applied to standing for a FHA claim, courts are expected to be hesitant to find a lack of standing. *See Hack v. President & Fellows of Yale College*, 237 F.3d 81, 87 (2d Cir. 2000) (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 375-76 (1982)); *see also Comer v. Cisneros*, 37 F.3d 775, 788-89 (2d Cir. 1994) (affording plaintiffs "the broadest possible grounds for standing").  The FHA only requires allegations of "injury in fact," meaning that a plaintiff need simply allege distinct and palpable injuries that are fairly traceable to defendants' actions. *See Leblanc-Sternberg v. Fletcher*, 67 F.3d 412, 424 (2d Cir. 1995).

[4]    "Def. Mem. at __" refers to Defendants' Memorandum of Law in Support of Motion to Dismiss the Complaint.

element of the standard set forth in *Lujan*.  Defendants argue, however, that Plaintiff has not fulfilled the second element of standing (as applied to BNC) in that Plaintiff has not alleged injury that can be "fairly traceable" to conduct by BNC. Def. Mem. at 8.

Defendants aver that the only specific allegation against BNC is the description of defendant BNC in the "parties" section of the Complaint. Def. Mem. at 9; ¶10.  Defendants' position appears to simply ignore the full pleading of the Complaint.  The Complaint alleges, for example, that BNC's immediate parent company is Lehman (¶10), that BNC and Lehman engaged in discriminatory practices in connection with loans issued under their own names or under the names of their divisions or subsidiaries (¶¶1, 25-32), and that BNC and Lehman schemed to establish the Discretionary Pricing Policy (¶¶1, 33-43).  The Complaint thereby alleges more than a simple introduction of BNC. Def. Mem. at 9.  In fact, the Complaint alleges that it was Defendants' – both Lehman's and BNC's – discriminatory Discretionary Pricing Policy that directly damaged Plaintiff and the Class. ¶¶27, 29, 41, 43 and 44.  The Complaint, therefore, unmistakably pleads that the injury to Plaintiff and the Class is (at a very minimum) traceable to conduct by BNC.[5]

The Complaint plainly alleges conduct traceable to BNC that caused injury to Plaintiff and the Class.  Any further disagreement on this issue by Defendants is, at best, a factual question that is inappropriate for resolution in the context of a motion to dismiss. *See Fair Housing in Huntington Comm. v. Town of Huntington*, 316 F.3d 357, 361 (2d Cir. 2003) ("To the degree that defendants

---

[5]    Also, the three-prong standard set forth in *Lujan* is silent as to the requisite showing of actual contact between a plaintiff and defendant -- Rivas and BNC.  In fact, in order to have proper standing, pleading of direct contact between a plaintiff and a defendant is not required. *See, e.g., Jackson*, 2007 U.S. Dist. LEXIS 93584, *11 (a finding of standing "does not require direct contact between a plaintiff and a defendant").  Here, Plaintiff alleges that BNC schemed with Lehman to establish and implement the Discretionary Pricing Policy.  As such, Plaintiff has more than sufficiently plead that his (and the Class members') injury is fairly traceable to BNC.

challenge the factual underpinnings of the allegations made by plaintiffs in support of their standing to bring suit, the argument is premature.") (citing *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 115 (1979)).[6]

This Court should, therefore, find that Plaintiff has standing to bring his instant claims against BNC.

### C.    Plaintiff Adequately Alleges Disparate Impact Claims

### 1.    Disparate Impact Claims Are Permitted Under Both the ECOA and FHA

"The ECOA provides for a private cause of action based on disparate impact or disparate treatment." *Johnson v. Wash. Mut. Bank*, F.A., 03-CV-4704 (DLI)(LB), 2006 U.S. Dist. LEXIS 26729 (E.D.N.Y. May 4, 2006); *Powell v. Am. Gen. Fin., Inc.*, 310 F. Supp. 2d 481, 487 (N.D.N.Y 2004) (same) (citing *Jones v. Ford Motor Credit Co.*, No. 00 Civ. 8330, 2002 U.S. Dist. LEXIS 1098, at *2 (S.D.N.Y. Jan. 22, 2002)).[7] The Federal Reserve Board, through its interpretation of the

---

[6]    Plaintiff's standing against BNC is further supported by the plain language of the ECOA, which provides that "creditor" may not "discriminate against any applicant, with respect to any aspect of a credit transaction--on the basis of race" 15 U.S.C. §1691(a)(1). The act then broadly defines the term "Creditor" to encompass "any person who regularly extends, renews, or continues credit" as well as "any person who regularly arranges for the extension, renewal, or continuation of credit" 15 U.S.C. §1691a(e). *See also Martinez v. Freedom Mortg. Team, Inc.*, 527 F. Supp. 2d 827 (N.D. Ill. 2007) (noting that even mortgage brokers uninvolved in the decision-making process regarding a borrower's credit are regarded as "creditors" for the "purposes of the Credit Opportunity Act's proscription against discrimination").

[7]    *See also Haynes v. Bank of Wedowee*, 634 F.2d 266, 269 n.5 (11th Cir. 1981) ("ECOA regulations endorse use of the disparate impact test to establish discrimination . . . ."); *Coleman v. Gen. Motors Acceptance Corp.*, 196 F.R.D. 315, 325-26 (M.D. Tenn. 2000) ("there is clear support for the use of a disparate impact theory in an ECOA case"), *modified on other grounds*, 296 F.3d 443 (6th Cir. 2002); *Wise v. Union Acceptance Corp.*, IP 02-0104-C-M/ S, 2002 U.S. Dist. LEXIS 23335, at *10 (S.D. Ind. Nov. 19, 2002) ("Disparate impact analysis clearly is available to demonstrate discrimination under the ECOA.").

ECOA, likewise concluded that the ECOA permits disparate impact claims.[8]  And, notably, the legislative history of the ECOA lends unequivocal support to the Federal Reserve Board's administrative interpretation.[9]

---

[8]    *Effects test*.  The effects test is a judicial doctrine that was developed in a series of employment cases decided by the U.S. Supreme Court under Title VII of the Civil Rights Act of 1964 (42 U.S.C. 2000e *et seq.*), and the burdens of proof for such employment cases were codified by Congress in the Civil Rights Act of 1991 (42 U.S.C. 2000e-2).  Congressional intent that this doctrine apply to the credit area is documented in the Senate Report that accompanied H.R. 6516, No. 94-589, pp. 4-5; and in the House Report that accompanied H.R. 6516, No. 94-210, p.5.  The Act and regulation may prohibit a creditor practice that is discriminatory in effect because it has a disproportionately negative impact on a prohibited basis, even though the creditor has no intent to discriminate and the practice appears neutral on its face, unless the creditor practice meets a legitimate business need that cannot reasonably be achieved as well by means that are less disparate in their impact.

12 C.F.R. Part 202, Supp. I at § 202.6(a)(2).

[9]    The relevant legislative history of the ECOA reads as follows:

> The prohibitions against discrimination on the basis of race, color, religion or national origin are unqualified.  In the Committee's view, these characteristics are totally unrelated to creditworthiness and cannot be considered by any creditor.  In determining the existence of discrimination on these grounds, as well as on the grounds discussed below ***courts or agencies are free to look at the effects of a creditor's practices*** as well as the creditor's motives or conduct in individual transactions.  Thus judicial constructions of anti-discrimination legislation in the employment field, in cases such as *Griggs v. Duke Power Co.*, 401 U.S. 424 (1971), and *Albemarle Paper Company v. Moody* (U.S. Supreme Court, June 25, 1975), are intended to serve as guides in the application of this Act, especially with respect to the allocations of burdens of proof.

S. Rep. No. 94-589 (1976), reprinted in 1976 U.S.C.C.A.N. 403, 406 (emphasis added).  The cited Senate Report discussed amendments expanding the prohibitive reach of the statute to include racial discrimination, which is precisely the basis on which Plaintiff here invokes the ECOA. (It is also worth noting that ten of the thirteen committee members remained unchanged from the prior Congress that had enacted the statute.)  The reporting committee openly endorsed the disparate impact interpretation.  That, coupled with the Supreme Court of the United States' decision in *Griggs v. Duke Power Co.*, 401 U.S. 424 (1971), demonstrates the reporting committee's intent to allow such claims under the new prohibition on racial discrimination.

The FHA equally provides for a private cause of action based on disparate impact or disparate treatment. The Second Circuit in *Reg'l Econ. Cmty. Action Program v. City of Middletown*, 294 F.3d 35, 52 (2d Cir. 2002) manifestly acknowledged that a "disparate impact" claim is permitted under the FHA, stating that the FHA "provide[s] relief not only from policies adopted and actions taken with a discriminatory intent, but also from the application of facially neutral standards that have an unlawful discriminatory effect upon a protected class." *See also Fair Hous. in Huntington Comm.,* 316 F.3d 357 (analyzing the theory of disparate impact under the FHA); *Tsombanidis v. West Haven Fire Dep't*, 352 F.3d 565, 575 (2d Cir. 2003) (same); *Hack v. President & Fellows of Yale College*, 237 F.3d 81, 90 (2d Cir. 2000) (same). The Second Circuit's decision in *Fair Hous. in Huntington* went so far as to state that "disparate impact is not a novel theory under the FHA." 316 F.3d at 366; *see also Khalil*, 452 F. Supp. 2d at 208. Indeed, every Federal Circuit Court in the United States that has been presented with a disparate impact claim under the FHA has regarded it as a permissible claim. *See, generally, 2922 Sherman Ave. Tenants' Ass'n v. District of Columbia*, 444 F.3d 673, 679 (D.C. Cir. 2006) (commenting that "every one of the eleven circuits to have considered the issue has held that the FHA similarly prohibits not only intentional housing discrimination, but also housing actions having a disparate impact").

Clearly, both under the ECOA and the FHA, the theory of disparate impact is a commonly accepted and cognizable claim. Yet, notwithstanding the decisional authority of the Second Circuit and its district courts, Defendants nevertheless argue that disparate impact claims are not permitted under these statutes. Def. Mem. at 12-15. Defendants base their entire contention that disparate impact claims are not permitted under the FHA and ECOA on a distorted (and unsupported) reading the Supreme Court of the United States decision in *Smith v. City of Jackson*, 544 U.S. 228 (2005).

- 11 -

In *City of Jackson*, the Supreme Court held that the plaintiff could bring a disparate impact claim under the Age Discrimination in Employment Act ("ADEA"). 544 U.S. at 235-39. In its analysis, the Supreme Court compared the language of the ADEA with the text of §703(a)(2) of the Civil Rights Act of 1964 ("Title VII"). The Supreme Court reasoned that the ADEA and Title VII both permitted disparate impact claims. As part of its discussion, the Supreme Court referenced the ADEA's and Title VII's prohibition against "actions that deprive any individual of employment opportunities or ***otherwise adversely affect*** his status as an employee, because of such individual's race or age." *City of Jackson*, 544 U.S. at 235 (emphasis in original).

Defendants, here, have taken an expansive interpretation of the Supreme Court's discussion regarding the "effects" language contained in the ADEA. Defendants maintain that the absence of "effects" language in an Act (*e.g.* ECOA or FHA) means that disparate impact claims are barred under that Act. Defendants' argument is simply flawed.

If this or any other court were to agree with Defendants' position, it would effectively overrule countless Federal Court decisions (including many Second Circuit opinions) that have permitted disparate impact claims under the ECOA and/or FHA. Those decisions should be respected. *See, supra,* at 9, 11. The *City of Jackson* decision does not even mention the FHA or the ECOA and certainly does not state that it intends to overrule years of precedent concerning disparate impact claims under the FHA or the ECOA.[10] Indeed, Second Circuit District Court opinions issued

---

[10]     Some courts have, in fact, applied the Title VII disparate impact analysis directly to FHA and the ECOA. *See, e.g.*, *Gamble v. City of Escondido*, 104 F.3d 300, 304 (9th Cir. 1997) ("We apply Title VII discrimination analysis in examining Fair Housing Act ("FHA") discrimination claims . . . Thus, a plaintiff can establish an FHA discrimination claim under a theory of disparate treatment, or disparate impact.") (citations omitted); *Pfaff v. U.S. Dep't of Housing & Urban Dev.,* 88 F.3d 739, 745 n. 1 (9th Cir. 1996) (looking to Title VII for guidance in examining a disparate impact claim under the FHA); *Miller*, 688 F.2d at 1239-40 (noting that Title VII disparate impact analysis applies to ECOA).

after the *City of Jackson* decision was published (on March 20, 2005) signified the existence of

disparate impact claims under the ECOA and FHA. *See Johnson v. Wash. Mut. Bank*, F.A., 2006

U.S. Dist. LEXIS 26729 and *Khalil*, 452 F. Supp. 2d at 208 (FHA).

Defendants do not cite to any pre- or post-*City of Jackson* authority to support their

contention; because they cannot. To the contrary, however, numerous post-*City of Jackson* decisions

(in addition to *Johnson* and *Khalil*) support Plaintiff's position that disparate impact claims under

ECOA and FHA are alive and well. *See Reinhart v. Lincoln County*, 482 F.3d 1225, 1229 (10th Cir.

2007) (stating that unlawful discrimination under FHA "may occur either by disparate treatment or

disparate impact") (quotations omitted); *Affordable Housing Dev. Corp.*, 433 F.3d 1182, 1194 (9th

Cir. 2006) (finding disparate impact claims are cognizable under FHA); *Golden v. City of Columbus*,

404 F.3d 950, 963 (6th Cir. 2005) (recognizing the continuing viability of ECOA disparate impact

claims); *Ware*, 534 F. Supp. 2d at 840 (rejecting defendants' claims that plaintiff had failed to state a

disparate impact claim under the FHA and ECOA); *Martinez*, 527 F. Supp. 2d at 834-35 (finding

disparate impact discrimination can constitute violation of FHA and ECOA); *Zamudio*, 2008 U.S.

Dist. LEXIS 13952, ("it is well established that a disparate-impact claim is available under both the

ECOA and FHA" and explicitly rejecting argument that *City of Jackson* changed this precedent);

*Newman*, 2008 U.S. Dist. LEXIS 2249, at *3-*5 (concluding that the plaintiff had sufficiently

pleaded disparate impact causes of action under FHA and ECOA); *Beaulialice v. Federal Home*

*Loan Mortgage Corp.*, No. 8:04-CV02316-T-24-EAJ, 2007 U.S. Dist. LEXIS 15846 at *16 (M.D.

Fla. Mar. 6, 2007) (*City of Jackson* notwithstanding, plaintiff "may bring a disparate impact claim

under the FHA" and ECOA); *Ojo v. Farmers Group, Inc.*, No. 05-5818-JFW, 2006 WL 4552707, at

*15 (C.D. Cal. Mar. 7, 2006) (FHA "prohibits racial discrimination in the form of disparate

impact"); *see also Ramirez*, 2008 WL 2051018, at *3-4; *Payares,* CV 07-5540 ABC (SHx).

- 13 -

Based on this overwhelming consensus, disparate impact claims have been and continue to be permitted under both the ECOA and FHA. There is no merit to the assertion that the *City of Jackson* decision in any way changed the private cause of action based on disparate impact under either the ECOA or FHA and, as such, Defendants' argument should be rejected.

> **2.    Plaintiff Sufficiently Alleges the Manner in Which Defendants' Discretionary Pricing Policy had a Negative Disparate Impact on Minorities**

"To state a disparate impact claim under the ECOA, a plaintiff must allege that the defendant had a discriminatory [] policy or practice." *Johnson*, 2006 U.S. Dist. LEXIS 26729 at *17-18; *see also Powell,* 310 F. Supp. 2d at 487. Similarly, to state a disparate impact claim under the FHA, "a plaintiff must demonstrate that an outwardly neutral practice actually or predictably has a discriminatory effect." *Fair Hous. in Huntington Comm. at* 316 F.3d 357, 366; *see also Khalil v. Farash Corp.*, 452 F. Supp. 2d 203 at 208 (same); *Hack*, 237 F.3d at 88 (stating that in order to state FHA claim based on disparate impact, plaintiffs must show that the identified policy, although adopted for neutral reasons, has a discriminatory impact).

Here, Plaintiffs allege that Defendants' facially neutral policy or practice to allow for subjective charges – the Discretionary Pricing Policy – had a discriminatory impact. ¶54. The Complaint further details the manner in which Defendants train and authorize their loan officers and correspondent lenders to first derive a financing rate from objective factors – the "Par Rate" – and then use subjective factors to later mark up the rate and impose additional non-risk charges. ¶37. Finally, according to the Complaint, the Discretionary Pricing Policy caused minorities to pay disparately more charges than similarly situated non-minorities. ¶¶ 2, 14, 27, 41, 42, 43, 46.

Based on these described allegations, Plaintiff sufficiently alleged disparate impact claims under both the FHA and ECOA.

- 14 -

The Southern District of New York examined facts and allegations under the purview of the automobile industry that are strikingly similar to the facts and claims at issue here. In *Jones v. Ford*, 2002 U.S. Dist. LEXIS 1098, the plaintiffs alleged that, in violation of the ECOA, defendant Ford's policy of authorizing automobile dealers to subjectively markup an otherwise objectively risk-based finance charge rate had a disparate impact on African American consumers. The court sustained the complaint, finding that the allegations of a specific policy – the creditor's authorization or allowance of third-party subjective markups to loan rates – resulted in disproportionately high interest rates for African-American borrowers. *Id.*, at *1. *Cf., Powell*, 310 F. Supp. 2d 481 (dismissing the plaintiffs' ECOA claims, but only based on their failure to allege that banks used subjective indicators when making loan decisions).

Notably, the court in *Ford* sustained the disparate impact claim despite the fact that defendant's original policy or practice was based on objective factors. In doing so, the court reasoned:

> Although plaintiffs concede that the first stage of the credit evaluation consists of considering objective risk-based factors, their claim against Ford Credit is aimed at the role Ford Credit plays in authorizing subjective mark-ups in the second stage. Taking plaintiffs' allegations as true, that Ford Credit is involved in a subjective scheme which has a disproportionate negative effect on African-Americans, plaintiffs have stated a claim for disparate impact.

*Ford*, at *12.

The District Court of New Jersey, also in the context of the automobile financing industry, reached like conclusions. *See Smith v. Chrysler Fin. Co*., Civil Action No. 00-6003 (DMC), 2003 U.S. Dist. LEXIS 1798 (D.N.J. Jan. 14, 2003). In *Chrysler*, the complaint alleged that the financing process at issue first calculated the borrower's objective Par-Rate based on creditworthiness factors

analogous to those present in Rivas' Complaint. *Chrysler*, at \*2.  Once the Par-Rate was calculated, the agent added a subjective "mark-up" that had a disparate impact.[11]  *Id.*

Defendant in *Chrysler* moved to dismiss on the basis that the complaint failed to identify a specific practice under the *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642 (1989) and *Watson v. Fr. Worth Bank & Trust*, 487 U.S. 977 (1988) decisions.  The court rejected defendant's argument, sustained the complaint and, with regard to the apparent absence of a practice or policy, specifically commented:

> This court does not agree with Defendant's argument that Plaintiffs failed to identify a specific practice or policy that resulted in the alleged discrimination. Defendant contends that the subjective mark-up policy alleged to cause discriminatory effects to African-Americans occurred not because Defendant authorized it as the assignee, but rather because the law allowed it. Moreover, ***Defendant argues that their actions are not improper because they are simply following a recognized business practice within the financial industry. These arguments are not compelling because the law does not allow subjective mark-up policies that result in discrimination against a protected class absent a valid business justification.***  Defendant fails to provide a valid business justification for its actions that result in discrimination.

> ***Assuming Plaintiff's allegations are correct and Defendant controls the implementation of the alleged subjective non-risk related mark-up policy, then Plaintiffs have identified a specific discriminatory practice or policy used by Defendant as required under the ECOA for a disparate impact claim.***  Standardized criteria within a business practice can be used as evidence of a disparate impact. Subjective applications of neutral underwriting criteria is standardized conduct because the loan originators have the opportunity to use their discretion with respect to each loan application.

*Chrysler*  at \*19-\*21 (internal citations and quotations omitted) (emphasis added).

---

[11]    In *Chrylser*, "[p]laintiffs' amended complaint attacks Defendant's 'mark-up' policy, which authorizes and encourages car dealerships who provide retail installment contracts to subjectively mark-up finance charge rates on otherwise objective risk-related annual percentage rates. Plaintiffs contend that such subjectivity causes widespread discriminatory impact on African-Americans as a whole who apply for vehicle financing, and is in violation of the Equal Credit Opportunity Act." *Id.* at \*4-\*5.

Akin to the complaints in *Ford* and *Chrysler*, Plaintiff here has alleged that Defendants have a policy of authorizing the imposition of subjective, discretionary charges and interest markups that are encompassed by the finance charges of originated loans – the "Discretionary Pricing Policy." For the purposes of evaluating disparate impact claims, the subjective policies at issue in the *Ford* and *Chrysler* cases are indistinguishable from the Discretionary Pricing Policy at issue in this litigation.[12]  Plaintiff's claims should thereby be sustained.

In *Garcia*, the court was presented with a similar claim of a discretionary pricing policy in the mortgage industry.  In connection with the plaintiff's identification of a specific policy, the court found that:

> Plaintiff does not challenge the overall process by which Defendants determine borrowers rates and fees.  Instead, Plaintiff challenges only the practice of allowing and incentivizing individual loan originators to assess additional, non-risk based fees. In the context of a motion to dismiss, this is sufficient to give Defendants 'fair notice of what the plaintiff's claim is and the grounds upon which it rests.'

*Garcia*, at *15 (citing *Conley v. Gibson*, 355 U.S. 41, 47 (1957)) (internal citations omitted). Defendants' contention that Plaintiff here does not point to a specific Defendants practice or policy (Def. Mem. at 20-21) should likewise fail. *See Ramirez,* 2008 WL 2051018.  In *Ramirez*, the court noted that plaintiffs adequately identified a specific policy pursuant to which borrowers paid discretionary points, fees or interest rate mark-ups in connection with their loan. The court expressly stated that "[i]n doing so, they have ***singled out the subjective portion of a lending policy that allegedly relies on both subjective and objective criteria, and they need do no more to meet the***

---

[12]    The lenders in the automobile financing industry cases, as here, sometimes rely on third parties to carry out their policies or practices.  Regardless, the courts in *Ford* and *Chrysler* each sustained the respective disparate impact claims against the defendant lenders or creditors. Defendant Lehman's attempt to hide behind the actions they purport to have been taken by third parties (Def. Mem. at 20-21) should likewise be rejected.

*"specific policy or practice" requirement for stating a disparate impact claim*." 2008 WL 2051018, at *4. (emphasis added).

Defendants argue that the Complaint "fails to allege any facts that would show that Lehman's neutral policies had a discriminatory impact against minorities, let alone a significant impact." Def. Mem. at 15, relying on *Tribett v. BNC Mortg.*, Case No. 07 C 2809 (VMK), 2008 U.S. Dist. LEXIS 3573 (N.D. Ill. Jan. 17, 2008). This statement by Defendants, however, not only ignores Plaintiff's allegations describing the discriminatory policy and its impact, but the statement implies that Plaintiff is subject to a pleading standard greater than what is required to defeat a motion to dismiss.

Defendants' argument fails as the Complaint unequivocally alleges, among other details, that Defendants' Discretionary Pricing Policy causes their minority customers to pay higher rates or charges than Defendants' non minority customers. The HMDA data plead in the Complaint supports these allegations. ¶¶ 11-24. To the extent that Defendants' seek additional evidence or proof of these claims, the argument is premature in a motion to dismiss. *See Garcia*, at *16 (finding that plaintiff "is not required at the pleading stage to produce statistical evidence proving a disparate impact on Defendants' customers – all that is required is fair notice of the claims and the grounds upon which they rest, sufficient to raise a right to relief above the speculative level") (citing *Swierkeiwics v. Soreman*, 534 U.S. 506 (2002)).[13]

---

[13]     *See also Newman*, 2008 U.S. Dist. LEXIS 2249. In *Newman*, the court held:

> All of Defendants' arguments that the amended complaint contains 'unfounded discrimination claims,' go to the merits of the claims, which is not a proper inquiry at the motion to dismiss stage. Whether or not Defendants charged minority borrowers higher rates, or whether Defendants can come forth with legitimate business reasons to justify the rates at issue, or whether Defendants' rates actually encourage home ownership are not matters that can be addressed at the motion to dismiss stage. **At the motion to dismiss stage a court must assess whether a plaintiff has stated a valid claim, rather than assess the merits of the plaintiff's allegations.**

In this regard, Defendants' argument that the Complaint lacks sufficient facts about loans specifically issued by Lehman likewise fails. The details Defendants purport to be necessary to state a claim are simply not necessary at the pleading stage. *See Garcia*, at *11-16 (concluding that the lack of specific data linked to defendant bank is not fatal to plaintiff's claims). In *Garcia*, the Court rejected these same arguments, stating that plaintiff alleged that Defendants' minority customers, specifically, pay disproportionately higher fees for mortgages than Defendants' non-minority customers. Plaintiff also provided statistical evidence of a nationwide disparate impact which, combined with the allegation that defendants were a large mortgage lender, the court in *Garcia* found to be "enough to raise above the speculative level Plaintiff's allegation that Defendants' minority buyers pay disproportionately higher fees." *Garcia* , at *16-17.[14]

Here, akin to the *Garcia* matter, the Complaint alleges that the Discretionary Pricing Policy causes Defendants' minority customers to pay higher rates or charges than Defendants' non minority customers. The Complaint similarly presents statistical evidence of a nationwide disparate impact

---

2008 U.S. Dist. LEXIS 2249, at *10-*71. (emphasis added).

[14]    *See also Zamudio.* In *Zamudio*, the court reasoned:

> Defendants assert that Zamudio fails to specifically identify any discriminatory policy or practice and, thus, fails to provide Defendants with fair notice of the claims. Zamudio's claims identify the discriminatory practice to be the method of Defendants' use of specific credit attributes in its self-designed system of automated underwriting and credit scoring. Zamudio asserts that racially discriminatory assumptions are embedded in the statistical formulas used to analyze credit information and ultimately form underwriting decisions. This is sufficient to meet the basic pleading requirements under *Twombly*. ***The only way for Zamudio to ascertain a more detailed picture of Defendants' use of credit-related variables would be through discovery.***

2008 U.S. Dist. LEXIS 13952, at *3-4. (emphasis added)

and alleges that Defendants rank among one of leading mortgage lenders in the United States. Therefore, the allegations of Rivas' Complaint exceed the speculative level and should be sustained.

Moreover, Defendants reliance on *Tribett*, 2008 U.S. Dist. LEXIS 3573, a case in which the plaintiffs' FHA and ECOA claims were dismissed because the complaint contained only vague and conclusory allegations, is misleading. Def. Mem. at 15. Defendants' depiction of the court's holding in *Tribett* is lacking a crucial component of the court's reasoning. In *Tribett*, the court did, in fact, find that the operative complaint stated "mainly vague and conclusory allegations that do not establish a plausible entitlement to relief under the FHA or the ECOA." *Tribett*, 2008 U.S. Dist. LEXIS 3573, at *8. The court, however, added that Plaintiffs claims could be sustained if they simply amended their complaint to insert the basic contentions of the discrimination that they raised for the first time in their brief in opposition to defendant's motion to dismiss. *Id.* at *9-*10. The *Tribett* court specifically noted:

> In support of their argument to the contrary, the [plaintiffs] contend, among other things, that brokers like Pan American are more successful in persuading African-American and Latino credit applicants to accept unnecessarily higher rates and/or larger interest rate increases and that BNC designed and established a financial incentive structure that encourages brokers to engage in discretionary loan pricing. The [plaintiffs] also suggest that BNC and/or its brokers disproportionately target African-American and Latino communities for loans and that BNC continues to pay YSPs, despite its knowledge (through trade journals and other studies) of pricing disparities in subprime loans that have occurred as a result of race. While such allegations may weigh against dismissal of Counts I and II[15], the [plaintiffs] failed to include any such allegations in their Complaint. Assuming that Plaintiff can make such allegations based on the facts that they have set forth in their supporting brief, Plaintiffs will be permitted to amend the Complaint and include such allegations in support of its FHA and ECOA claims.

*Tribett*, 2008 U.S. Dist. LEXIS 3573, at *8-*9 (citations omitted).

---

[15]    Count I of the complaint in *Tribett* alleged discrimination under the FHA. Count II of the complaint in *Tribett* alleged discrimination under the ECOA.

- 20 -

Clearly, despite what Defendants' suggest, the *Tribett* court was not looking for anything more than basic allegations that would put defendants on notice of their claims, even absent proof or evidence to support their claims of discrimination or without alleging all facts involved in the claim. *Id.* at *7, *10.  Here, unlike in *Tribett*, Plaintiff has plead the discriminatory practice, the associated (subjective) discriminatory policy, and the disparate impact caused by Defendants' policy.

Defendants add that the data used by Plaintiff in his Complaint may not be sufficient for drawing conclusions or can lead to inaccurate conclusions. Def. Mem. at 16. Defendants further argue that the publicly available data concerning the mortgage lending in the industry is insufficient "support" to state a claim against Lehman.  Def. Mem. at 15-16.  Defendants' argument, however, is entirely inappropriate in the context of a motion to dismiss.  Defendants will have ample opportunity, through discovery, to attempt to refute Plaintiff's theory of the case or rebut Plaintiff's evidence to ultimately support his claim.  Defendants' factual disputations of Plaintiff's pleading can be appropriately raised in a motion for summary judgment after adequate discovery on the issues have been conducted and completed.  For the purposes of the pleading stage and in the context of deciding a motion to dismiss, however, Plaintiff's use of publicly available data concerning the mortgage lending industry amply sustains his causes of action against Defendants and advances the notice of his claims against Defendants – which is all that is required at this stage of the litigation. *See, supra,* at 26; *Zamudio*, 2008 U.S. Dist. LEXIS 13952; *Garcia, at *6, Newman*, 2008 U.S. Dist. LEXIS 2249, at *3-*5.

Defendants also argue that Plaintiff's use of the HDMA data in his Complaint is inappropriate because a plaintiff cannot use information on industry-wide practices to support a claim. Def. Mem. at 16-17.  Defendants misinterpret and expand the holding in *Amron v. Morgan Stanley Inv. Advisors, Inc.,* 464 F.3d 338 (2d Cir. 2006) to support their contention.  In *Amron*, the

court refused to apply broad and general criticisms of the mutual fund industry to support allegations that defendants charged unreasonably high fees. *Amron*, 464 F.3d at 340.  The *Amron* decision is clearly limited to its facts and does not stand for the proposition that industry-wide practices ***cannot*** support a claim.  *See also In re Salomon Smith Barney Mut. Fund Fees Litig.,* 528 F. Supp. 2d 332, 336 (S.D.N.Y. 2007) (examining the allegations rejected in *Amron*).  Indeed, to the contrary, other courts have looked to industry practice or data to support a claim or cause of action.  *See, e.g., Garcia*.  Regardless, Defendants argument in this regard ignores Plaintiff's specific pleading data applicable to Defendants. ¶21 ("minorities who borrowed from Defendants between 2004 and 2006 were nearly 50% more likely than Caucasion borrowers to have received a high-APR loan to purchase or refinance their home").

Defendants also argue that explanations, other than discrimination, could explain some of the discrepancies identified by the data concerning the mortgage lending industry.  As such, according to Defendants, Plaintiff cannot show disparate impact discrimination as a matter of law.  Def. Mem. at 18.  Again, Defendants' argument is premised on the incorrect standard to be applied for a motion to dismiss.[16]  Further, in support of this position, Defendants rely on *Brown v. Coach Stores*, 163 F.3d 706 (2d Cir. 1998) for the proposition that where several possible factors exist to explain the underrepresentation of minorities employed at a company, the Plaintiffs must show that a particular factor existed to account for the discriminatory impact. Def. Mem. at 18.  In *Brown*, however, the court simply called for the pleading of a plausible cause – *e.g.* a company policy – that could explain

---

[16]    In addition to being premature, Defendants' argument appears to wrongly shift the burden of proof to Plaintiff.  In support of a disparate impact claim, a plaintiff is simply required to: (1) identify a specific practice or policy used by the defendant; and (2) demonstrate, through statistical evidence, that the practice or policy has caused an adverse effect on the protected group.  Once this showing is made, the burden is on defendant "to articulate a legitimate, non-discriminatory reason for the practice or policy".  *Ford Motor Credit Co.*, 2002 U.S. Dist. LEXIS 1098, at *10.

the decrease in the overall percentage of minority employees. *Brown*, 163 F.3d at 712 ("Brown does

not connect these general statistics to any [company] policy.").  While the complaint in *Brown* may

have failed to identify a policy to support the disparate impact claim (*Brown*, 163 F.3d at 713), the

Complaint here plainly alleges the creation of the Discretionary Pricing Policy and the disparate

impact of its implementation.

## IV.     Conclusion

For the reasons stated above, Plaintiff respectfully requests that the Court deny Defendants'

motion in its entirety.[17]

DATED:  July 25, 2008                         COUGHLIN STOIA GELLER
                                                 RUDMAN & ROBBINS LLP
                                              SAMUEL H. RUDMAN
                                              ROBERT M. ROTHMAN
                                              MARK S. REICH


                                              _____
                                                   */S/ Samuel H. Rudman*
                                                    Samuel H. Rudman

                                              58 South Service Road, Suite 200
                                              Melville, NY  11747
                                              Telephone:  631/367-7100
                                              631/367-1173 (fax)

---

[17]      In the event that the Court deems any of the claims against Defendants insufficiently plead, Plaintiff requests an opportunity to amend the Complaint, pursuant to Federal Rule of Civil Procedure 15. *See Space, Inc. v. Simowitz*, 08 Civ. 2854 (SAS), 2008 U.S. Dist. LEXIS 51782 (S.D.N.Y. July 7, 2008).  Whether to permit a plaintiff to amend its pleadings is a matter committed to the Court's "sound discretion." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007). Rule 15(a) provides that leave to amend a complaint "shall be freely given when justice so requires." Moreover, "[i]t is the usual practice upon granting a motion to dismiss to allow leave to replead." *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991).

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
JOHN J. STOIA, JR.
THEODORE J. PINTAR
LESLIE E. HURST
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

BONNETT, FAIRBOURN, FRIEDMAN
  & BALINT, P.C.
ANDREW S. FRIEDMAN
WENDY J. HARRISON
T. BRENT JORDAN
2901 N. Central Avenue, Suite 1000
Phoenix, AZ  85012
Telephone:  602/274-1100
602/274-1199 (fax)

CHAVEZ & GERTLER LLP
MARK A. CHAVEZ
JONATHAN E. GERTLER
NANCE F. BECKER
42 Miller Avenue
Mill Valley, CA  94941
Telephone:  415/381-5599
415/381-5572 (fax)

RODDY KLEIN & RYAN
Gary Klein
Kevin Costello
727 Atlantic Ave -
2nd Floor
Boston, MA  02111
Telephone:  (617) 357-5500
(617) 357-5030 (fax)

Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I, Samuel H. Rudman, hereby certify that on July 25, 2008, I caused a true and correct copy of the attached:

Memorandum of Law in Opposition to Defendants' Motion to Dismiss

to be served: (i) electronically on all counsel registered for electronic service for this case; and (ii) by first-class mail to any additional counsel participating in this action.

_____ */s/ Samuel H. Rudman* _____
SAMUEL H. RUDMAN

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

| Case No. | CV 07-5540 ABC (SHx) | Date | May 15, 2008 |
|---|---|---|---|

| Title | Alfredo B. Payares v. JP Morgan Chase & Co., et al. |
|---|---|

| Present: The Honorable | Audrey B. Collins | |
|---|---|---|
| Daphne Alex | Not present | N/A |
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| None | None |

**Proceedings:** DEFENDANTS' MOTION TO DISMISS (In Chambers)

Pending before the Court is Defendants' Motion to Dismiss ("Motion"), filed March 11, 2008. Plaintiff filed his Opposition on April 7, 2008; Defendants filed their Reply on April 21, 2008. The Court finds that the motion is appropriate for submission without oral argument and VACATES the hearing set for May 19, 2008. See Fed. R. Civ. P. 78(b); Local Rule 7-15. Having considered the materials submitted by the parties and the case file, the Court hereby GRANTS Defendants' Motion in part and DENIES it in part, as set forth below.

## BACKGROUND

On August 23, 2007, Plaintiff Alfredo B. Payares ("Plaintiff") filed a class action complaint against Defendants JP Morgan Chase & Co. and Chase Bank U.S.A., N.A. ("Defendants"), alleging violations of the Equal Credit Opportunity Act (15 U.S.C. §§ 1691-1691f), the Fair Housing Act (42 U.S.C. §§ 3601-3619), and two provisions of the Civil Rights Act (42 U.S.C. §§ 1981-1982). Plaintiff asserts that Defendants, in funding residential mortgage loans, follow "discretionary loan pricing procedures that cause minority borrowers to pay subjective fees such as yield spread premiums and other mortgage-related finance charges at higher rates than similarly situated non-minority borrowers." (Compl. ¶ 19.) Specifically, Plaintiff focuses on the use of "yield spread premiums," which he does not define or explain in his complaint.

Plaintiff, who identifies himself as Latino, purports to bring this action on behalf of members of all minority racial groups "who have entered into residential mortgage loan contracts that were financed or purchased by [Defendants], and who have been subjected to racial discrimination." (Compl. ¶ 5.) Plaintiff claims that he was injured by Defendants' discriminatory pricing policies in August, 2005, when he refinanced his home in Paramount, California. (Id. at ¶¶ 35-39.) This refinancing was arranged through Amstar Mortgage Company, a brokerage company whose loan officers work on commission in obtaining financing from Defendants. (Id. at ¶ 35.) Plaintiff alleges that, in addition to a number of other fees, he was charged a "yield spread premium" of $5,640, "paid outside of closing," to receive his new loan. (Id. at ¶37.)

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 07-5540 ABC (SHx) | Date | May 15, 2008 |
|---|---|---|---|
| Title | Alfredo B. Payares v. JP Morgan Chase & Co., et al. | | |

On March 11, 2008, Defendants filed a motion to dismiss the complaint, arguing that the complaint does not sufficiently allege facts to support claims of intentional discrimination. Further, they argue that the theory of "disparate impact" discrimination is not available to Plaintiff under any of his causes of action, but that even if it were, he has not alleged sufficient facts to support any claims of disparate impact.

### LEGAL STANDARD

A Rule 12(b)(6) motion tests the legal sufficiency of the claims asserted in a complaint. Fed. R. Civ. P. 12(b)(6). Rule 12(b)(6) must be read in conjunction with Rule 8(a), which requires a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2); 5A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure: Civil § 1356. A Rule 12(b)(6) dismissal is proper only where there is either a "lack of a cognizable legal theory" or "the absence of sufficient facts alleged under a cognizable legal theory." Balistreri v. Pacifica Police Dept., 901 F.2d 696, 699 (9th Cir. 1988). To survive a Rule 12(b)(6) motion, a complaint "does not need detailed factual allegations," but the "[f]actual allegations must be enough to raise a right to relief above the speculative level." Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1964-65 (2007).

The Court must accept as true all material allegations in the complaint, as well as reasonable inferences to be drawn from them. Pareto v. F.D.I.C., 139 F.3d 696, 699 (9th Cir. 1998). Furthermore, the complaint must be read in the light most favorable to plaintiff. Id. However, the Court need not accept as true any unreasonable inferences, unwarranted deductions of fact, or conclusory legal allegations cast in the form of factual allegations. Id.; Western Mining Council v. Watt, 643 F.2d 618, 624 (9th Cir. 1981).

### DISCUSSION

In theory, two different methods of proving discrimination are potentially available to Plaintiff: showing that Defendants engaged in intentional discrimination against minorities, or "disparate treatment"; and showing that Defendants's actions resulted in a "disparate impact" on minority groups. Defendants argue that the theory of "disparate impact" discrimination is not available to Plaintiff under any of his causes of action. If true, his claims could only survive a motion to dismiss if he had sufficiently alleged the existence of intentional discrimination. Plaintiff appears to concede that claims for violations of the Civil Rights Act cannot proceed under a disparate impact theory, asserting that his Section 1981 and 1982 causes of action are based solely on claims of intentional discrimination. (Pl.'s Mem. in Opp'n to Defs.' Mot. to Dismiss, at 15 n.14.) Thus if the complaint does not include facts sufficient to show intentional discrimination, as Defendants also argue, Plaintiff's Civil Rights Act claims must fail. On the other hand, Plaintiff disputes Defendants' argument that disparate impact claims are not cognizable under either the Fair Housing Act ("FHA") or the Equal Credit Opportunity Act ("ECOA"), arguing that not only can he bring disparate impact claims under those two statutes, he has sufficiently alleged facts to support these claims.

### A. "Disparate Impact" Discrimination

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 07-5540 ABC (SHx) | Date | May 15, 2008 |
|---|---|---|---|

| Title | Alfredo B. Payares v. JP Morgan Chase & Co., et al. |
|---|---|

Defendants argue that disparate impact discrimination is not cognizable under either the FHA or the ECOA. Their entire argument is based on two Supreme Court decisions: Alexander v. Sandoval, 532 U.S. 275 (2001), and Smith v. City of Jackson, 544 U.S. 228 (2005). Neither of these cases addressed either of the two statutes at issue here, but Defendants nonetheless argue that they "compel[] the conclusion" that Plaintiff's disparate impact claims are not permissible. (Defs.' Mem. of Ps. & As. in Support of Mot. to Dismiss ("Defs.' Mem."), at 14.) In short, these cases purportedly suggest that anti-discrimination statutes must contain language expressly prohibiting actions that "adversely affect" a protected class of individuals in order to authorize "disparate impact" claims. Accordingly, Defendants continue, as the FHA and ECOA lack such "effects" language, they cannot support disparate impact claims. This argument is creative, but not convincing. Ninth Circuit law makes clear that both the FHA and the ECOA support disparate impact claims. Budnick v. Town of Carefree, 518 F.3d 1109, 1114-15 (9th Cir. 2008) ("Title VII discrimination analysis is used to examine claims under the FHAA; thus, a plaintiff may establish discrimination in violation of the FHAA under a theory of disparate treatment or disparate impact."); Affordable Housing Dev. Corp. v. City of Fresno, 433 F.3d 1182, 1194 (9th Cir. 2006) (finding that plaintiffs made a prima facie showing of disparate impact discrimination under the FHA, but upholding judgment for defendants after jury trial); Harris v. Itzhaki, 183 F.3d 1043, 1051 (9th Cir. 1999) ("A plaintiff can establish a[n] FHA discrimination claim under a theory of disparate treatment or disparate impact."); Gamble v. City of Escondido, 104 F.3d 300, 304-05 (9th Cir. 1997) ("We apply Title VII discrimination analysis in examining Fair Housing Act . . . discrimination claims. . . . Thus, a plaintiff can establish an FHA discrimination claim under a theory of disparate treatment . . . or disparate impact . . . ."); Pfaff v. United States Dept. of Hous. & Urban Dev., 88 F.3d 739, 745-46 (9th Cir. 1996) (discussing elements of prima facie case of disparate impact under FHA); Keith v. Volpe, 858 F. 2d 467, 482 (9th Cir. 1988) (upholding order finding defendants liable under FHA on disparate impact theory; "discriminatory effect" sufficient to make prima facie showing); Miller v. American Express Co., 688 F.2d 1235, 1240 (9th Cir. 1982) (finding, in reversing summary judgment for defendant on ECOA claim, that legislative history of ECOA "allows but does not limit proof of credit discrimination to the two traditional Title VII tests for employment discrimination," i.e., disparate treatment and disparate impact).

Defendants argue that the Ninth Circuit has never addressed their particular argument, and that many of the cases recognizing disparate impact claims under the FHA and ECOA pre-date the Supreme Court's Sandoval and Smith decisions. Defendants imply that Sandoval held, for the first time, that disparate impact claims were not actionable under Section 601 of Title VI of the Civil Rights Act, and that this should cast doubt on any pre-Sandoval case in which disparate impact claims were allowed to proceed under any anti-discrimination statute with language similar to that of Section 601. (Defs.' Mem. at 12, 18.) However, Sandoval merely acknowledged that disparate impact claims under Section 601 had been foreclosed in 1978, by the Court's decision in Regents of Univ. of Cal. v. Bakke, 438 U.S. 265 (1978). 532 U.S. at 280. Sandoval itself held only that no private right of action was available to enforce regulations enacted by federal agencies to prohibit disparate impact discrimination under a statute previously held to prohibit only intentional discrimination. 532 U.S. at 278, 293. While some of the relevant Ninth Circuit law on disparate impact claims under the FHA and ECOA may pre-date Sandoval, it does not appreciably pre-date Bakke.

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 07-5540 ABC (SHx) | Date | May 15, 2008 |
|---|---|---|---|
| Title | Alfredo B. Payares v. JP Morgan Chase & Co், et al. | | |

As for <u>Smith</u>, Defendants rely primarily on language taken from a section of the opinion not joined by a majority of the Justices.  (Defs.' Mem. at 13-14 (citing <u>Smith</u>, 544 U.S. at 236-38 (Stevens, J., joined by Souter, Ginsburg, and Breyer, JJ.).)  The one relevant fact clear from those sections of the opinion that are supported by a majority of Justices is that the Age Discrimination in Employment Act ("ADEA") does in fact permit disparate treatment claims.  544 U.S. at 232 (Stevens, J., joined by Souter, Ginsburg, Breyer, and Scalia, JJ.)  Furthermore, the plurality section of the opinion on which Defendants so heavily rely by no means provides unambiguous support for Defendants' position, looking beyond the text of the statute at issue to its purpose and legislative history, and to its implementing regulations.  In no way can <u>Smith</u> be read as holding that an anti-discrimination statute must contain "effects" language like that in the ADEA in order to allow disparate treatment claims.  Nor is this the first Court to read <u>Smith</u> in such a way.  <u>See, e.g.</u>, <u>Garcia v. Countrywide Fin. Corp.</u>, Case No. EDCV 07-1161-VAP (JCRx), Am. Order Granting in Part & Denying in Part Defs.' Mot. to Dismiss, at 9 (C.D. Cal. Jan. 17, 2008); <u>Ramirez v. Greenpoint Mortgage Funding, Inc.</u>, Case No. C08-0369 TEH, Order Denying Mot. to Dismiss, at 5-6 (N.D. Cal. May 13, 2008).

While it is not impossible that the Supreme Court would agree with Defendants' position if faced with the issue of disparate treatment claims in FHA or ECOA cases, it is by no means "clear," as Defendants repeatedly claim, how that Court would rule in such a case.  Lacking such clarity, this Court must follow binding Ninth Circuit precedent allowing disparate impact claims of discrimination to be brought under both the FHA and the ECOA; precedent which, as it happens, appears to be well-reasoned, consistent with Congressional intent, in accord with the law in other circuits, and reflective of good public policy.

Having determined that Plaintiff can assert disparate impact claims under both the FHA and the ECOA, it is clear that Defendants' motion to dismiss must be denied.  Plaintiff has alleged sufficient facts to proceed under either statute.  He has alleged that Defendants have a facially neutral policy (granting discretion to their brokers to mark up the previously calculated risk-related interest rate and impose additional, non-risk-based charges, and encouraging those brokers to steer applicants into loans with higher interest rates), which, as applied, disproportionally causes minority borrowers to pay higher interest rates and more fees than similarly situated non-minority borrowers.  He has alleged that statistics disclosed by lenders to the Federal Reserve Board pursuant to Congressional mandate demonstrate this disparity.  Further, Plaintiff has alleged that he himself was injured by Defendants' policy, when he refinanced his home on less favorable terms than similarly situated non-minority borrowers.  Whether Plaintiff will ever be able to prove any of these allegations remains to be seen.  However, he has provided sufficient detail to provide Defendants with "fair notice" of his claims and the grounds on which they rest, which is enough to survive a motion to dismiss at this stage of the case.  <u>Twombly</u>, 127 S. Ct. at 1964-65.

## B.     "Disparate Treatment" Discrimination

On the other hand, Plaintiff has not alleged sufficient facts to suggest the existence of any intentional discrimination by Defendants.  True, he repeats the words "intentionally discriminated"

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 07-5540 ABC (SHx) | Date | May 15, 2008 |
|---|---|---|---|
| Title | Alfredo B. Payares v. JP Morgan Chase & Co., et al. | | |

several times in his complaint, but the mere recitation of these words does not magically create a disparate treatment claim.  Unlike a plaintiff with a disparate impact claim, a disparate treatment plaintiff must show that the defendants' intent in adopting the challenged policy was deliberately discriminatory.  American Fed'n of State, County, and Municipal Employees, AFL-CIO (AFSCME) v. Washington, 770 F.2d 1401, 1405 (9th Cir. 1985).  It is not enough to show that the defendants were aware of the potential discriminatory impact of the policy.  Id.  The defendants must have chosen the policy at least in part because of its discriminatory impact, not in spite of that impact.  Id.  Of course, the plaintiff does not have to prove such discriminatory intent at the pleading stage, but he must provide something that raises an inference of deliberate discrimination "above the speculative level."  Twombly, 127 S. Ct. at 1964-65.  This the instant plaintiff has not done.  He has provided nothing whatsoever to suggest that Defendants ever deliberately acted to impose less favorable loan terms on minority applicants.  At most, the complaint supports an inference that Defendants may have known their attempts to achieve higher profits by encouraging brokers to steer applicants into loans with higher fees and interest rates may have impacted minority populations more than non-minorities.  This is not sufficient to make out a claim of deliberate discrimination.  Accordingly, Plaintiff's two Civil Rights Act claims, which can only proceed on a disparate treatment theory, must be dismissed.

### CONCLUSION

Therefore, for the reasons set forth above, the Court hereby GRANTS Defendants' motion to dismiss as to Plaintiff's Second and Third Causes of Action, for racial discrimination under 42 U.S.C. sections 1981 and 1982, with leave to amend.  The motion is otherwise DENIED.  Plaintiff shall have 30 days from the date of this order in which to file an amended complaint.

**IT IS SO ORDERED.**

_____ : _____

Initials of Preparer     AB for DA



C Ramirez v. GreenPoint Mortg. Funding, Inc.
N.D.Cal.,2008.
Only the Westlaw citation is currently available.
United States District Court,N.D. California.
Ana RAMIREZ, et al., Plaintiffs,
v.
GREENPOINT MORTGAGE FUNDING, INC.,
Defendant.
**No. C08-0369 TEH.**

May 13, 2008.

*ORDER DENYING MOTION TO DISMISS*

THELTON E. HENDERSON, District Judge.
**\*1** This matter comes before the Court on Defendant GreenPoint Mortgage Funding, Inc.'s ("GreenPoint's") motion to dismiss the first amended complaint. Upon careful consideration of the parties' written submissions, the Court does not find oral argument to be necessary and hereby VACATES the hearing scheduled for May 19, 2008, at 10:00 AM. For the reasons discussed below, the Court now DENIES GreenPoint's motion in its entirety.

**BACKGROUND**

Plaintiffs Ana Ramirez, Ismael Ramirez, and Jorge Salazar bring this action against Defendant GreenPoint on behalf of themselves and all others similarly situated. They seek to represent a class of:

> all minority consumers (the "Class") who obtained a GREENPOINT home mortgage loan in the United States between January 1, 2001 and the date of judgment in this action (the "Class Period"), and who were subject to GREENPOINT's Discretionary Pricing Policy pursuant to which they paid discretionary points, fees or interest rate mark-ups in connection with their loan. For the purposes of this Complaint, the term "minority" is intended to include black and Hispanic consumers.

First Am. Compl. ("FAC") ¶ 77. "Discretionary Pricing Policy" refers to GreenPoint's alleged "policy of authorizing its loan officers, brokers and correspondent lenders to impose subjective,

discretionary charges and interest rate mark-ups that are included in the loans they originate."*Id.* ¶ 79.

The Ramirez Plaintiffs allegedly obtained a GreenPoint mortgage through a broker on August 3, 2005. Plaintiff Salazar allegedly obtained such a mortgage, through a different broker, on August 17, 2006. Both loans are alleged to have included, unbeknownst to Plaintiffs, subjective charges based on GreenPoint's Discretionary Pricing Policy that were greater than non-risk-related charges paid by similarly situated white borrowers.

According to the complaint's allegations, GreenPoint makes home mortgage loans directly to consumers through its local branches as well as through a network of mortgage brokers. Based on the locations of GreenPoint's branches, minority borrowers are alleged to be more likely than white borrowers to apply for mortgages through brokers rather than through GreenPoint directly, and loans obtained through mortgage brokers are alleged to be more expensive, on average, than loans obtained directly from GreenPoint. Loan officers and brokers are alleged to have been GreenPoint's agents "for the purpose of setting credit price, which was always set based on GREENPOINT's policy."*Id.* ¶ 49.

The process of obtaining a loan from GreenPoint allegedly has two distinct components. In the first, GreenPoint "compute[s] a financing rate [often called the 'Par Rate'] through an objective credit analysis that, in general, discern [s] the creditworthiness of the customer."*Id.* ¶¶ 41-43."Although GREENPOINT's initial analysis applied objective criteria to calculate this risk-related Par Rate, GREENPOINT then authorized a subjective component in its credit-pricing system-the Discretionary Pricing Policy-to impose additional non-risk-related charges."*Id.* ¶ 44.These discretionary charges are alleged to have been "paid by the customer as a component of the total finance charge (the 'Contract APR'), without the homeowner knowing that a portion of their Contract APR was a non-risk-related charge."*Id.* ¶ 45.GreenPoint profited from such discretionary mark-ups regardless of whether the loan was obtained from GreenPoint directly or through a mortgage broker.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

**\*2** Plaintiffs allege that GreenPoint's Discretionary Pricing Policy had an adverse disparate impact on minority borrowers because such borrowers paid higher fees and interest rates than white borrowers who posed similar credit risks. GreenPoint is alleged to have "chosen to use a commission-driven, subjective pricing policy that it knows or should have known has a significant and pervasive impact on minority borrowers."*Id.*  ¶ 51.Plaintiffs further allege that "[t]he disparities between the terms of GREENPOINT's transactions involving minority homeowners and the terms involving white homeowners cannot be a product of chance and cannot be explained by factors unrelated to race, but, instead, are the direct causal result of the use of the discriminatory Discretionary Pricing Policy."*Id.*  ¶ 52.

Based on these allegations, Plaintiffs assert two causes of action: violation of the Equal Credit Opportunity Act ("ECOA") and violation of the Fair Housing Act ("FHA"). The ECOA makes it unlawful "for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction-(1) on the basis of race, color, religion, national origin, sex or marital status, or age (provided the applicant has the capacity to contract)." 15 U.S .C. § 1691(a). The FHA makes it unlawful "for any person or other entity whose business includes engaging in residential real estate-related transactions to discriminate against any person in making available such a transaction, or in the terms or conditions of such a transaction, because of race, color, religion, sex, handicap, familial status, or national origin." 42 U.S.C. § 3605.

**LEGAL STANDARD**

Dismissal is appropriate under Federal Rule of Civil Procedure 12(b)(6) when a plaintiff's allegations fail "to state a claim upon which relief can be granted."Fed.R.Civ.P. 12(b)(6). In evaluating the sufficiency of a complaint's allegations, a court must assume the facts alleged in the complaint to be true unless the allegations are controverted by exhibits attached to the complaint, matters subject to judicial notice, or documents necessarily relied on by the complaint and whose authenticity no party questions. *Lee v. City of Los Angeles,* 250 F.3d 668, 688-89 (9th Cir.2001). In addition, a court need not "accept as

true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences."*Sprewell v. Golden State Warriors,* 266 F.3d 979, 988 (9th Cir.2001), *amended on other grounds by*275 F.3d 1187 (9th Cir.2001). A court should not grant dismissal unless the plaintiff has failed to plead "enough facts to state a claim to relief that is plausible on its face."*Bell Atlantic Corp. v. Twombly,* 127 S.Ct. 1955, 1974 (2007). Moreover, dismissal should be with leave to amend unless it is clear that amendment could not possibly cure the complaint's deficiencies.*Steckman v. Hart Brewing, Inc.,* 143 F.3d 1293, 1296 (9th Cir.1998).

**DISCUSSION**

**I. Whether the FHA and ECOA Permit Disparate Impact Claims**

**\*3** GreenPoint first moves to dismiss the complaint on grounds that the FHA and ECOA do not allow disparate impact claims. GreenPoint acknowledges that Ninth Circuit precedent clearly allows such claims. *See, e.g., Harris v. Itzhaki,* 183 F.3d 1043, 1051 (9th Cir.1999) (disparate impact claims allowable under FHA); *Miller v. Am. Express Co.,* 688 F.2d 1235, 1239-40 (9th Cir.1982) (disparate impact claims allowable under ECOA). However, GreenPoint contends that such precedent is no longer good law in light of the Supreme Court's decision in *Smith v. City of Jackson,* 544 U.S. 228 (2005). Although neither party discussed the relevant standard, the Ninth Circuit has held that "where intervening Supreme Court authority is clearly irreconcilable with our prior circuit authority ... a three-judge panel of this court and district courts should consider themselves bound by the intervening higher authority and reject the prior opinion of this court as having been effectively overruled."*Miller v. Gammie,* 335 F.3d 889, 900 (9th Cir.2003) (en banc).

In *Smith,* the Supreme Court ruled that the Age Discrimination in Employment Act ("ADEA") allows for disparate impact claims based on analysis of the statute's text, the governing regulations, the purposes of the act, and the uniform interpretation of the appellate courts. *Smith,* 544 U.S. at 233-40. GreenPoint focuses on the textual analysis under which the Court held that one paragraph of the ADEA allows disparate impact claims because, like Title VII, it provides that an employer may not "limit,

segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or *otherwise adversely affect* his status as an employee, because of such individual's age."29 U.S.C. § 623(a)(2) (emphasis added). By contrast, the Court noted in a footnote that paragraph (a)(1) of the same statute, which prohibits certain actions by an employer "because of such individual's age," does not allow for disparate impact claims. *Smith,* 544 U.S. at 236 n. 6 (quoting 29 U.S.C. § 623(a)(1)). GreenPoint argues that the language of both the FHA and ECOA is more analogous to paragraph (a)(1) than to paragraph (a)(2), and that *Smith* therefore mandates the conclusion that the FHA and ECOA do not permit disparate impact claims.

However, GreenPoint reads *Smith* too broadly, and no court has applied *Smith* to find that disparate impact claims are not cognizable under the FHA or ECOA. To the contrary, numerous courts post-*Smith* have addressed disparate impact claims under these statutes. *E.g., Graoch Associates # 33, L.P. v. Louisville/Jefferson County Metro Human Relations Comm'n,* 508 F.3d 366, 371-74 (6th Cir.2007) (FHA); *Reinhart v. Lincoln County,* 482 F.3d 1225, 1229 (10th Cir.2007) (FHA); *Affordable Housing Dev. Corp. v. City of Fresno,* 433 F.3d 1182, 1194-95 (9th Cir.2006)(FHA); *Zamudio v. HSBC N. Am. Holdings Inc.,* No. 07 C 4315, 2008 WL 517138, at *2 (N.D.Ill. Feb. 20, 2008)* (ECOA and FHA); *Garcia v. Country Wide Financial Corp.,* No. EDCV 07-1161-VAP (JCRx), Am. Order Granting in Part & Denying in Part Defs.' Mot. to Dismiss, at 7-11 (C.D.Cal. Jan. 17, 2008) (attached as Ex. A to moving papers and Ex. 1 to opposition brief; hereinafter "*Garcia* Order") (ECOA and FHA); *Beaulialice v. Fed. Home Loan Mortg. Corp.,* No. 8:04-CV-2316-T-24-EAJ, 2007 WL 744646, at *4 (M.D.Fla. Mar. 6, 2007)* (ECOA and FHA). Although GreenPoint correctly observes that not all of these courts specifically discussed *Smith,* the fact that the courts nonetheless addressed disparate impact claims under the FHA and ECOA indicates that pre-*Smith* precedent allowing such claims has not been overruled.

**\*4** Moreover, at least three district courts have explicitly considered *Smith* and concluded that the case did not bar disparate impact claims under the FHA or ECOA. Having carefully considered the

analysis contained in both *Smith* and those decisions, this Court agrees that *Smith* "did not hold that a statute must contain ... 'effects' language in order to authorize disparate impact claims."*Garcia* Order at 9. Indeed, "[a]lthough the identical language found in the ADEA and Title VII was a basis for comparison in *Smith,* the *Smith* decision does not reach so far as to prohibit disparate-impact claims under other statutes that do not contain this same language; nor does it set forth a new test for determining whether a statute supports disparate-impact claims."*Zamudio,* 2008 WL 517138, at *2;*see also Beaulialice,* 2007 WL 744646, at *4 (concluding that *Smith* does not prohibit disparate impact claims under the FHA or ECOA).

Thus, GreenPoint has not met its burden of demonstrating that *Smith* is "clearly irreconcilable" with Ninth Circuit precedent holding that disparate impact claims are cognizable under the FHA and ECOA. *Miller v. Gammie,* 335 F.3d at 900. Accordingly, the Court DENIES the portion of GreenPoint's motion to dismiss based on this argument.

## II. Whether Plaintiffs Have Adequately Alleged a Disparate Impact Claim

To prevail on a disparate impact claim, a plaintiff must show "a significant disparate impact on a protected class caused by a specific, identified ... practice or selection criterion."*Stout v. Potter,* 276, F.3d 1118, 1121 (9th Cir.2002).[FN1] GreenPoint argues that Plaintiffs have failed to state a disparate impact claim because they have failed to identify a specific policy or practice and also failed to allege a disparate impact on a protected class. The Court addresses each argument in turn below.

> FN1. Although *Stout* was an employment discrimination case, the parties do not dispute that courts look to employment discrimination jurisprudence when interpreting claims under the FHA and ECOA. *E.g., Rosa v. Park W. Bank & Trust Co.,* 214 F.3d 213, 214 (1st Cir.2000) (ECOA); *Gamble v. City of Escondido,* 104 F.3d 300, 304 (9th Cir.1997) (FHA).

### A. Specific Policy or Practice

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

GreenPoint first argues that Plaintiffs have failed to identify a specific policy or practice and that, instead, Plaintiffs "are simply attacking the cumulative effects of pricing by thousands of independent brokers."Mot. at 7. However, Plaintiffs clearly allege that GreenPoint "designed, disseminated, controlled, [and] implemented" the Discretionary Pricing Policy that forms the basis of the allegations in this case. FAC ¶ 50. The policy allegedly allowed GreenPoint's loan officers and brokers to charge additional fees based on subjective criteria rather than objective criteria related to creditworthiness, and GreenPoint "communicated the ... authorized discretionary charges to its loan officers and brokers via regularly published 'rate sheets.' " *Id.* ¶ 44.

The Supreme Court has squarely held that "subjective or discretionary employment practices may be analyzed under the disparate impact approach in appropriate cases."*Watson v. Fort Worth Bank & Trust,* 487 U.S. 977, 991 (1988). Although challenging subjective practices does not relieve a plaintiff from identifying a specific policy or practice that allegedly results in a disparate impact, Plaintiffs have adequately identified a specific policy in the Discretionary Pricing Policy. In doing so, they have singled out the subjective portion of a lending policy that allegedly relies on both subjective and objective criteria, and they need do no more than to meet the "specific policy or practice" requirement for stating a disparate impact claim. As another district court ruled in a case involving similar allegations:

> **\*5** Plaintiff does not challenge the overall process by which Defendants determine borrowers' rates and fees. Instead, Plaintiff challenges only the practice of allowing and incentivizing individual loan originators to assess additional, non-risk-based fees. In the context of a motion to dismiss, this is sufficient to give Defendants 'fair notice of what the plaintiff's claim is and the grounds upon which it rests.'

*Garcia* Order at 15 (citations omitted); *see also Rose v. Wells Fargo & Co.,* 902 F.2d 1417, 1424-25 (9th Cir.1990) (holding that an employer's "policy of committing employment decisions to the subjective discretion of its managers is a specific employment practice subject to a disparate impact analysis").FN2 Accordingly, this Court finds that Plaintiffs have adequately identified a specific policy for purposes of

stating a disparate impact claim.

> FN2. Plaintiffs also find support from similar cases involving auto loans. For example, although the court in *Jones v. Ford Motor Credit Co.* did not address whether plaintiffs had identified a specific policy or practice, it nonetheless concluded that plaintiffs sufficiently stated a disparate impact claim under ECOA based on allegations that defendant had "a policy authorizing car dealers who enter into retail installment contracts [issued by defendant] with customers to subjectively mark-up an otherwise objective risk-based finance charge rate," and that this policy had a discriminatory impact against African-Americans. No. 00 CIV. 8330 (LMM), 2002 WL 88431, at *1, *4 (S.D.N.Y. Jan. 22, 2002).

**B. Disparate Impact on a Protected Class**

The Court also rejects GreenPoint's argument that Plaintiffs have failed to allege a disparate impact on a protected class because they do not allege that minority borrowers were given more unfavorable loans from GreenPoint than similarly situated white borrowers. While it is true that the complaint refers to statistical data from "other mortgage companies that use credit-pricing systems structured like that of GREENPOINT," the complaint also alleges that GreenPoint's Discretionary Pricing Policy "has a disproportionately adverse effect on minority borrowers compared to similarly-situated whites in that minority borrowers pay disparately more discretionary charges (both in frequency and amount) than similarly-situated whites."*Id.* ¶ 48.Plaintiffs further allege that Home Mortgage Disclosure Act ("HMDA") data from the federal government shows that "minorities who borrowed from GREENPOINT between 2004 and 2006 are almost 50% more likely than white borrowers to have received a high-APR loan to purchase or refinance their home," and that, "[w]hile credit differences may explain some part of the disparities in rate and terms, GREENPOINT's Discretionary Pricing Policy accounts for a significant portion of the disparity."*Id.* ¶¶ 35-36.In addition, the complaint alleges that the individually named plaintiffs "were subject to the Defendant's Discretionary Pricing Policy" and "were charged a

Slip Copy                                                                    Page 5
Slip Copy, 2008 WL 2051018 (N.D.Cal.)
**2008 WL 2051018 (N.D.Cal.)**

disproportionately greater amount in non-risk-related credit charges than similarly-situated white persons."*Id.* ¶¶ 63-64, 73-74.Such allegations are sufficient to allege a disparate impact of the Discretionary Pricing Policy on minority borrowers as compared to white borrowers with similar credit risks. Consequently, the Court DENIES GreenPoint's motion to dismiss on grounds that Plaintiffs have failed to allege a disparate impact claim.

### III. Whether the Ramirez Plaintiffs' Claims Are Time-Barred

Finally, GreenPoint argues that the Ramirez Plaintiffs' claims are barred by the two-year statute of limitations under the FHA and ECOA. *See*15 U.S.C. § 1691 e(f) (two-year statute of limitations under ECOA); 42 U.S.C. § 3613(a)(1)(A) (two-year statute of limitations under the FHA). Plaintiffs do not dispute that the complaint was filed more than two years after the Ramirezes allegedly obtained their loan from GreenPoint on August 3, 2005. Instead, Plaintiffs argue that the statute of limitations was tolled by the so-called "discovery rule" under which the limitations period does not begin to run until the plaintiff "knows or has reason to know of the injury which is the basis of his action,"*Cline v. Brusett, 661 F.2d 108, 110 (9th Cir.1981)*; the continuing violation doctrine; and GreenPoint's fraudulent concealment of operative facts. The Court finds Plaintiffs' continuing violation argument to be persuasive and therefore need not and does not reach Plaintiffs' alternate theories for tolling the statute of limitations.[FN3]

> FN3. The Court notes, however, that neither party sufficiently briefed the issue of whether the discovery rule applies to claims under the FHA and ECOA. GreenPoint simply noted in a single sentence *in its reply brief* that at least one court has held that the discovery rule does not apply to ECOA claims. *Archer v. Nissan Motor Acceptance Corp.,* No. Civ. A. 3:03CV906DPJJ, 2007 WL 2580321, at *1-4 (S.D.Miss. Sept. 4, 2007).

**\*6** In *Havens Realty Corporation v. Coleman,* the Supreme Court held that the continuing violation doctrine applied to allegations that a defendant was engaged in a practice of discrimination when it turned down apartment rental applications from African-Americans, and that therefore the statute of limitations under the FHA did not bar claims based on four incidents that occurred outside the limitations period. 455 U.S. 363, 380-81 (1982). The Court explained that a continuing violation of the FHA "should be treated differently from one discrete act of discrimination. Statutes of limitations ... are intended to keep stale claims out of the courts. Where the challenged violation is a continuing one, the staleness concern disappears."*Id.* at 380 (citations omitted). A "wooden" application of a statute of limitations that "ignores the continuing nature of the alleged violation" would only "undermine[ ] the broad remedial intent of Congress embodied in the Act."*Id.* As a result, the Court concluded that where, as in this case, "a plaintiff, pursuant to the Fair Housing Act, challenges not just one incident of conduct violative of the Act, but an unlawful practice that continues into the limitations period, the complaint is timely when it is filed within [the statutory limit] of the last asserted occurrence of that practice."*Id.* at 380-81 (footnote omitted). Thus, the Ramirez Plaintiffs' claims are timely under *Havens.*

The Supreme Court later held that discrete acts of employment discrimination, "such as termination, failure to promote, denial of transfer, or refusal to hire," are not subject to the continuing violation doctrine, but that the continuing violation doctrine does apply to hostile work environment claims because "the entire hostile work environment encompasses a single unlawful employment practice."*Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 113-18 (2002)*. However, *Morgan* was a Title VII case that did not address claims under the FHA or even discuss, let alone modify, the rule established for such claims by *Havens.*In addition, the allegations in this case are, in any event, "more analogous to the hostile work environment claims than discrete discriminatory acts.... The ongoing discrimination plaintiffs allege could only manifest itself after a critical mass of similarly situated people experienced it, so as to bring an over-arching pattern to light."*Davis v. Gen. Motors Acceptance Corp., 406 F.Supp.2d 698, 705-06 (N.D.Miss.2005)* (applying continuing violation doctrine to ECOA claims alleging racially discriminatory mark-ups on auto loans). Although each loan origination could be seen as a separate violation of the FHA and ECOA, this does not mean that the continuing violation doctrine does not apply. As another court in this district

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                                    Page 6
Slip Copy, 2008 WL 2051018 (N.D.Cal.)
**2008 WL 2051018 (N.D.Cal.)**

persuasively explained in a recent case:

> a single incident of "steering" constitutes an actionable violation of the FHA, just as the construction of each complex constitutes an actionable violation of the FHA. That more than one incident of steering occurred only demonstrates a *pattern* of such violations, not that each incident, standing on its own, is not a violation of the FHA. Defendants have offered no intelligible argument as to why the reasoning of *Havens* is not applicable to an alleged pattern or practice of construction-based violations of the FHA.

**\*7** *Nat'l Fair Housing Alliance v. A.G. Spanos Constr., Inc.,* ---F.Supp.2d ----, No. 07-3255 SBA, 2008 WL 927711, at \*6 (N.D.Cal. Apr. 4, 2008).

This Court reaches the same conclusion in this case. GreenPoint has failed to persuade the Court that the continuing violation doctrine as applied in *Havens* does not apply here, and the Court therefore DENIES GreenPoint's motion to dismiss the Ramirez Plaintiffs' claims as time-barred.

**CONCLUSION**

In short, Plaintiffs have adequately alleged a disparate impact claim, and such claims are cognizable under the FHA and ECOA. In addition, the Ramirez Plaintiffs' claims are timely under the continuing violation doctrine. For all of the reasons discussed above, the Court therefore DENIES GreenPoint's motion to dismiss the first amended complaint.

This case is also currently scheduled for a case management conference on May 19, 2008, at 10:00 AM. That conference is hereby rescheduled for the same date at 1:30 PM.

**IT IS SO ORDERED.**

N.D.Cal.,2008.
Ramirez v. GreenPoint Mortg. Funding, Inc.
Slip Copy, 2008 WL 2051018 (N.D.Cal.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

1

2

3    O

4

5

6

7

8           UNITED STATES DISTRICT COURT

9           CENTRAL DISTRICT OF CALIFORNIA

10

11   GABRIEL GARCIA,              )   Case No. EDCV 07-1161-VAP
                                  )   (JCRx)
12                Plaintiff,      )
                                  )   **[Motion filed on November 8,**
13      v.                        )   **2007]**
                                  )
14   COUNTRY WIDE FINANCIAL       )   **ORDER GRANTING IN PART AND**
     CORPORATION and             )   **DENYING IN PART DEFENDANTS'**
15   COUNTRYWIDE HOME LOANS,      )   **MOTION TO DISMISS**
     INC.,                        )
16                                )
                 Defendants.     )
17   _____ )

18

19      Defendants' Motions to Dismiss came before the Court

20   for hearing on January 7, 2007.  After reviewing and

21   considering all papers filed in support of, and in

22   opposition to, the Motion, as well as the arguments

23   advanced by counsel at the hearing, the Court GRANTS IN

24   PART and DENIES IN PART Defendants' Motion to Dismiss.

25

26                      **I. BACKGROUND**

     **A.  Procedural History**
27
        Plaintiff Gabriel Garcia filed a putative class
28
     action Complaint ("Compl.") on September 12, 2007,

1  alleging that Defendants Countrywide Financial

2  Corporation and Countrywide Home Loans, Inc.

3  (collectively, "Defendants") violated and continue to

4  violate (1) the Equal Credit Opportunity Act ("ECOA");

5  (2) the Fair Housing Act ("FHA"); and (3) the Civil

6  Rights Act, 42 U.S.C. §§ 1981 and 1982.

7

8      On November 8, 2007, Defendants filed a Motion to

9  Dismiss ("Mot.") pursuant to Federal Rule of Civil

10 Procedure 12(b)(6).  Plaintiff filed an Opposition

11 ("Opp'n") on December 3, 2007.  On December 10, 2007,

12 Defendants filed a Reply.

13

14     **B.   Plaintiff's Allegations**

15     Nationwide, minority consumers "have less-than-equal

16 access to loans at the best prices and on the best terms

17 that their credit history, income, and other individual

18 financial considerations merit."  (Compl. ¶ 13 (citing

19 Joint Center for Housing Studies, <u>The Dual Mortgage</u>

20 <u>Market: The Persistence of Discrimination in Mortgage</u>

21 <u>Lending</u> (2005).)  Even after controlling for a borrower's

22 gender, income, property location, and loan amount,

23 federally mandated lender disclosures show that Hispanic

24 and black borrowers were 37.5 to 50 per cent more likely

25 to receive a higher-rate home loan than non-Hispanic

26 whites.  (<u>Id.</u>  ¶ 15-16.)

27 ///

28

                              2

1    Defendants represent themselves as "America's #1 home

2    lender" and "America's #1 Lender to Minorities." (Id. ¶

3    19.)  They originate and fund mortgage loans through loan

4    officers, brokers and a network of correspondent lenders

5    (collectively "loan originators").  (Id.)  These loan

6    originators act as Defendants' agents in originating

7    loans.  (Id. ¶¶ 26-27.)

8

9    Defendants encourage and offer incentives to these

10   loan originators to increase interest rates, charge

11   additional fees, and include prepayment penalties and

12   other less favorable terms in loans to certain borrowers.

13   (Id. ¶ 3.)  As a direct result of these policies,

14   minorities receive residential loans with higher interest

15   rates and higher fees and costs than similarly situated

16   non-minority borrowers.  (Id.)

17

18   Specifically, Defendants employ discretionary loan

19   pricing procedures that cause minority borrowers to

20   purchase loans with prepayment penalties and other

21   unfavorable terms, and to pay subjective fees such as

22   yield spread premiums and other mortgage-related finance

23   charges, at higher rates than similarly situated non-

24   minority borrowers.  (Id. ¶ 21.)  Defendants' loan

25   originators receive more compensation when they steer

26   borrowers into loans with these higher interest rates,

27   penalties and fees.  (Id. ¶ 22.)

28

3

1      Moreover, these discretionary charges are unrelated

2  to any objective risk-based credit evaluation.  When a

3  loan applicant provides credit information to Defendants

4  through a loan originator, Defendants perform an initial

5  objective credit analysis, evaluating numerous risk-

6  related credit variables, including debt-to-income

7  ratios, loan-to-value ratios, credit bureau histories,

8  debt ratios, bankruptcies, automobile repossessions,

9  prior foreclosures, payment histories, and credit scores.

10 (Id. ¶ 29.)  From these objective factors, Defendants

11 derive a risk-based financing rate called the "par rate."

12 (Id. ¶ 30.)

13

14     Defendants, however, authorize and offer incentives

15 to their loan originators to charge discretionary, non-

16 risk-based fees in addition to the "par rate," including

17 "yield spread" or "broker premiums."  (Id. ¶ 31.)  This

18 practice causes persons with identical or similar credit

19 scores to pay differing amounts for obtaining credit, and

20 disparately impacts Defendants' minority borrowers.  (Id.

21 ¶ 34.)  Specifically, Defendants' use of yield spread

22 premiums and other discretionary fees disproportionately

23 and adversely affects minorities relative to similarly

24 situated non-minorities.  (Id. ¶ 35.)

25

26     Defendants have intentionally discriminated against

27 minority borrowers through these policies and procedures,

28

4

systematically giving them mortgage loans with less
favorable conditions than were given to similarly
situated non-minority borrowers.  (Id. ¶ 21, 36.)  This
pattern of discrimination is a direct result of
Defendants' mortgage lending policies and procedures,
cannot be justified by business necessity, and could be
avoided by alternative policies and procedures that have
less discriminatory impact and no less business efficacy.
(Id.  ¶¶ 21, 25, 26.)

These discriminatory practices directly damaged
Plaintiff.  (Id. ¶ 37.)  On or about February 27, 2006,
Plaintiff obtained $415,000 in financing from Defendants
to purchase a single-family house.  (Id.)  The loan
originator and Defendants knew that Plaintiff was a
minority borrower, and because of Defendants'
discriminatory practices, Plaintiff received a loan on
worse terms with higher costs than similarly situated
non-minority borrowers.  (Id.  ¶¶ 40-41.)  Specifically,
Plaintiff paid a $8,300 "broker origination fee," a
$1,250 "broker administration fee," a $550 "processing
fee," a $830 yield spread premium, a $150 "loan tie in
fee" and a $995 "underwriting fee." (Id. ¶ 39.)  All of
these fees were assessed pursuant to Defendants' credit
pricing policies.  (Id.)
///
///

5

## II. LEGAL STANDARD

Under Rule 12(b)(6), a party may bring a motion to dismiss for failure to state a claim upon which relief can be granted. As a general matter, the Federal Rules require only that a plaintiff provide "'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." <u>Conley v. Gibson</u>, 355 U.S. 41, 47 (1957) (quoting Fed. R. Civ. P. 8(a)(2)); <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. __, 127 S. Ct. 1955, 1964 (2007). In addition, the Court must accept all material allegations in the complaint -- as well as any reasonable inferences to be drawn from them -- as true. <u>See</u> <u>Doe v. United States</u>, 419 F.3d 1058, 1062 (9th Cir. 2005); <u>ARC Ecology v. U.S. Dep't of Air Force</u>, 411 F.3d 1092, 1096 (9th Cir. 2005).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." <u>Bell Atlantic</u>, 127 S. Ct. at 1964-65 (citations omitted). Rather, the allegations in the complaint "must be enough to raise a right to relief above the speculative level." <u>Id</u>. at 1965.

1    Although the scope of review is limited to the

2   contents of the complaint, the Court may also consider

3   exhibits submitted with the complaint, <u>Hal Roach Studios,</u>

4   <u>Inc. v. Richard Feiner & Co.</u>, 896 F.2d 1542, 1555 n.19

5   (9th Cir. 1990), and "take judicial notice of matters of

6   public record outside the pleadings," <u>Mir v. Little Co.</u>

7   <u>of Mary Hosp.</u>, 844 F.2d 646, 649 (9th Cir. 1988).

8

9                    **III. DISCUSSION**

10    Defendants argue that (1) the FHA and ECOA do not

11   authorize disparate impact claims; (2) Plaintiff fails to

12   state a disparate impact claim; (3) Plaintiff fails to

13   state a claim for intentional discrimination; (4)

14   Plaintiff does not have standing to assert claims on

15   behalf of minority populations of which he is not a

16   member; (5) Plaintiff fails to allege liability on the

17   part of Defendant Countrywide Financial Corporation,

18   Inc.; and (6) Plaintiff's allegations regarding tolling

19   of the statute of limitations should be stricken.  The

20   Court considers each of these arguments in turn.

21

22   **A.   Disparate Impact Under the FHA and ECOA**

23    Plaintiff alleges that Defendants violate the FHA and

24   ECOA, in part, because Defendants' policies have a

25   negative disparate impact on minority borrowers.  The

26   Fair Housing Act, in relevant part, states that "it shall

27   be unlawful":

28

                            7

1               To refuse to sell or rent after the
              making of a bona fide offer, or to refuse
2               to negotiate for the sale or rental of,
              or otherwise make unavailable or deny, a
3               dwelling to any person because of race,
              color, religion, sex, familial status, or
4               national origin.

5 42 U.S.C. § 3604(a).  In the Ninth Circuit, a plaintiff

6 can establish an FHA discrimination claim under a theory

7 of disparate treatment or disparate impact.  Gamble v.

8 City of Escondido, 104 F.3d 300, 304-05 (9th Cir. 1996).

9

10     The ECOA provides, in relevant part, that "[i]t shall

11 be unlawful for any creditor to discriminate against any

12 applicant, with respect to any aspect of a credit

13 transaction . . . on the basis of race, color, religion,

14 national origin, sex or marital status, or age."  15

15 U.S.C. § 1691(a).  A plaintiff can establish an ECOA

16 claim under a theory of disparate treatment or disparate

17 impact.  Miller v. American Exp. Co., 688 F.2d 1235, 1240

18 (9th Cir. 1982).

19

20     Defendant argues that the Ninth Circuit cases

21 recognizing disparate impact claims under FHA and ECOA

22 "were wrongly decided" and "cannot be good law in light

23 of the subsequent Supreme Court decision in Smith v. City

24 of Jackson."  (Mot. at 14 (citing Smith v. City of

25 Jackson, 544 U.S. 228 (2005)).)  In Smith, the Supreme

26 Court held a plaintiff could bring a disparate impact

27 claim under the Age Discrimination in Employment Act

28

("ADEA").  <u>Smith</u>, 544 U.S. at 235-39.  The Court compared
the text of the ADEA to the text of Title VII, and
reasoned that both statutes authorized disparate impact
claims when they prohibited "actions that deprive any
individual of employment opportunities or *otherwise*
*adversely affect* his status as an employee, because of
such individual's race or age."  <u>Id.</u> at 235 (emphasis in
original; citations omitted).

Defendants argue that the FHA and ECOA do not support
disparate impact claims because, unlike the ADEA and
Title VII, they do not contain text expressly prohibiting
actions that "otherwise adversely affect" individuals
based on their protected status.  (Mot. at 15-16.)
<u>Smith</u>, however, did not hold that a statute *must* contain
this "effects" language in order to authorize disparate
impact claims.  Indeed, the Court did not rely only on
this textual analysis of the statutes, but also held that
the purpose and legislative history of the ADEA, as well
as unanimous circuit court treatment of the Act,
supported disparate treatment claims.  <u>Smith</u>, 544 U.S. at
236-39.

Like the Supreme Court in <u>Smith</u>, the Ninth Circuit
relied on the purposes of the ECOA in determining that
Act supports disparate impact claims.  <u>See</u> <u>Miller</u>, 688
F.2d at 1239-40.  It held that "not requiring proof of

1   discriminatory intent is especially appropriate in

2   analysis of ECOA violations because discrimination in

3   credit transactions is more likely to be of the

4   unintentional, rather than the intentional, variety."

5   <u>Id.</u> at 1239 (citations omitted).

6

7       Moreover, all eleven circuits that have considered

8   the matter have concluded that the FHA supports disparate

9   impact claims.  See <u>2922 Sherman Ave. Tenants' Ass'n v.</u>

10  <u>District of Columbia</u>, 444 F3d 673, 679 (D.C. Cir. 2006)

11  (analyzing circuit holdings); Note, <u>The Fair Housing Act</u>

12  <u>and Disparate Impact in Homeowners' Insurance</u>, 104 Mich.

13  L. Rev. 1993, 2006-07 & n.117 (listing cases).

14  Furthermore, in <u>Village of Arlington Heights v.</u>

15  <u>Metropolitan Housing Development Corp.</u>, the Supreme Court

16  affirmed summary judgment against the plaintiffs on all

17  claims requiring discriminatory intent, finding that the

18  plaintiffs had failed to prove such intent, but remanded

19  for consideration of an FHA claim, thus implying that

20  discriminatory intent was not necessary for an FHA claim.

21  <u>Village of Arlington Heights v. Metropolitan Housing</u>

22  <u>Development Corp.</u>, 429 U.S. 252, 270-71 (1977).

23

24      Indeed, the Ninth Circuit has recognized the

25  viability of disparate impact claims under the FHA after

26  <u>Smith</u>.  See <u>Affordable Housing Dev. Corp. v. City of</u>

27  <u>Fresno</u>, 433 F.3d 1182, 1195-96 (9th Cir. 2006) (affirming

28

10

1  a judgment for the defendants but recognizing the

2  viability of such a claim).  The Sixth Circuit similarly

3  has recognized the continuing viability of ECOA disparate

4  impact claims.  See Golden v. City of Columbus, 404 F.3d

5  950, 964-65 (6th Cir. 2005) (same).  Accordingly, this

6  Court declines to hold that Smith overturned Ninth

7  Circuit precedent recognizing disparate impact claims

8  under the FHA and ECOA.

9

10  **B.  Disparate Impact**

11      In analyzing discrimination claims under the FHA,

12  courts have borrowed the analysis that they use in

13  assessing claims under Title VII.  Gamble, 104 F.3d at

14  304.  To establish discrimination through disparate

15  impact, a plaintiff must (1) identify a specific practice

16  of the Defendant; (2) identify a significant

17  discriminatory impact on the protected class of which the

18  plaintiff is a member; and (3) demonstrate that the

19  identified practice causes the identified discriminatory

20  impact.  Paige v. California, 291 F.3d 1141, 1144-45 (9th

21  Cir. 2002); Gamble, 104 F.3d at 304.  The causation

22  requirement may be inferred through statistical evidence

23  showing a sufficiently substantial disparity.  Id.

24

25      **1.  Specific Practice**

26      Defendants argue that Plaintiff fails to challenge a

27  sufficiently specific practice on the part of Defendants.

28

1  (Mot. at 6-10.)  To establish discrimination based on
2  disparate impact, a plaintiff must "isolate[e] and
3  identify[y] the *specific* . . . practices that are
4  allegedly responsible for any observed statistical
5  disparities."  Smith, 544 U.S. at 241 (emphasis in
6  original; citations omitted).  In Smith, plaintiffs
7  challenged a pay plan that granted proportionately
8  greater pay raises to employees with less than five years
9  of tenure, arguing that the plan had a discriminatory
10  impact on older employees.  Id. at 231.  The Supreme
11  Court held that the plaintiffs failed to identify the
12  specific practice being challenged, and that imposing
13  liability for the pay plan in general could "result in
14  employers being potentially liable for the myriad of
15  innocent causes that may lead to statistical imbalances."
16  Id. at 241.  Additionally, the Court stressed that the
17  plaintiffs could not successfully challenge the plan as a
18  whole because it "was based on reasonable factors other
19  than age."  Id.
20
21      The Ninth Circuit similarly has rejected challenges
22  to a defendant's overall processes.  In Stout v. Potter,
23  postal inspectors challenged the process by which a
24  review panel screened applicants for promotion.  Stout v.
25  Potter, 276 F.3d 1118, 1121 (9th Cir. 2002).  The Ninth
26  Circuit held that by merely attacking "the decision-
27  ///
28

                              12

1  making process" or "the process by which the [screening]

2  Panel evaluated applications," the plaintiffs failed

3  toidentify a "specific employment practice or selection

4  criterion."  <u>Id.</u> at 1124.  The court explained,

5          Plaintiffs generally cannot attack an
        overall decisionmaking process in the
6          disparate impact context, but must
        instead identify the particular element
7          or practice within the process that
        causes an adverse impact. A
8          decisionmaking process may be analyzed as
        a single employment practice if the
9          complaining party can demonstrate to the
        court that the elements of a respondent's
10         decisionmaking process are not capable of
        separation for analysis.
11

12  <u>Id.</u>  In <u>Stout</u>, the court did not treat the decision-

13  making process as a single practice because the overall

14  process consisted of discrete elements and the plaintiffs

15  failed to argue that the various elements could not be

16  separated for analysis.  <u>Id.</u> at 1124-25.

17

18      Similarly, the Ninth Circuit has frowned on a

19  challenge to a complex market-based process.  In <u>AFSCME</u>

20  <u>v. State of Wash.</u>, the plaintiffs attacked the state's

21  practice of setting salaries based on biennial studies

22  assessing prevailing market rates for each position.

23  <u>AFSCME v. State of Wash.</u>, 770 F.2d 1401, 1403 (9th Cir.

24  1985.)  The Ninth Circuit held that "the decision to base

25  compensation on the competitive market . . . involves the

26  assessment of a number of complex factors not easily

27  ascertainable, an assessment too multifaceted to be

28  appropriate for disparate impact analysis."  <u>Id.</u> at 1406.

13

1       In contrast, challenges to subjective decision-making
2  practices are more likely to survive initial pleading
3  attacks.   In <u>Watson v. Fort Worth Bank and Trust</u>, the
4  plaintiff challenged her employer's practice of promoting
5  employees based on the "subjective judgment of
6  supervisors who were acquainted with the candidates and
7  with the nature of the jobs to be filled."   <u>Watson v.</u>
8  <u>Fort Worth Bank and Trust</u>, 487 U.S. 977, 982 (1988).   The
9  Court held that "subjective or discretionary employment
10  practices may be analyzed under the disparate impact
11  approach," but did not decide whether the plaintiff had
12  made out a *prima facie* claim for disparate impact
13  discrimination.   <u>Id.</u> at 991, 1000.

14

15       Here, Plaintiff challenges Defendants' practice of
16  authorizing and offering incentives to their loan
17  originators to charge discretionary, non-risk-based fees
18  in addition to the "par rate," including "yield spread"
19  or "broker premiums."   (Compl. ¶ 31.)   Like the practice
20  challenged in <u>Watson</u>, Defendants' practice allows
21  subjective decision-making that is alleged to result in a
22  discriminatory impact.   Unlike the practice challenged in
23  <u>Smith</u>, the challenged decision-making, is *not*, on its
24  face, based on objective factors other than prohibited
25  discrimination.   <u>See</u> <u>Smith</u>, 544 U.S. at 241 (stressing
26  that the challenged plan is based on reasonable factors
27  other than age).

28

                              14

1    Defendants argue that, like the practice challenged

2  in <u>AFSCME</u>, the practice attacked here is merely a "policy

3  of allowing pricing to be responsive to supply and demand

4  and other market forces."  (Mot. at 9 (quotations

5  omitted).)  Plaintiff, however, alleges that Defendants'

6  assessment of fees in addition to the "par rate" is *not*

7  based on market-based factors such as risk or

8  creditworthiness, and indeed is unrelated to legitimate

9  business necessity.  (Compl. ¶ 25, 28-35.)  From this, it

10  is reasonable to infer that the challenged practices do

11  not merely allow pricing to be responsive to market

12  forces.  In the context of a motion to dismiss, the Court

13  takes as true these allegations and reasonable inferences

14  therefrom.  <u>See Doe</u>, 419 F.3d at 1062.

15

16    Finally, unlike in <u>Stout</u>, Plaintiff does not

17  challenge the overall process by which Defendants

18  determine borrowers' rates and fees.  Instead, Plaintiff

19  challenges only the practice of allowing and

20  incentivizing individual loan originators to assess

21  additional, non-risk-based fees.  (Compl. ¶ 31.)  In the

22  context of a  motion to dismiss, this is sufficient to

23  give Defendants "fair notice of what the plaintiff's

24  claim is and the grounds upon which it rests."  <u>See</u>

25  <u>Conley</u>, 355 U.S. at 47; <u>Bell Atlantic</u>, 127 S. Ct. at

26  1964.

27  ///

28

15

1          **2.  Significant Discriminatory Impact**

2          To establish disparate impact discrimination, a

3     plaintiff must demonstrate that there is a significant

4     disparity in outcomes between minorities and similarly

5     situated non-minorities.  <u>See</u>, <u>e.g.</u> <u>Wards Cove</u>, 490 U.S.

6     at 651-53.  Here, Defendants argue that the nationwide

7     statistics cited by Plaintiff "fail[] to allege a

8     disparate impact because the cited data is not specific

9     to Countrywide."  (Mot. at 10.)  As Plaintiff points out,

10    however, he is not required at the pleading stage to

11    produce statistical evidence proving a disparate impact

12    on Defendants' customers -— all that is required is fair

13    notice of the claims and the grounds upon which they

14    rest, sufficient to raise a right to relief above the

15    speculative level.  <u>Bell Atlantic</u>, 127 S. Ct. at 1964-65

16    (citations omitted); <u>see also</u> <u>Swierkeiwicz v. Sorema</u>, 534

17    U.S. 506, 514-15 (2002) (no heightened pleading standard

18    to state a discrimination claim).  Here, Plaintiff does

19    allege that Defendants' minority customers, specifically,

20    pay disproportionately higher fees for mortgages than

21    Defendants' nonminority customers.  (<u>See</u> Compl. ¶¶ 21,

22    22, 24, 35.)  Moreover, he provides statistical evidence

23    of a nationwide disparate impact which, combined with an

24    allegation that Defendants are "America's #1 home

25    lender," is enough to raise above the speculative level

26    Plaintiff's allegation that Defendants' minority buyers

27    ///

28

                              16

1  pay disproportionately high fees.  (<u>See</u> Compl. ¶¶ 13-16,
2  19.)

3

4       Defendants also argue that Plaintiff fails to allege
5  that "the relevant groups of whites and Hispanics are
6  similarly-situated."  (Mot. at 10-11.)  The Complaint,
7  however, does allege that Defendants charge minorities
8  higher fees "even after controlling for borrowers'
9  gender, income, property location, and loan amount."
10 (Compl. ¶ 15.)  Moreover, Plaintiff alleges that
11 Defendants charge minorities higher fees than others with
12 the same "par-rate," a number which takes into account
13 numerous risk-related credit variables, including debt-
14 to-income ratios, loan-to-value ratios, credit bureau
15 histories, debt ratios, bankruptcies, automobile
16 repossessions, prior foreclosures, payment histories, and
17 credit scores.  (<u>Id.</u> ¶ 29.)  Finally, Plaintiff alleges
18 Defendants' use of yield spread premiums and other
19 discretionary fees disproportionately and adversely
20 affects minorities "relative to similarly situated non-
21 minorities."  (<u>Id.</u> ¶ 35.)  Accordingly, Plaintiff has
22 alleged that there is a significant disparate impact on
23 minorities compared to similarly situated non-minorities.
24

25      **3.  Causation**
26      To allege causation, Plaintiff must allege facts
27 sufficient to raise above a speculative level the
28

1  inference that, but for Defendants' challenged policy,

2  minorities would not receive higher-cost loans than

3  similarly situated non-minority borrowers.  See Bell

4  Atlantic, 127 S. Ct. at 1964-65.  Here, Plaintiff alleges

5  that Defendants' policy of allowing and offering

6  incentives to its loan originators to add fees in

7  addition to the "par rate" directly causes minorities to

8  receive home loans with higher interest rates and higher

9  fees and costs.  (Compl. ¶¶ 3, 21, 24, 35, 62, 80.)

10 Defendants argue that these allegations are conclusory

11 and that Plaintiff fails to "allege a set of facts from

12 which causation plausibly can be inferred."  (Mot. at

13 13.)

14

15      Defendants claim that the higher costs imposed on

16 minority borrowers could be explained by such borrowers'

17 lower average credit scores.  (Id.)  This explanation

18 ignores Plaintiff's allegation that Defendants impose the

19 challenged discretionary fees in addition to the "par

20 rate," which is calculated based on a borrower's credit

21 score.  (Compl. ¶¶ 15, 29.)  Indeed, Plaintiff alleges

22 that the higher costs imposed on minority borrowers

23 cannot be explained by any factor other than Defendants'

24 challenged policies.  (Compl. ¶ 15.)  These allegations

25 are sufficient to raise above a speculative level the

26 inference that, but for Defendants' policy of offering

27 incentives for discretionary fees, minorities would not

28

18

1  receive higher-cost loans than similarly situated non-
2  minority borrowers.  Accordingly, Plaintiff has stated a
3  claim for disparate impact discrimination.

4

5  **C.   Disparate Treatment**

6       To show disparate treatment based on race, a
7  plaintiff must establish that the defendant was *motivated*
8  to discriminate against the plaintiff on the basis of
9  race.  See AFSCME, 770 F.2d at 1406-07.  Where a
10 plaintiff challenges a defendant's policy, the plaintiff
11 must establish that the defendant implemented the policy
12 "because of, not merely in spite of," its adverse effects
13 on the protected group.  Personnel Adm'r of Massachusetts
14 v. Feeney, 442 U.S. 256, 279 (1979).

15

16      Here, Plaintiff alleges that Defendants have
17 intentionally discriminated against minority borrowers
18 through their policy of offering incentives for
19 discretionary loan fees, and that Defendants
20 intentionally designed this policy to discriminate
21 against minority borrowers.  (Compl. ¶¶ 21, 36.)
22 Plaintiff maintains that this policy perpetuates past
23 racial discrimination in mortgage lending.  (Id. at 12-
24 18.)

25

26      To state a claim for disparate treatment, Plaintiff
27 must provide more than mere conclusory allegations of

28

1  Defendants' intent to discriminate.  See Bell Atlantic,

2  127 S. Ct. at 1964-65.  Rather, the allegations in the

3  complaint "must be enough to raise a right to relief

4  above the speculative level."  Id. at 1965.  Here,

5  Plaintiff provides no factual allegations regarding

6  intent to discriminate beyond his bare assertion that

7  Defendants "intentionally discriminated" and that

8  Defendants' policy "by design discriminates against

9  minority borrowers."  (Compl. ¶¶ 21, 36.)  These

10  assertions are not enough to raise Plaintiff's right to

11  relief for disparate treatment above the speculative

12  level.  See Bell Atlantic, 127 S. Ct. at 1965.

13  Accordingly, Plaintiff has failed to state a claim for

14  disparate treatment.

15

16  **D.  Standing**

17      To satisfy Article III's standing limitations, a

18  plaintiff must demonstrate that:  (1) he or she has

19  suffered an "'injury in fact' -- an invasion of a legally

20  protected interest which is (a) concrete and

21  particularized, and (b) actual or imminent, not

22  conjectural or hypothetical"; (2) there is a causal

23  connection between the injury and the conduct complained

24  of -- the injury is "fairly traceable" to the challenged

25  action of Defendants, and not the result of the

26  independent action of some third party not before the

27  court; and (3) it is "likely," as opposed to merely

28

20

1  "speculative," that the injury will be redressed by a
2  favorable judicial decision.  <u>Lujan v. Defenders of</u>
3  <u>Wildlife</u>, 504 U.S. 555, 560-561 (1992) (citations
4  omitted).  "In the class action context, Article III
5  standing simply requires that the class representatives
6  satisfy standing individually."  <u>In re Verisign, Inc.</u>,
7  2005 WL 88969, *4 (N.D. Cal. 2005).

8

9       Defendants argue that Plaintiff cannot establish
10  standing to sue on behalf of potential class members of
11  minority groups other than Hispanics.  (Mot. at 19-20.)
12  To establish Article III standing, however, Plaintiff
13  must only show that he has standing to sue on his own
14  behalf.  <u>In re Verisign</u>, 2005 WL at *4.  Whether he may
15  represent the claims of the class is a separate inquiry,
16  governed by Federal Rule of Civil Procedure 23.  <u>Id.</u>
17

18       Defendants do not argue that Plaintiff does not have
19  standing to sue on his own behalf.  Indeed, Plaintiff has
20  alleged he has suffered an actual injury that is fairly
21  traceable to Defendants' acts, and the type of injury he
22  alleges (discriminatory fees) is redressible by a federal
23  court.  (<u>See</u> Compl. ¶¶ 39-41 (alleging that as a result
24  of Defendants' discriminatory credit pricing policies,
25  Plaintiff received a loan on worse terms with higher
26  costs than similarly situated non-minority borrowers).)
27  ///

28

21

1 Accordingly, Plaintiff has established Article III

2 standing.[1]

3

4 **E.   Liability of Defendant Countrywide Financial**

5      **Corporation, Inc.**

6     Plaintiff's Complaint does not distinguish between

7 the two named Defendants.  (Compl. ¶ 1.)  Nonetheless,

8 Defendants argue that Defendant Countrywide Financial

9 Corporation ("CFC") cannot be liable because Plaintiff

10 "states no factual allegations at all as to CFC."  (Mot.

11 at 21.)  The Complaint, however, alleges numerous acts by

12 CFC.  Every allegation of an act by Defendants is an

13 allegation of an act by both CFC and Countrywide Home

14 Loans, Inc.  (See Compl. passim.)  For instance, the

15 Complaint alleges Plaintiff obtained a residential loan

16 from "CONTRYWIDE," which he defines as Countrywide

17 Financial Corporation *and* Countywide Home Loans, Inc.

18 (See Compl. ¶¶ 1, 37-38.)  The Complaint also alleges

19

20 _____

21     [1]At the hearing on this matter, Defendants' counsel
argued that Plaintiff lacks Article III standing to

22 represent minority groups of which he is not a part under
the Ninth Circuit holding in Black Coalition v. Portland

23 School Dist. No. 1.  Black Coalition held that a
plaintiff has no standing to challenge a policy or
procedure which has not adversely affected that

24 individual plaintiff's interests.  Black Coalition v.
Portland School Dist. No. 1., 484 F.2d 1040, 1042-43

25 (1973).  In contrast, Plaintiff here challenges a policy
that he alleges directly and adversely affected him.

26 Moreover, while Black Coalition considered an appeal of a
district court judgment in a class action, here a class

27 has not yet been certified, so the issue of whether
Plaintiff may represent all members of the class is not

28 yet properly before the Court.

1  that Defendants collectively designed, implemented, and

2  oversee the allegedly discriminatory policy of allowing

3  loan officers to add discretionary fees to the

4  objectively determined "par rate."  (Compl. ¶¶ 3, 21-25,

5  29-36.)

6

7      Defendant argues that these allegations are untrue

8  and cannot be proven as to CFC, but for the purposes of a

9  Motion to Dismiss, the Court takes Plaintiff's

10 allegations as true.  <u>Doe</u>, 419 F.3d at 1062.

11 Accordingly, the Court declines to dismiss Defendant CFC.

12

13 **F.   Motion to Strike Allegations re Tolling of the**

14 **     Statute of Limitations**

15     Under Federal Rule of Civil Procedure 12(f), a party

16 may ask the court to strike any "insufficient defense or

17 any redundant, immaterial, impertinent, or scandalous

18 matter."  Fed. R. Civ. Proc. 12(f).  "'Immaterial' matter

19 is that which has no essential or important relationship

20 to the claim for relief or the defenses being pleaded. .

21 . . 'Impertinent' matter consists of statements that do

22 not pertain, and are not necessary, to the issues in

23 question."  <u>Fantasy, Inc. v. Fogerty</u>, 984 F.2d 1524, 1527

24 (9th Cir. 1993), <u>rev'd on other grounds by</u> <u>Fogerty v.</u>

25 <u>Fantasy, Inc.</u>, 510 U.S. 517 (1994).

26 ///

27 ///

28

23

1  "Motions to strike are generally regarded with

2  disfavor because of the limited importance of pleading in

3  federal practice, and because they are often used as a

4  delaying tactic." Cal. Dept. of Toxic Substances Control

5  v. Alco Pacific, Inc., 217 F. Supp. 2d 1028, 1033 (C.D.

6  Cal. 2002). Thus, "courts often require 'a showing of

7  prejudice by the moving party' before granting the

8  requested relief," and "[u]ltimately, whether to grant a

9  motion to strike lies within the sound discretion of the

10  district court." Id. (citing Fantasy, 984 F.2d at 1528).

11  A court should deny "[a] motion to strike under Rule

12  12(f) . . . unless it can be shown that no evidence in

13  support of the allegation would be admissible, or those

14  issues could have no possible bearing on the issues in

15  the litigation." Gay-Straight Alliance Network v.

16  Visalia Unified Sch. Dist., 262 F. Supp. 2d 1088, 1099

17  (E.D. Cal. 2001).

18

19  Defendant moves to strike the allegations in

20  paragraphs 51-58 of the Complaint. (Mot. 21-22.) These

21  paragraphs allege that class members' claims did not

22  accrue until shortly before the filing of the action,

23  that Defendants fraudulently concealed their

24  discriminatory practices, and that Defendants'

25  discriminatory conduct is continuing and recurrent.

26  (Compl. ¶¶ 51-55.) Accordingly, Plaintiff alleges that

27  "[t]he statute of limitations applicable to any claims

28

24

1  that Plaintiff or other class members have brought or

2  could bring as a result of the unlawful and fraudulent

3  concealment and course of conduct described herein, have

4  been tolled."  (Id. ¶ 58.)

5

6      Defendants argue that the allegations in paragraphs

7  51-58 of the Complaint are irrelevant because the named

8  Plaintiff filed his claim within all applicable statutes

9  of limitations.  (Mot. 21-22.)  This argument is

10 premature.  Until the Court has ruled on the issue of

11 class certification, it cannot be shown that the

12 allegations regarding other class members "could have no

13 possible bearing on the issues in the litigation."  See

14 Gay-Straight Alliance Network, 262 F. Supp. 2d at 1099.

15

16     Defendants further argue that the Court should strike

17 Plaintiff's allegations of fraudulent concealment because

18 Plaintiff failed to plead with particularity sufficient

19 facts showing fraudulent conduct.  (Mot. at 22-23.)

20 Indeed, one pleading fraudulent concealment "must plead

21 with particularity the facts which give rise to the

22 claim.  Conerly v. Westinghouse Elec. Corp., 623 F.2d

23 117, 120 (9th Cir. 1980); see also Fed. R. Civ. Proc.

24 9(b).  Here, Plaintiff merely alleges that Defendants

25 "took steps to conceal [their] fraudulent and unfair

26 conduct," but fails to allege what steps were taken, how

27 those steps were intended to mislead Plaintiff and class

28

1  members, or why those steps would lead a reasonable
2  person to be misled into believing that he did not have a
3  claim for relief.  See Conerly, 623 F.2d at 120.  In his
4  Opposition, Plaintiff does not contest that the Complaint
5  fails to plead fraudulent concealment properly.

6

7      Plaintiff has failed to plead fraudulent concealment
8  with sufficient particularity, and Plaintiff's
9  allegations regarding fraudulent concealment are
10  stricken.

11

12      Finally, Defendants argue that Plaintiff's
13  allegations of a continuing violation are insufficient as
14  a matter of law to justify tolling the statute of
15  limitations under the "continuing violation" doctrine.
16  (Mot. at 24-25.)  Defendants cite Ledbetter v. Goodyear
17  Tire & Rubber Co. Inc., which held that the statute of
18  limitations was not tolled when the alleged
19  discriminatory act was a pay decision that occurred
20  before the limitations period, even though the plaintiff
21  continued to receive lower pay during the limitations
22  period.  Ledbetter v. Goodyear Tire & Rubber Co. Inc.,
23  127 S. Ct. 2162, 2166-69 (2007).  The Court held that a
24  limitations period does not recommence "upon the
25  occurrence of subsequent nondiscriminatory acts that
26  entail adverse effects resulting from the past
27  discrimination."  Id. at 2169.

28

26

1    Unlike the plaintiff in <u>Ledbetter</u>, however, Plaintiff
2  here alleges a discriminatory act -— Defendants' sale to
3  him of an allegedly high-cost loan  —- which occurred
4  during the limitations period.  (Compl. ¶ 37.)  Indeed,
5  in an FHA case similar to this one, the Supreme Court
6  tolled the statute of limitations under a "continuing
7  violation" theory.  <u>See</u> <u>Havens Realty Corp. v. Coleman</u>,
8  455 U.S. 363, 380 (1982).  In <u>Havens Realty</u>, the
9  plaintiffs alleged five specific incidents of alleged FHA
10 violations.  <u>Id.</u>  Only one of the incidents, involving
11 only one of the plaintiffs, occurred within the
12 limitations period.  <u>Id.</u>  Nevertheless, the Court tolled
13 the statute as to the other incidents involving the other
14 plaintiff.  <u>Id.</u>  The Court held, "where a plaintiff,
15 pursuant to the Fair Housing Act, challenges not just one
16 incident of conduct violative of the Act, but an unlawful
17 practice that continues into the limitations period, the
18 complaint is timely when it is filed within 180 days of
19 the last asserted occurrence of that practice."  <u>Id.</u> at
20 380-81.

21

22    Here, Plaintiff alleges an occurrence of Defendants'
23 allegedly discriminatory practice within the statute of
24 limitations.  (Compl. ¶ 37.)  Thus, his allegations
25 regarding a "continuing violation" as to other potential
26 class members are not irrelevant, redundant, or
27 scandalous, and are accordingly not stricken.
28

**IV. CONCLUSION**

For the foregoing reasons, the Court GRANTS Defendants' Motion to Dismiss as to Plaintiff's claims of disparate treatment discrimination under the FHA, ECOA, and 42 U.S.C. §§ 1981 and 1982 with leave to amend, DENIES the Motion to Dismiss as to Plaintiff's claims of disparate impact discrimination, and STRIKES the allegations of fraudulent concealment in paragraphs 53, 57, and 58 of the Complaint.

Defendants shall answer or otherwise respond to the Complaint by January 23, 2007.

Dated: <u>January 15, 2008</u>

_____
VIRGINIA A. PHILLIPS
United States District Judge